LAW OFFICES
**MANOLIO & FIRESTONE, PLC**
8686 E. San Alberto Dr., Suite 200
Scottsdale, Arizona 85258
(480) 222-9100
vmanolio@mf-firm.com
Veronica L. Manolio, SBN 020230
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Takeover Industries, Inc., a Nevada corporation,<br><br>      Plaintiff,<br><br>v.<br><br>Michael Holley, *et al.*,<br><br>      Defendants. | Case No. CV-22-00357-PHX-JJT<br><br>**TAKEOVER INDUSTRIES, INC.'S EMERGENCY MOTION FOR INJUNCTIVE RELIEF (INCLUDING APPOINTMENT OF A TEMPORARY RECEIVER) (With Notice)**<br><br>(Hon. John J. Tuchi) |

    Pursuant to Rule 65, FRCP, Plaintiff Takeover Industries, Inc. ("Takeover" or "Company") seeks emergency injunctive relief from this Court because Defendant Michael Holley and Third-Party Defendant Toby McBride staged a complete takeover of the business operations this week. By improperly thrusting themselves into leadership, Takeover's employees are threatening to leave, its primary investor has withheld funding essential to the Company's survival, and Takeover is unable to pay current obligations. These parties have hijacked the Company website, interfering with potential orders/sales.

    Additionally, these Defendants manufactured alleged conflict(s) of interest for undersigned counsel by pretending they are now "in charge" of Takeover. Undersigned counsel is unable to communicate directly with or take direction from these gentlemen, as they are individual Defendants in this lawsuit and represented by other legal counsel.

**Takeover is on the brink of business failure without immediate intervention,** and undersigned counsel needs Court intervention/assistance to ensure that her ethical and professional obligations are not at issue.

For each of these reasons, Takeover respectfully asks for a temporary restraining order and preliminary injunction that:

1. Permits undersigned counsel to continue representing Takeover and the Tucker Defendants in this lawsuit;

2. Appoints a temporary receiver[1] to oversee the business of Takeover, its assets and its affairs; and

3. Enjoins Michael Holley and Toby McBride, and any party acting in concert with them, from interfering with the Company's business and contract relationships during the pendency of this lawsuit.

These requests are meant to protect the **business**, its employees, its shareholders, and shareholders of its parent company (Labor Smart, Inc. or "LTNC") as well as they are meant to ensure that undersigned counsel is acting ethically and professionally.[2]

Undersigned counsel avows that these issues were thoroughly discussed among counsel, and this motion is being filed as a last result and **need** for Court intervention.

This motion is supported by the following Memorandum of Points and Authorities, the court's record to date, and the attached Declarations.

---

[1] The bios of two independent receivers, who have already performed conflict checks and could be ready to immediately step in and help, are attached as part of the Declaration of Counsel (**Exhibit A)**, incorporated by this reference.

[2] In this vein, undersigned counsel candidly discloses that Takeover has placed company funds into undersigned's Trust Account, **solely to be held in Trust for the Company**. This is Takeover's money and has been protected solely in the interest of safeguarding funds until this Court resolves the matters; not one penny has been taken/paid to counsel from these protected funds. *See*, **Exhibit A** at ¶16.

- 2 -

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Mr. Holley, who was removed from the Board of Directors of Takeover last year (based on evidence of mismanagement and misuse of Company funds) and Mr. McBride (who is on administrative leave from Takeover after he **admitted** to spending hundreds of thousands of dollars of Company funds for personal use) collaborated with their legal counsel to conduct a self-serving "Board Meeting" this week to put themselves back in control of Takeover. They used Third-Party Joseph Pavlik in this game, despite that he is represented by undersigned counsel and was advised not to participate in this scheme.

The gentlemen miraculously "terminated" Mr. McBride's administrative leave and reinstated him as the CEO of Takeover, and they voted to reinstate or re-elect Mr. Holley to the Board of Directors, appointing him as CFO. In detailed Recitals and Resolutions, Messrs. Holley and McBride intended to create a conflict of interest between Takeover and Third-Party Defendant Jason Tucker, positioning so that undersigned could no longer represent both parties.

While these Defendants now claim to be in "control" of Takeover, they attempted to give undersigned counsel directives despite that counsel cannot even speak to these represented parties. Counsel cannot continue representing Mr. Pavlik, given his participation. (A Motion to Withdraw is being separately filed.) Counsel cannot legally fulfill obligations to Takeover and cannot ethically proceed until the Court addresses "conflict" questions that have been manufactured.

Since the alleged "Board Meeting," Messrs. Holley and McBride have hijacked the Company website, interfering with online sales/orders necessary to generate income. They have caused Takeover's largest investor, James V. Deppoleto, to notice a "Default" and a demand for payment of Notes that Takeover cannot pay. They caused Takeover a loss of additional funding, making the Company breach obligations to third parties.

Mr. McBride has been notifying Takeover's staff and investors that Jason Tucker has been "fired" and that he (McBride) is in control; he has been commenting online, making false promises about business product and is spreading rumors and innuendo. He has undertaken a widespread effort to professionally defame Mr. Tucker, regardless of the harm being done to Takeover in the process.

Meanwhile, Takeover is on the precipice of fulfilling its largest vendor commitments to date, and it needs additional financing to complete its obligations. These large-scale vendors could allow Takeover to pay its debts and become profitable.

It is in the best interests of the Company to avoid all in-fighting over control and to appoint a **neutral** receiver who can manage the business back to success. Messrs. Holley and McBride were offered this neutral solution but have not agreed to protect the Company. If they are not immediately enjoined, Takeover will fail.

## II. FACTUAL AND PROCEDURAL BACKGROUND

As this Court may remember, this case began with a hearing on injunctive relief in March of this year. At that hearing, it was established that Defendant Michael Holley had been removed from the Board of Directors of Takeover and of its parent company, LTNC, as of last December (2021). Mr. Holley was holding the banking information for Takeover "hostage" and would not allow the Company's active directors access to the company's email and website domain accounts. Relief was granted, and Mr. Holley eventually turned over the requested information (although Takeover was forced to file a Motion to Enforce, and this Court had to order Mr. Holley's cooperation).

Since its inception, the business of Takeover has been run by a Board of Directors. While LTNC is a major shareholder of Takeover, Takeover's operations have always been governed by the Board (not shareholders). Since December 2021, Takeover's Board of Directors has included only Jason Tucker, Toby McBride and Joe Pavlik.

Those gentlemen, with a team of employees and consultants, have continued to run Takeover, in conjunction with Michael Costello, the CEO of LTNC, who is authorized to act for that entity. *See*, Declaration of Michael Costello as **Exhibit B.** Nothing about that workflow process or the governance of Takeover changed after the TRO hearing or while this litigation has been pending. *Id*. Mr. Tucker has continued to act as Takeover's President and Treasurer, and Mr. McBride continued to act as its CFO until recently. *Id*.

Since Mr. Holley was removed from the Boards of both Takeover and LTNC last December, he has remained out of both businesses entirely. He has filed a Counterclaim and Third-Party Complaint disputing his removal(s), but those issues have not yet been adjudicated. Mr. Holley has also attempted to bring a derivative action on behalf of LTNC, but there is a pending motion to dismiss that action. (*See*, Doc. 75)

### A.   Takeover's Growth Actions In Recent Months

Since the parties appeared in Court in March, Takeover's team has been working tirelessly to grow the business and research potential new products. **Exhibit B** at ¶¶4-11. By May, the Company secured an agreement with a major convenience store chains[3] to place its "Gamer Shots" for sale in thousands of convenience stores across the country, and it recently won the Retailers Choice Award™ for the best energy drink in 2022. *Id*.

Takeover also secured a significant amount of investor financing, through a Convertible Note Purchase Agreement with Mr. Deppoleto and a series of secured Notes. *See*, Declaration of James Deppoleto as **Exhibit C** here. The full Board of Directors for Takeover – Jason Tucker, Toby McBride, and Joe Pavlik – along with LTNC's CEO (Michael Costello), acting for LTNC as the Shareholder of Takeover, all signed a Unanimous Written Consent approving and ratifying the Loan Documents. *Id*.

---

[3] The names are intentionally withheld for purposes of protecting business relationships; Takeover is more than willing to provide the Court more details if needed.

These funds were secured primarily for brand expansion and manufacturing of product, but the Notes place Mr. Deppoleto in a secured priority position for all of Takeover's assets, making it essential that they are fulfilled. *Id*. The Loan Documents also give Mr. Deppoleto certain rights and powers, such as the right to approve before any change is made to the Board of Directors, and the Loan Documents prohibit Takeover from removing its acting Officers without Mr. Deppoleto's consent. *Id*.

With the proper financing and backing in place, Takeover recently landed a second national agreement, this time with a large "variety store" chain, and Takeover is set to place its "Gamer Shots" product in nearly **eight thousand stores** across the country. **Exhibit B** at ¶¶4-11. Takeover also recently negotiated to expand its presence in the convenience store chain (mentioned above), increasing by over **five thousand** (5,000) additional stores. These deals are huge for Takeover's success, but the cost of manufacturing product and investing in displays for the placement(s) are major cash outlays on the front-end of the obligations. *Id*. at ¶11-12. Takeover will obviously recoup profits over time, as its product is sold nationwide, but the initial investment is crucial to this profitability.

At this moment, Takeover is obligated to invest roughly $3MM to secure its displays and placements in the variety store(s). *Id*. Takeover also has significant financial obligations due to sponsors in the next 30 days – in the amount of $250,000 and additional product costs in the range of $500,000. *Id*. at ¶13. Mr. Deppoleto had agreed to provide additional financing to ensure that these obligations can be met. *Id*. at ¶14.

### B. Takeover's Discovery Regarding McBride

Despite the excitement and growth of the Company, by September Takeover learned that Director McBride had been spending significant sums of Company funds on personal expenses. *See*, **Exhibit A**. This had been a problem in 2021, and Mr. McBride signed an acknowledgement that he owed Takeover **$243,534.94** for company funds he

used/spent on personal expenses in 2021. *Id*. He agreed to repay that money, and instead he spent at least an additional **$30,000.00** in 2022 for personal expenses, including travel and shopping. *Id*. Counsel for Mr. McBride was contacted on this issue, and the parties held an informal discussion/meeting on September 20th with counsel present. *Id*. During the call, Mr. McBride apologized profusely and admitted to spending Company funds. *Id*. Mr. McBride explained that he had financial difficulties but agreed that he would repay the Company. *Id*.

On September 21, 2022, the Takeover Board of Directors held a Special Meeting. *Id*. The meeting was knowingly recorded, and Mr. McBride repeatedly apologized for lying and for using Company funds. *Id*. The Board (including Mr. McBride, himself) all agreed to a 60-day leave of absence to allow Takeover to investigate the misconduct and to discuss findings. *Id*.; *see also*, Resolution as **Exhibit D**. Mr. McBride agreed to refrain from all business of Takeover and LTNC during leave. *Id*.

Since his leave of absence began, the Company's outside accounting firm has now identified more than **$60,000.00** of charges "under review" for suspected personal spending. **Exhibit A** at ¶19. Takeover plans to seek leave to amend its Complaint to add Mr. McBride as a Defendant for his admitted breach of fiduciary duties. *Id*.[4]

### C. The "Board Meeting" of Messrs. Holley and McBride

Takeover recently began having discussions with Michael Holley about resolving this suit. (Docs. 68, 71) Unbeknownst to Takeover, Mr. Holley and Mr. McBride were also having settlement talks and cooperating with one another. **Exhibit A**. This was only discovered when counsel filed a Stipulation last Friday afternoon and Mr. McBride withdrew his Motion to Disqualify counsel M. Canini. *Id*., citing Doc. 73.

---

[4] A First Amended Complaint will also expand the factual bases for the breach of fiduciary duty claims against Mr. Holley, based on the reasons explained in this Motion.

Also on Friday afternoon, November 4th, after 4:00 p.m., Mr. McBride sent an email "Notice of Special Meeting of the Board of Directors of Labor Smart, Inc." *See*, **Exhibit E**. Under the guise of conducting **LTNC** (Labor Smart) business, Messrs. Holley and McBride set a meeting for 9:00 a.m. on Monday to discuss "the pending litigation," "***Takeover's*** financial records, status and corporate and financial controls," and nominating and electing "a new board of directors of ***Takeover***." *Id*. The Notice was not sent to Michael Costello, although he is Labor Smart's CEO and is to preside over its Board of Director Meetings. The Notice made it abundantly clear that Mr. Holley (a non-Board Member of Takeover) and Mr. McBride (a suspended Board Member of Takeover) were using this tactic to circumvent proper voting requirements.

Undersigned counsel, believing that neither Mr. Canini nor Ms. Reiter would sanction such an action, immediately reached out to them for assistance. *See*, **Exhibit A**.[5] Undersigned asked to confer and discuss next steps, but both counsel insisted that their clients were proceeding with a meeting, and they would be attending. *Id*.

Through a series of emails, Takeover and Mr. Tucker made it clear that they would not attend this improper meeting, but Mr. Canini confirmed it would proceed. *Id*. He recognized that Mr. Pavlik was planning to attend, and **despite knowing Mr. Pavlik is represented by undersigned**,[6] he and Ms. Reiter intended to attend. *Id*. Undersigned asked that the meeting be recorded, but Mr. Canini refused. *Id*.

---

[2] Undersigned was shocked to learn that counsel advised/sanctioned this meeting because it was antithetical to the very pleadings/arguments Mr. Canini has asserted in this case. Mr. Canini recently filed the <u>Verified</u> First Amended Complaint (Doc. 67) on behalf of Mr. Holley, wherein he specifically alleges that "LTNC's Bylaws" do not permit any special meeting without "4 days' written notice." *Id*. at ¶61. It seemed impossible that Mr. Canini would advise his client to ignore his own pleading.

[6] Based on Mr. Pavlik's actions, undersigned will be moving to withdraw as counsel for Pavlik; a client Consent has already been requested.

By 3:00 p.m. on November 8th, Mr. Canini forwarded "Resolutions" from both Labor Smart and Takeover. *See*, **Exhibit F**. In lengthy recitals, obviously written by legal counsel, Messrs. Holley, McBride and Pavlik made the legal conclusion that last year's Board of Directors Meeting for LTNC was improper, and they decided among themselves to disregard the prior Resolutions and insist that Michael Holley is still on the Board for LTNC. *Id*. The gentlemen then pretended that they, as Directors of LTNC, could vote on behalf of all shareholders of LTNC to remove Jason Tucker as a Director of Takeover and to put Michael Holley back onto the Board by these means. *Id*.

After having "removed" Jason Tucker as a Director of Takeover, these gentlemen pretended they had a unanimous consent of "all" Takeover Directors and proceeded to:

1. "Terminate" Mr. McBride's leave of absence for his misuse of funds;
2. Suspend Jason Tucker from his President position;
3. Suspend Melissa Tucker from her positions at Takeover;
4. Reappoint Mr. McBride as Takeover's CEO;
5. Appoint Mr. Pavlik in Mr. Tucker's stead as President;
6. Instruct undersigned counsel to turn over all of Takeover's financial and business information to them. (This "resolution" instructs undersigned counsel to turn over all "communications" with Takeover, ignoring the attorney/client privilege at issue.)

The Recitals listed in this document create obvious (and intentional) conflicts of interest between Takeover and Mr. Tucker, and they contain significant conclusions without proof. Nonetheless, the gentlemen have been sending these accusatory and inflammatory resolutions to third parties, including investors, the bank, and the Company's transfer agent (Clear Trust, LLC). *See*, **Exhibit A**.

After the meeting, Mr. McBride began calling, emailing and sending text messages to employees of Takeover. *See*, **Exhibit B**. He continues misinforming people that he is back "in control" of Takeover and claims that Mr. Tucker is "fired" and

"dishonest" (or words to this effect). Mr. McBride has relayed these same types of messages to Takeover **investors**, making disparaging statements and undermining confidence in the Company. *See*, **Exhibit A.** Mr. McBride made baseless posts online, promising a Takeover product that is unavailable. *Id.*

Additionally, Messrs. McBride and Holley notified Clear Trust, LLC, the independent transfer agent for Takeover and LTNC of "pending officer changes" to both companies. *Id*. Clear Trust has put a "stop" on the accounts and refuses to provide a Certified Shareholder list of current information for Takeover to provide this Court. *Id*.

Finally, and most importantly, the actions of Messrs. McBride and Holley have led to two (2) major issues with Takeover's main investor, James Deppoleto:

1. He has Noticed a "DEFAULT" to Takeover and has demanded payment of all Notes for monies invested in Takeover; and

2. He has withdrawn his offer to make the next investment that is necessary for the survival of the Company if Messrs. McBride and Holley are involved.

*See*, **Exhibit C** (Deppoleto Declaration).

Through his legal counsel, Mr. Deppoleto offered the appointment of a neutral receiver as a way to protect Takeover's assets during any disputes the Directors were having. **Exhibit A**. Mr. Deppoleto also agreed that, if a receiver was appointed, he would make the next investment that is essential to the survival of Takeover. *Id*.; *see also,* **Exhibit C** (Deppoleto Declaration).

Without the next investment of funds, Takeover will not be able to complete its manufacturing of pending orders nor install its needed displays, and it will breach its agreements with both the convenience store chain and the variety store chain. Takeover will not be able to generate profit or recoup the funds necessary to pay on the Notes. Takeover's pledged collateral will be lost, leaving the Company defunct.

/ / /

### III. LAW AND ARGUMENT

To obtain a temporary restraining order or preliminary injunction, a plaintiff must show: 1) its likelihood of success on the merits; 2) its likelihood of irreparable injury in the absence of preliminary relief; 3) a balance of hardships tips in its favor; and 4) that an injunction is in the public interest. *Garcia v. Google, Inc.,* 786 F.3d 733, 740 (9th Cir. 2015) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365 (2008)). In this Ninth Circuit, these factors may be considered on a "sliding scale," whereby the "likelihood" of success can be downgraded to establishing only "serious questions going to the merits" so long as a plaintiff can demonstrate a "balance of hardships that tips sharply toward the plaintiff" and a likelihood of irreparable injury. *See, e.g., Alliance for the Wild Rockies v. Cotrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

**A. Takeover is Likely to Succeed on the Merits of its Claims.**

Using the guise of a **Labor Smart** "Board Meeting," Messrs. Holley and McBride clearly conducted **Takeover** business. *See*, **Exhibit F** (Resolutions).

First and foremost, Mr. McBride had no right to "Notice" a meeting nor to conduct any business for either Takeover or Labor Smart because **he was on administrative leave for misappropriating funds**. *See*, **Exhibits A, D**. His very attempt to usurp his theft makes all of his actions at the "Board Meeting" void.

Next, Takeover and Labor Smart are **separate entities** with varying governance. While Labor Smart is governed by its written Bylaws, Takeover is undisputedly a Nevada entity governed by statutes (no Bylaws have been fully ratified).

*<u>Labor Smart</u>*

Labor Smart's Bylaws require that the CEO shall preside at all meetings of the Board of Directors. *See*, Bylaws attached as **Exhibit G** at Article IV, Section 6 (p. 4). Mr. Costello was not provided Notice and was not permitted to preside over the meeting. *See*, **Exhibits E, F**.

Labor Smart's Bylaws also make it clear that if Labor Smart owns shares in another corporation held in the name of Labor Smart, it is the **CEO** who is authorized to "vote, represent, and exercise" the Labor Smart rights. *See*, **Exhibit G** at Article V, Section 3. **Nothing in the Labor Smart Bylaws allows the Directors to exercise the company's voting power in another entity.** To date, Mr. Costello has been the only person authorized to vote for the Labor Smart-owned shares of Takeover. *Id*.; *see also, e.g.,* **Exhibit A5**.

*<u>Takeover</u>*

Nevada Revised Statute ("N.R.S.") 78.335 requires a "vote of the stockholders representing not less than two thirds of the voting power of the issued and outstanding stock entitled to vote" in order to remove a Director. In this instance, **Labor Smart – the entity –** is the largest stockholder of Takeover. Acting as Labor Smart Directors, Messrs. Holley and McBride unilaterally gave themselves the right to "exercise the vote of the shares" of Labor Smart without authority. *See*, **Exhibit F**.

Labor Smart's Bylaws are clear that this voting authority was vested in the CEO, unless the Board delegates that responsibility to another "officer." *See*, **Exhibit G** at Article V, Section 3. The Resolutions are clear that no delegation was done; no change was made on record removing the voting authority from Mr. Costello. *See*, **Exhibit F**. There is no record that an "officer" exercised the vote, and the Board of Directors is not authorized in any manner to vote Labor Smart's shares. *Id. all.*

Takeover is likely to succeed in proving that the actions of Messrs. Holley and McBride were intentional and violated both Labor Smart's Bylaws and the written Resolution (agreement) binding on Mr. McBride. It is likely to succeed in proving that these actions were taken as a tactical advantage, not done for any benefit to Takeover. It will also be able to demonstrate how these "voting" actions caused complete upheaval (and potential destruction) of the Takeover business as a whole.

Takeover will succeed in showing that Mr. Holley disregarded Takeover by voting to oust its President without any knowledge of Takeover's current contracts, business, or its financial obligations. He voted to "terminate" Mr. McBride's leave of absence, even with knowledge that Mr. McBride had used Company funds for his personal gain. Mr. Holley has cooperated in ensuring that Takeover's Clear Trust (share transfer) accounts are frozen and that its website has been taken offline.

Takeover will also likely succeed in demonstrating Mr. Holley's bad faith actions in circumventing the litigation process. He filed claims in this suit to determine that his prior Board removal was improper, yet he and his legal counsel took it upon themselves to make that legal decision themselves and adjudicate the removal issue. Mr. Holley also has a pending "derivative" action on behalf of Labor Smart, claiming that a demand on Labor Smart would be futile. By "resolving" that he is and always has remained a Director of Labor Smart, his derivative pleading fails on its face.

Takeover will succeed in showing that Mr. McBride breached his fiduciary duties as a Director and Officer of Takeover when he **admittedly** charged nearly $300,000 of personal expenses on company credit cards without approval. He breached his duties again when he "terminated" his own leave of absence, imposed on him for good cause. Mr. McBride breached his duties by conducting "Board Meeting(s)" while he was on leave of absence and under an agreement to abstain from Takeover business. He has breached his fiduciary duties by contacting investors and spreading false information, particularly when Takeover has significant contracts hanging in the balance. He has breached duties by acting to "freeze" the Company's Clear Trust account, taking down its website, outright lying to investors, and otherwise harming Takeover's business functions and its reputation.

Collectively, Takeover is highly likely to succeed in proving that these gentlemen have acted with a total and willful disregard of the detriment being caused to Takeover.

### B. Takeover will Suffer Irreparable Injury in the Absence of Relief.

Takeover, though trying its hardest to grow and flourish, is **still** in its infancy. Takeover has only been properly functioning this year, and once it was finally able to control the Director spending of Messrs. Holley and McBride. Takeover has concentrated on securing financing and growing its footprint. While the Company is now poised to succeed on its two largest vendor deals (and finally become profitable), losing the financing to complete these deals will leave every asset of Takeover subject to foreclosure. Unless these actions are stopped immediately and a receiver is appointed, Takeover is bound to fail quickly.

### C. The Balance of Hardships Tips Squarely in Favor of Takeover.

The balance of hardships tips firmly in favor of Takeover. The Company's entire existence remains on the line, as it is poised for growth but in a position of weakness by having had to leverage itself to create future profitability. If its financing is not funded and its contracts are not fulfilled, Takeover will not succeed.

Even if Takeover could somehow succeed past paying the current outstanding obligations, if it is not permitted to manage its communications with investors, customers, vendors, business partners and employees, and/or if Mr. McBride is permitted to continue disseminating false information and defamatory claims, the Company will lose trust and reputation. It will fail in that way as well.

On the other hand, neither Mr. Holley nor Mr. McBride will suffer hardship from protecting the Company/its assets. Mr. Holley has been out of Takeover for a year now, and Mr. McBride has been removed from the Company since September (on admin leave). Keeping these gentlemen out of the active business during litigation will not change anything. Both are still shareholders of Labor Smart, and when/if Takeover is profitable, they seek to financially gain. There is no hardship to them that cannot be remedied with money.

### D. An Injunction is in the Public Interest.

The public interest favors allowing corporations to lawfully operate without "in-fighting" that impedes contracts and employees. It is in the public interest to encourage disgruntled businesspersons to deal with their disagreements in a legal forum rather than permitting business interference as a tactic.

The public would benefit from a strong message that harmful corporate shenanigans are disfavored.

### E. A Nominal Additional Bond Should be Set.

The conduct Takeover seeks to restrain will not cause harm or damages to Messrs. Holley or McBride. Neither will lose income or shares/stock in either entity by an injunction. Neither will be harmed by refraining from destroying Takeover business. In fact, by placing a receiver in charge, the injunction will <u>protect</u> both gentlemen's investment in the company, as it will be permitted to succeed.

The Court is permitted to "dispense with the filing of a bond" if it can conclude that there is no realistic likelihood of harm from issuing the injunction. *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir.). This Court should be able to conclude that neither Mr. Holley nor Mr. McBride are likely to be harmed in this instance. But even if that conclusion cannot be reached, it is important to note that Takeover posted a $10,000.00 Bond as security when the prior TRO was entered. Although that TRO has long since expired, the Bond/Security remains in place. If the Court believes that additional security be posted, Takeover respectfully asks that an additional amount be nominal because the current bond is likely to cover any damages or costs that could be tied to injunctive relief.

## IV. CONCLUSION

For the foregoing reasons, and as supported by the Declarations and Exhibits, Takeover requests that this Court enter injunctive relief on an expedited basis.

1  DATED this 10th day of November, 2022.

**MANOLIO & FIRESTONE, PLC**

By: /s/ Veronica L. Manolio
   Veronica L. Manolio
   8686 E. San Alberto Dr., Suite 200
   Scottsdale, Arizona 85258
   *Attorneys for Plaintiff*