LAW OFFICES
**MANOLIO & FIRESTONE, PLC**
8686 E. San Alberto Dr., Suite 200
Scottsdale, Arizona  85258
(480) 222-9100
vmanolio@mf-firm.com
Veronica L. Manolio, SBN 020230
*Attorneys for Tucker Defendants, Counterclaimants,*
*       And Third-Party Claimants*

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Labor Smart, Inc.<br><br>                              Plaintiff,<br><br>v.<br><br>Jason and Melissa Tucker,<br><br>                              Defendants.<br>And related Counterclaims<br> and Third-Party Claims. | Case No. 2:22-cv-00357-PHX-JJT<br><br>**DEFENDANT TUCKERS'**<br>**ANSWER,**<br>**COUNTERCLAIMS, AND**<br>**THIRD-PARTY CLAIMS**<br><br>(Before the Honorable J. Tuchi) |

## ANSWER [1,2]

Defendants Jason and Melissa Tucker hereby answer the Amended claims against them (Doc. 67) by affirming, denying and alleging as follows:

---

[1]   This Answer is filed after the Court ruled that Labor Smart, Inc. ("LTNC") is substituted as the sole Plaintiff and that the Tuckers shall be deemed Defendants rather than Third-Party Defendants. (Doc. 129.)  Similarly, the Court removed Michael Holley as a derivative Plaintiff in order to allow LTNC to proceed.  *Id*.  Moreover, this Answer is filed after the Court ruled that Count I of the operative complaint (Doc. 67) has been dismissed.  (Doc. 140.)  For these reasons, the Tucker address all allegations of Doc. 67 but identify certain issues/claims as "moot" based on the Court's prior rulings.

[2]  The operative complaint (Doc. 67) contains multiple allegations by/references to Takeover Industries, Inc. ("Takeover").  While the Tuckers acknowledge that Takeover is no longer a party, it files a Third-Party Complaint bringing Takeover back into this suit and, thus, several allegations related to Takeover remain addressed rather than deemed "moot."  This is not a mistake; Takeover and its history are intentionally addressed.

# THE PARTIES

1.    With regard to Paragraph 1, Michael Holley is no longer a derivative plaintiff, making this allegation moot.

2.    With regard to Paragraph 2, the Tuckers admit that LTNC was originally formed in Nevada on or about May 31, 2011.  The Tuckers deny the remainder of the allegations contained in Paragraph 2 and affirmatively states that LTNC is a **<u>Nevada</u>** entity with the following identifying information:

> Entity Name:LABOR SMART INC
> Entity Number:E0308252011-7
> Entity Type:Domestic Corporation (78)
> Entity Status:Active
> Formation Date:05/31/2011
> NV Business ID:NV20111363274
> Termination Date: Perpetual
> Annual Report Due Date:5/31/2022

3.    With regard to Paragraph 3, Takeover Industries ("Takeover") is no longer a Plaintiff and, therefore, the allegation is moot.  Without regard to mootness, however, the Tuckers admit that Takeover was formed in Nevada in January 2021 and deny that Takeover was "moved" without proper authorization.

4.    With regard to Paragraph 4, the Tuckers admit that LTNC became the sole shareholder of Takeover.  The Tuckers deny that the terms and conditions of that purchase are adequately reflected in this Paragraph and, therefore, deny the remainder.

5.    The Tuckers admit McBride's domicile as alleged in Paragraph 5.

6.    With regard to Paragraph 6, the Tuckers deny domicile in Mexico and admit they have resumed full-time status as citizens of the United States.

7.    The Tuckers admit Pavlik's domicile as alleged in Paragraph 7.

8.    With regard to Paragraph 8, the Tuckers admit that Takeover, Pavlik, McBride, and the Tuckers have all agreed to personal jurisdiction by this Court.  There

is no legal basis for any of these parties to deny personal jurisdiction here, regardless whether the Tuckers agree to the bas(es) stated in Paragraph 8.

9.     The Tuckers deny the collusive efforts of LTNC, Holley, McBride, Pavlik, and Takeover as asserted in Paragraph 9.

10.     The Tuckers admit the allegations in Paragraph 10.

11.     With regard to Paragraph 11, the Tuckers are without sufficient information to affirm or deny Holley and McBride's "original intent" and, thus, deny that allegation. The Tuckers admit that Takeover was a subchapter s corporation.

12.     The Tuckers deny the facts, the interpretation, and the implications contained in Paragraphs 12.

13.     The Tuckers deny Paragraph 13 in its entirety.

14.     With regard to Paragraph 14, the Tuckers admit that Holley and McBride originally agreed to compensate themselves in the amount of $240,000 from Takeover, but the Tuckers expressly deny the remainder of the Paragraph and affirmatively state that the compensation structure changed when Pavlik and Tucker became involved. The Tuckers further affirm that the Company was "nascent" and could not afford to pay each Holley and McBride $20,000 per month as a base salary.

15.     The Tuckers deny the facts, the interpretation, and the implications contained in Paragraph 15.

16.     With regard to Paragraph 16, the Tuckers deny that payments made to Holley and McBride (and their LLC) were duly authorized and denies that Takeover's books were properly kept by Holley when that was his job/role in the Company. The Tuckers admit that Holley paid himself at least $352,000, but there were multiple other payments he made to himself and for his benefit that are not included in this figure. The Tuckers further affirm that investigation determined McBride's role in the improper use of funds, and it was discovered (and admitted by McBride) that he abused Takeover

funds for his personal use.  McBride even agreed to his suspension based on the fact that he spent more than $200,000 of Takeover funds for his personal use.

17.     With regard to Paragraphs 17-25, the Tuckers admit that Takeover was originally formed in Nevada, moved to Wyoming, and has since reinstated its domicile in Nevada.  The Tuckers deny any wrongdoing regarding Takeover and its domicile, and they expressly incorporate this Court's ruling that no claim can be stated against them for any alleged wrongdoing for domicile.  (Doc. 140.)

18.     The Tuckers admit the allegations in Paragraph 26.

19.     With regard to Paragraph 27, the Tuckers admit that LTNC cites one term of the Stock Purchase Agreement.

20.     With regard to Paragraph 28, the Tuckers admit that the allegation reflects one term of the Stock Purchase Agreement.

21.     With regard to Paragraphs 29-30, the Tuckers admit the allegations so far as they reflect citation to LTNC's public records, but the Tuckers deny the remaining allegations in these Paragraphs, including the applicability of the voting power to this lawsuit or the Counterclaims.  Moreover, the Tuckers affirmatively state that Holley, McBride and Pavlik (improperly acting for LTNC) have "pledged," "sold," "traded," or otherwise compromised multitudes of LTNC shares in order to resolve their wrongdoing, and these men continue to mislead the voting members of LTNC and/or common stockholders of LTNC.

22.     The Tuckers admit that the allegations in Paragraphs 31-32 are true, but they expressly deny that LTNC (or Holley, McBride and Pavlik) have followed the correct allocation of Series A Preferred Share voting (to oust Mr. Tucker/his shares).

23.     The Tuckers admit the allegations of Paragraph 33.

24.     The Tuckers admit the allegations of Paragraph 34.

25.     The Tuckers admit the allegations of Paragraph 35.

- 4 -

26.     With regard to Paragraph 36, the Tuckers admit that Tucker was originally a consultant rendering services to Takeover but deny that Tucker "did not accept his appointment to Takeover's board and the role of President until November 2021."

27.     With regard to Paragraph 37, the Tuckers believe that these are terms contained in the Agreement that is referenced, but they are without sufficient information to admit or deny the full scope and realm of the Agreement.  The Tuckers admit that Holley testified in early proceedings in this case that he (on behalf of Takeover) accepted $500,000 to sell LTNC (Labor Smart) "actually nothing."

28.     The Tuckers admit the allegations of Paragraph 38 but affirmatively state that the current board of directors of LTNC is unknown; Holley, McBride and Pavlik have sold, pledged, traded, "settled" with, and/or otherwise clouded the LTNC shares and board of directors' positions so much that they are unaware of the current directorship(s).

29.     With regard to Paragraph 39, the Tuckers deny that compensation was modified in November 2021 and, instead, point to the parties' written agreement that was agreed to in **July 2021** and formalized by signatures in August 2021 that the monthly payments, draws and/or salary of Messrs. Holley, McBride, Pavlik and Tucker would be "equal to each other…."  The Tuckers further state that Tucker was routinely unpaid for his work, which he continued to accrue for the sole benefit of Takeover (and for which compensation remains due/owed to him).[3]

30.     The Tuckers admit the allegations of Paragraphs 40-41.

31.     The Tuckers deny the allegations contained in Paragraphs 42-48.

32.     The Tuckers deny the allegations contained in Paragraph 49 and affirmatively state that neither Takeover nor LTNC is a Wyoming entity controlled by "the Wyoming Act."

---

[3] *See*, Counterclaim and Third-Party Claims, *infra*.

- 5 -

33.    With regard to Paragraphs 50-51, the Tuckers deny the allegations and implications and affirmatively defends that the actions taken were done properly and in accordance with the relevant (Nevada) state law and the Bylaws of LTNC; the Tuckers deny any and all violations of the business judgment rule(s).

34.    With regard to Paragraph 52, the Tuckers deny that Jason Tucker denied any business judgment rule(s) and also denies harassment, improper actions, and/or corporate waste; any and all failures to exercise business judgment and/or corporate waste (or improper action) was taken by the Holley, McBride and Pavlik collusion effort.

35.    With regard to Paragraphs 53-54, the Tuckers deny any improper conduct and/or grossly negligent actions or omissions by Jason Tucker; the Tuckers deny the applicability of Wyoming law to this matter.  The Tuckers deny that this is now a derivative claim (making certain allegations in these paragraphs moot) but admit that any wrongdoing, collusion, or lack of business judgment in Takeover was committed by the Holley, McBride and Pavlik collusion effort.

## THIRD-PARTY CLAIM I

36.    Paragraphs 55-71 state a Third-Party Claim that has now been dismissed. Therefore, there is no reason to answer these allegations as they are deemed moot.

## THIRD-PARTY CLAIM II

37.    Paragraph 72 is an incorporation paragraph, and the Tuckers incorporate all prior responses as if set forth here verbatim.

38.    The Tuckers admit the allegations in Paragraph 73.

39.    With regard to Paragraph 74, the Tuckers deny that Jason Tucker directed Mr. Sequeira to pay him "personally."  Rather, Mr. Tucker directed Mr. Sequeira to pay a separate business entity because Mr. Holley was hospitalized and unable to make financial transactions for Takeover; Mr. Tucker ensured that the funds were made solely for use by Takeover and its business, and evidence proves Takeover's use of the funds.

40.     With regard to Paragraphs 75-80, the Tuckers deny that any amount of funds was taken/used personally; all funds were used for Takeover business, and the Tuckers have provided Takeover and LTNC uncontroverted proof that the full amount paid by Mr. Sequeira was used solely for Takeover's benefit.  The Tuckers also deny any and all damages or losses to Takeover (and fail to see how this claim survives as a claim by Labor Smart, since Takeover is no longer a plaintiff).

### THIRD-PARTY CLAIM III

41.     With regard to Paragraph 81 the Tuckers incorporate all prior responses.

42.     With regard to Paragraph 82, the Tuckers deny that they have (or ever took) any amount of funds tendered by Mr. Sequeira in an exchange for LTNC shares.  The funds were, at all times, used for the business of Takeover and have been fully accounted for on the books of Takeover (with proper stock/share references made in LTNC).

43.     With regard to Paragraphs 83-84, the Tuckers deny a failure to deliver funds, deny a "written demand," and deny causing any damages to LTNC.

### THIRD-PARTY CLAIM IV

44.     With regard to Paragraph 85, the Tuckers incorporate all prior responses as if set forth here verbatim.

45.     Paragraph 86 should be rendered moot as it is a contribution claim by Holley, who is no longer a plaintiff (derivative or otherwise).  However, based on the Tuckers' affirmative claims, *infra*, they agree that Holley should be held liable with McBride and Pavlik for all of their collective actions, errors, and omissions to Takeover.

46.     With regard to Paragraphs 87-88, the Tuckers agree that Holley, McBride (and Pavlik when/where proven) should all be jointly liable for their actions in (over)paying themselves with funds of Takeover (which harmed LTNC), paying a separate entity (One Elite Sports) with funds that belonged to Takeover (and which harmed LTNC), and for other damages they caused.

47.     With regard to Paragraph 89, the Tuckers deny that Holley is entitled to any judgment, as he is no longer a plaintiff here.   The Tuckers admit that Holley, McBride, and Pavlik caused damages to Takeover and LTNC, and each of them should each be held accountable for his proportionate share of damages caused.

## COUNTERCLAIMS

48.     The Counterclaims previously filed by Takeover have all been dismissed, making Paragraphs 90-110 moot.

## AFFIRMATIVE DEFENSES

1.     The Tuckers affirmatively defend on (at least) the following grounds:

   a.   Each of the claims against them fail to state a legal basis on which relief can be granted against them and in favor of LTNC as a matter of law;

   b.   Each of the claims against them has been brought in bad faith, absent a proper Rule 11 inquiry and/or a full analysis of available evidence, entitling the Tuckers to damages for loss(es);

   c.   The contract and/or quasi-contract claims are barred by first breach(es);

   d.   Without admitting that the Tuckers have any liability, to the extent they may, any payment(s) due to LTNC are subject to setoff or recoupment by the Tuckers for sums owed to them;

   e.   Jason Tucker, at all times, relied on the proper business judgment rule(s);

   f.   Any and all actions taken by Mr. Tucker were authorized, lawful and/or ratified by the Board of Directors and/or Officers of LTNC;

   g.   Any and all alleged damages to LTNC were caused, in part or whole, by the negligence and/or misconduct and/or breach of duties by Holley, McBride, and Pavlik, requiring a reduction in any liability to LTNC;

   h.   LTNC has failed to mitigate damages; and

   i.   To the extent LTNC seeks equitable relief, such claims are barred by the unclean hands of the LTNC Board of Directors.

2.     The Tuckers expressly reserve the right to file an Amendment and/or to seek additional affirmative defenses that may be discovered in the course of litigation.

/ / /

/ / /

- 8 -

**PRAYER FOR RELIEF**

WHEREFORE, the Tuckers having fully answered the claims against them, hereby respectfully request judgment as follows:

    a.    That the claims be dismissed, with prejudice, and that LTNC take nothing;

    b.    That the Tuckers be granted damages in an amount to be proven at trial, both by their affirmative defenses of offset and/or recoupment and by any affirmative claims as set forth below;

    c.    That the Tuckers be awarded their reasonable attorneys' fees and costs incurred in this matter (including, but not limited to, for having succeeded on the Motion to Dismiss Claim I after a proper Rule 11 letter was sent); and

    d.    That the Court award other such relief as it deems just and proper.

**<u>COUNTERCLAIM AND THIRD-PARTY COMPLAINT</u>**

The Tuckers hereby assert their Counterclaims and file Third-Party Claims by alleging as follows:

**THE PARTIES**

1.    Counterclaimants and Third-Party Claimants Jason and Melissa Tucker ("the Tuckers") are a married couple and citizens of the United States.

2.    Counter-Defendant Labor Smart, Inc. ("LTNC") is a Nevada corporation in good standing and has been previously registered in both Georgia and Wyoming. LTNC is governed by written Bylaws that govern its business.

3.    Third-Party Defendant Takeover Industries, Inc. ("Takeover") is a Nevada corporation in good standing.

4.    Third-Party Defendant Next Gen Beverages, LLC ("Next Gen") is a Wyoming limited liability company in good standing.

5.     Third-Party Defendants Michael Holley and Chirine Holley are a married couple and are residents of this jurisdiction.

6.     Third-Party Defendant Toby McBride is an unmarried man and, upon information and belief, a resident of California.

7.     Third-Party Defendant Joseph Pavlik is an unmarried man and, upon information and belief, a resident of Ohio.

8.     Third-Party Defendants Thomas ("Tom") Zarro and Kimberly Zarro are a married couple and residents of Nevada.

9.     To the extent that any individual Third-Party is married, it is alleged that each actor took the actions for the benefit of and on behalf of his marital community, making the marital communit(ies) liable for such wrongdoing.  Accordingly, Third-Party Defendants Chirine Holley and Kimberly Zarro are named in their capacity as spouses of the wrongdoers; neither Mrs. Holley nor Mrs. Zarro is alleged to have independently committed wrongdoing that gives rise to this cause of action.

10.     The Tuckers are informed and believe that each of the individual Third-Party Defendants took actions as agent(s), employee(s), and/or representatives of LTNC and/or Takeover and/or Next Gen.  In taking such actions, each individual was acting within the course and scope of the agency, employment, and/or representation with knowledge, acquiescence, and/or ratification by each and every other Defendant for the acts taken.

**JURISDICTION AND VENUE**

11.     Jurisdiction was originally stated in this matter under 28 U.S.C. §1332 as the controversy originally arose between citizens of different states and an amount in controversy exceeding $75,000.  Moreover, the venue was stated as proper in this District under 28 U.S.C. §1391 because a substantial part of the events and omissions giving rise to the claims occurred in this District.

12.     Throughout various pleadings in this case (with a long and sordid history), most of the Third-Party Defendants (including Takeover, Holley, McBride, and Pavlik) have appeared and consented to personal jurisdiction.  Personal jurisdiction continues to be proper over these individuals, both because they have already consented to be in this Court and have asked for various forms of relief from this Court.  Subject matter jurisdiction remains appropriate as the claims are all ancillary to the original claims that give rise to jurisdiction here.

13.     For Third-Party Defendants Next Gen and Zarro, jurisdiction is appropriate because each of these parties purposefully and intentionally inserted itself/themselves into this dispute, knowing this litigation was pending and attempting to settle/change the course of this litigation.  These parties used means and instrumentalities of interstate commerce, including but not limited to: interstate telephone communications; interstate electronic communications; and interstate transactions between federally insured banking institution(s), knowingly and intentionally aimed at dealings in this District.

**GENERAL AND FACTUAL ALLEGATIONS**

***History of Takeover and Labor Smart***

14.     Holley touts himself as a sales professional specializing in the sports and nutraceutical fields.  He claims to have been involved in several companies that have developed or promoted sports beverages and related products.  Holley claims to have experience in management, accounting, and corporate structuring.

15.     In early 2021, Holley and colleague Toby McBride (who claims to be an established beverage industry veteran) put together a company and brand based upon performance water products and energy drinks.  The products were to be marketed under the brand NXT LVL.

16.     Holley and Mr. McBride incorporated in Nevada as Takeover Industries but wished to operate as a publicly-traded company.  Thus, Holley negotiated a deal where

he "sold" Takeover to Labor Smart, a publicly-traded entity, trading on the OTC Markets under the symbol LTNC.  As Holley has testified in this matter, he sold LTNC "actually nothing," but he accepted $500,000 nonetheless.

17.     After LTNC acquired Takeover, Holley was named a Director of LTNC and became the Chief Operating Officer and Treasurer of Takeover, while also sitting on the Board of Directors of Takeover.  McBride was also named as a Director of Takeover and a Director of LTNC.

18.     Holley and McBride then commenced working with Joseph Pavlik, a well-known nutrition advocate, and they placed him as an Officer of Takeover, an Officer of LTNC, and he sat on the Board of Directors for Takeover.

19.     Holley, McBride, and Pavlik quickly put together a brand that developed an industry buzz.  The flagship products were "NXT LVL" hydrogen-infused water and an energy shot purportedly developed by Pavlik.

20.     Shortly thereafter, Takeover began to work with Jason Tucker, a branding and business consultant with expertise in licensing, leveraging intellectual property, Internet sales, marketing, and finance.  Tucker saw the potential of Takeover and put his efforts into moving the company forward on all fronts.

21.     Because of Tucker's extensive work, knowledge and experience, Holley, McBride, and Pavlik recognized his ability to help grow Takeover.  Thus, these men offered Tucker an ownership/shareholder interest in Takeover.

22.     On June 10, 2021, the Directors of Takeover (which included Holley, McBride and Pavlik) held a "Special Meeting"[4] in Arizona and specifically resolved:

    a. The Company (Takeover) would have four Directors: Holley, McBride, Pavlik, and Tucker.

---

[4] At the time of this meeting, McBride, Holley and Pavlik were the only Directors of LTNC and Takeover.  Thus, this was a unanimous decision of all of the then-Directors.

    b.  Tucker would be appointed as the President of Takeover, while Holley would remain its Treasurer and be appointed as both the Chief Operating Officer and Chief Financial Officer;

    c.  McBride would act as Takeover's Chief Executive Officer and Secretary; and

    d.  The parties would cooperate to fulfill all paperwork requirements necessary to complete these elections and appointments.

23.    With Tucker acting as President of Takeover, its success (and that of LTNC) was remarkable. Tucker assisted Takeover in securing an endorsement deal with boxing legend Manny Pacquiao and his Manny Pacquiao Foundation, and then he negotiated and secured endorsement deals with Grammy Award-winning artist and professional gamer "T-Pain," and other notables including MMA Champions, NFL players, and various celebrities.

24.    Tucker ensured that Takeover's online store was active, updating its presence and hiring outside help to do marketing and strategic work. Through those efforts, the NXT LVL beverage product line (which includes hydrogen-infused water products and 2 oz. "Gamer Shots") grew to be among the highest rated beverage products for their respective categories on Amazon.com. The Takeover online store continued to generate substantial sales.

25.    Under Tucker's direction, Takeover also:

    a.  Secured retail commitments to place its products on the shelves of over 10,000 stores in 2022;

    b.  Entered into exclusive manufacturing deals to source its products;

    c.  Entered into substantial endorsement deals to promote its products; and

    d.  Takeover retained experts in beverage sales, marketing, and an established public relations firm to further promote the NXT LVL products.

26.     It is fair to say Takeover had become very successful within its first year.

27.     In early August 2021, Holley, McBride, Pavlik and Tucker had put together a "Takeover – LTNC Agreement" to memorialize the discussions and agreements they made during the June 2021 Board Meeting.  This document (hereafter "the July 2021 Agreement") was discussed thoroughly in a Special Meeting of the Board of Directors.

28.     On <u>August 6, 2021</u>, Holley, McBride, Pavlik and Tucker held their second Board of Directors Meeting and executed a Resolution that approved the July 2021 Agreement in its entirety, explicitly making it retroactive to July 1, 2021, and a fully-executed copy of the July 2021 Agreement was attached to the Resolution for clarity. The Resolution further specified that the decisions made were unanimous.

29.     In turn, the July 2021 Agreement specified the following terms:

a.  Holley, McBride, Pavlik, and Tucker were each to receive 25% of the shares in Takeover;

b.  Pavlik and Tucker were each to be named as Directors of Takeover;

c.  Holley, McBride, Pavlik, and Tucker were each entitled to receive monthly payments, draws and/or salary equal to each other;

d.  Holley, McBride, and Pavlik collectively held 51 Preferred Shares (17 shares each) in LTNC, which amounts equaled 51% of the voting rights in LTNC;

e.  12 of the Preferred Shares were to be released to Tucker when LTNC received a "current" status from OTC Markets or another market, such as NASDAQ, NYSE, or an equivalent;

f.  In addition, when LTNC received a "current" status, Tucker was to receive 750M common shares of LTNC valued at the same rate as McBride's shares;

g.  None of the parties' LTNC shares could be diluted without "collective" agreement;

h.  Further changes to the Agreement had to be in writing; and

i.  The Agreement was governed by Arizona state law.

30.     Holley, McBride, Pavlik, and Tucker proceeded with business as usual.

31.     On <u>September 20, 2021</u>, Tucker and Pavlik entered a written "Preferred Stock Purchase Agreement" (hereafter "Pavlik Stock Agreement") wherein Pavlik agreed to sell his 17 shares of Series A preferred stock in LTNC and 1,850,000,000 of his common shares in LTNC to Tucker for the price of five thousand dollars ($5,000.00).  The Pavlik Stock Agreement was fully executed by October 13, 2021, and by October 29, 2021, Pavlik confirmed to the escrow entity (Clear Trust, LLC) his receipt of payment/satisfaction by Tucker for the Pavlik Stock Agreement.

32.     By October 2021, under President Tucker's lead, Takeover attended the National Advancing Convenience Store ("NACS") industry trade show, and Takeover's NXT LVL Hydrogen Water was awarded the CSP Best New Beverage Product (beating Smartwater+, a Coca-Cola® product, and other brands).

33.     Tucker was made to temper the excitement/attitudes of Holley, McBride, and Pavlik, reminding them that the four principals could not distribute profits unnecessarily (and could not do so unless distributions were made evenly and with unanimous consent).  Tucker's goal was to continue growing Takeover and its brands.

34.     Simultaneously, Tucker ensured that Takeover was updating the books and accounting of its parent company, LTNC.  LTNC had been subjected to speculation among OTC "day traders" – who often buy and sell large volumes of penny stocks in short periods of time – because of the spike/growth in Takeover.  This obviously affected LTNC's pricing and value, which Tucker wanted to fix.

35.     Despite efforts to bring the LTNC books current, it became apparent that Takeover would need to "spin off" from LTNC and operate under its own stock ticker. Tucker began to oversee the spinoff process, and he (for Takeover) sourced the services of third-party Accounting and Legal professionals who specialized in this type of business transaction.

36.     In September and October 2021, vendors began expressing frustrations to Tucker (and others) about Takeover's late payment(s) or non-payments of outstanding invoices/commitments.

37.     By October 2021, Defendant Holley became ill with COVID-19 and was hospitalized.

38.     Tucker and McBride requested that Defendant Holley provide access to the Takeover bank account(s) so that the bills could be paid/outstanding issues could be resolved.

39.     Until that time, Holley was the only Takeover officer/director with access to the bank account(s) of Takeover.  An outside bookkeeper (Mr. Eisenberg) could view the accounts/statements, but only Holley could manage funds and access money.

40.     Holley denied any other Takeover officers/directors to have direct access. Holley instructed Eisenberg to "share information" with the others but not to grant access or control, despite Holley's hospitalization and incapacity.

41.     During this same time frame (last quarter of 2021), Tucker negotiated a deal where a third party (Luis Sequeira) wished to do a "Private Placement" of LTNC shares.  Mr. Sequeira was expressly told by Tucker about Holley's hospitalization and that Tucker needed to have the funds placed in a non-Takeover account so that Tucker could use the funds for paying Takeover debt while Holley remained hospitalized and incapacitated.

42.     Sequeira agreed, and the original amount ($75,000) was paid into a non-Takeover entity on or about November 2, 2021.

43.     By November 5, 2021, $25,000 of the funds were transferred into Takeover's bank account to ensure payment for liabilities that would be automatically debited from Takeover.

44.     By November 18, 2021, Tucker ensured that $10,000 of the funds were used to pay the law firm VGC LLP – a legitimate business expense of Takeover to provide an Accounting for Takeover's books and records.

45.     By November 22, 2021, Tucker ensured that $25,000 of the funds were used to pay Nappy Boy Entertainment (T-Pain) for a contractual obligation owed by Takeover.

46.     On November 24, 2021, Tucker transferred the remaining $15,000 of the funds back into Takeover's bank account to ensure repayment of the full $75,000.

47.     Despite Tucker's efforts to protect Takeover and LTNC, Takeover's outside Accounting firm provided an initial review that showed significant wrongdoing and mismanagement of funds.   General Counsel was then involved, and legal and accounting professionals found multiple instances of malfeasance.  As examples:

    a.  Holley had been making significant distributions to himself without any authorization, ignoring that all four Directors (Holley, McBride, Pavlik, and Tucker) were to be paid the same amounts monthly;

    b.  Holley was paying his daughter a salary from Takeover funds;

    c.  Holley authorized over $750,000 in distributions without obtaining Board Approval.   Some of those distributions *may* have been acceptable, but they were done clandestinely and with less than full Board Approval;

    d.  Distributions were not made evenly, as the owners had agreed;

    e.  Holley distributed $51,500 to One Elite Sports, LLC, an entity that is controlled/owned by Holley and McBride;

    f.  Holley failed to enter debts/income into the accounting records;

    g.  Third parties were paid without any invoices or documentation;

    h.  Vendors and third-party sponsorship partners were not paid; and

    i.  Distributions authorized by Holley were not properly taxed or reported for tax accounting purposes.

48.     In December, the Board of Directors conducted a "Special Meeting" and voted to remove Holley from the Board and to allow Tucker to remove Holley from Takeover's bank account and gain access.   Once Holley was removed, Takeover's "full access" to the records showed additional discrepancies and misdealing, including: a) Holley had charged tens of thousands of dollars in personal expenses to Takeover, and additional expenses even after he was hospitalized; and b) Holley was allowing his family to make personal purchases through Takeover while he was hospitalized.

49.     By December 2021, Takeover's legal counsel made a demand to Holley for repayment of the improper amounts he took from the company.

50.     By January 2022, Takeover was forced to file suit (in California) to seek an injunction against Holley and to recover Takeover's rights and property.

51.     By March 2022, Takeover was forced to dismiss the California suit and refile in this jurisdiction to avoid further fighting over the correct jurisdiction/venue.

***History of this Lawsuit and Current Stance(s)***

52.     This lawsuit was originally filed by Takeover in early 2022, attempting to recover funds from Holley for his significant wrongdoing/misappropriation of Takeover funds and mismanagement of LTNC.   This Court granted Takeover an injunction, making Holley cooperate to stop harming Takeover unnecessarily.

53.     By September 2022, Takeover discovered that McBride had been spending significant sums of Takeover funds on personal expenses.   This had been a problem in 2021, but McBride signed an acknowledgement that he owed Takeover more than $243,000 for company funds he used/spent on personal expenses in 2021.   While agreeing to repay Takeover, Tucker discovered at least an additional $30,000 taken by McBride in 2022.

54.     On or about September 20, 2022, McBride apologized profusely, admitting to spending Takeover funds, and promising to repay the Company.

55.     On <u>September 21, 2022</u>, McBride attended a Takeover Board of Directors meeting that was knowingly recorded, and McBride again apologized for lying and for taking company funds for his personal use.

56.     During the September 21, 2022 Board Meeting, all Takeover Directors (including McBride, himself) agreed that McBride would be placed on a 60-day leave of absence to allow Takeover to investigate the misconduct and discuss findings.

57.     McBride readily agreed to refrain from all Takeover and LTNC business during his 60-day leave.

58.     Worse, and more importantly, Tucker discovered that Holley, McBride, (and likely Pavlik) committed wrongdoing by over-pledging the shares of Takeover.

59.     Preliminary evidence demonstrated that Holley and McBride sold, conveyed, offered, and/or committed 210% of Takeover's interest.  While Holley had "sold" to LTNC (and Takeover owns/votes 800M shares of LTNC's common stock), Holley, McBride, and Pavlik likewise conveyed 10% of Takeover to another party and also pledged/committed 25% each to Holley, McBride, Pavlik, and Tucker.

60.     Tucker did not know (and had no reason to know) that Holley, McBride, and Pavlik had over-pledged Takeover at the time he became involved in the entity.

61.     By November 2022, Holley, McBride, and Pavlik all colluded (along with the help of legal counsel, Matthew Canini for Holley and Jennifer Reiter for McBride) to stage a "takeover" of Takeover.  Upon information and belief, this collusive effort was made because Holley, McBride, and Pavlik all knew that strong evidence existed to show their ongoing schemes and dishonesty in Takeover and LTNC business.

62.     On or about November 7, 2022, Holley (who was not a Director or Officer of Takeover at that time), McBride (who was on administrative leave from Takeover) and Pavlik (a collusive member of the group) all held a "Special Meeting of the Board of Directors of Labor Smart, Inc."

63.     Under the guise of conducting LTNC business, Holley, McBride, Pavlik, and legal counsel all discussed the "pending litigation" (this lawsuit), Takeover's financial records, and electing "a new board of directors of Takeover."

64.     Counsel for Holley (Canini) and McBride (Reiter) refused to record the meeting, despite requests from the Tuckers' counsel.

65.     On November 8, 2022, Canini forwarded alleged "Resolutions" from both LTNC and Takeover, verifying that Holley, McBride, and Pavlik each decided to:

a.   "Terminate" McBride's leave of absence, despite his theft from Takeover;

b.   Suspend Jason Tucker as President of Takeover;

c.   Reappoint McBride as Takeover's CEO;

d.   Appoint Pavlik in Tucker's stead as President of Takeover.

66.     After the November 2022 Meeting, McBride began calling, emailing and sending text messages to employees of Takeover, making false, defamatory and misleading statements about Tucker.

67.     McBride made a series of similar (mis)statements about Tucker and his wife, Melissa Tucker, to Takeover and LTNC **investors**.

68.     McBride even sat for an hour-plus video conference with LTNC shareholders that consistently defamed Tucker and/or placed him in a false light.  The video was streamed via You Tube and made public, which has now been viewed by hundreds (if not thousands) of people.

69.     After improperly removing Tucker from Takeover and "freezing" him out of LTNC, Holley, McBride, and Pavlik continued collusive efforts with third-party Thomas ("Tom") Zarro to revamp Takeover and LTNC.

70.     On or about December 2, 2022, Takeover was sued in Nevada by an investor, James Deppoleto, Jr., in *James V. Deppoleto, Jr. v. Takeover Industries, Inc.*, Case No. 22-CV-02013-GMN-VCF (the "Nevada Lawsuit").

71.     Upon information and belief, the Nevada Lawsuit remains pending, and any and all issues between Takeover and its loans remain subject to that lawsuit.

72.     By January 2023, Holley, McBride, and Pavlik were each sued personally in Florida by investors claiming that they had a long-term scheme to defraud investors into LTNC.  *See*, Case No. 23-CV-60023-RS in the Southern District of Florida (the "Florida Lawsuit" herein).

73.     Upon information and belief, Holley, McBride, Pavlik, and Zarro (among others) negotiated the Florida Lawsuit into a Settlement Agreement by pledging LTNC preferred and common shares that are owned by Tucker.  These men negotiated on behalf of Takeover and LTNC as one "Company," disregarding formalities.

74.     Upon information and belief, Holley, McBride, Pavlik and Zarro (among others) colluded to "strip" Takeover of all of its rights/assets/liabilities, disregarding this ongoing lawsuit and the Nevada Lawsuit and start a new/competing entity, Next Gen, to carry on the identical business that Takeover conducted.

75.     LTNC, along with the Third-Party Defendants, has conducted LTNC business throughout 2023-2024 without any regard to Tucker or the 17 Preferred Shares of LTNC owned by Tucker (and/or business entities that he owns).

76.     Third-Party Defendants, including Zarro and Next Gen, have purposefully and repeatedly inserted themselves into this legal matter.  By way of example, both before the "settlement" of the Florida Lawsuit and after, Tom Zarro has attempted to strongarm the Tuckers into resolving this lawsuit.  Zarro (and others) have threatened the Tuckers with the loss of common shares and Preferred Shares of LTNC rightfully owned by them and/or their business entities.

77.     Within the past 120 days (approximately), both LTNC and all of the Third-Party Defendants worked collectively to attempt to hold a "restriction" on the LTNC stock controlled by the Tuckers to ensure that they could not trade/sell the shares.

78.     Specifically, Pavlik provided the LTNC Transfer Agent (Clear Trust, LLC) with false representations and claiming he never sold his common and Preferred Shares in LTNC to Tucker.  Upon information and belief, this was done with the assistance of the Third-Party Defendants and LTNC/its Board of Directors.

79.     The collective actions of LTNC and the Third-Party Defendants have caused the Tuckers significant financial damages in amounts to be proven at trial.

**COUNTERCLAIM I**
**Breach of Contract**

**Against Labor Smart/LTNC**

80.     The Tuckers incorporate the foregoing paragraphs as if fully repeated here.

81.     LTNC is subject to written Bylaws that govern its business endeavors, including the rights and procedures applicable to Shareholders and Directors.

82.     By taking the actions described above, including holding an improper "Special Meeting," removing Tucker from his LTNC positions, and depriving Tucker from voting the 17 Series A Preferred Shares he owned to conduct LTNC business, LTNC has breached the Bylaws.

83.     Additionally, LTNC is a party to the July 2021 Agreement, signed by all of the Board of Directors of LTNC and promising Tucker 12 Preferred Shares (4 from each Holley, McBride, and Pavlik) and 750M common shares once LTNC received a "current" status from OTC markets.

84.     Although LTNC has received "current" status on the OTC markets, and despite that the Tuckers made demand for the Preferred and Common Shares owed by Holley and McBride,[5] LTNC has refused to honor the July 2021 Agreement.

---

[5] Tucker acknowledges that he already purchased all of Pavlik's Preferred Shares under the Pavlik Stock Agreement, so only the Holley and McBride Preferred Shares need to be provided to abide by the July 2021 Agreement.

1       85.    LTNC's actions have caused the Tuckers financial damages in an amount

2   to be proven at trial but, in no event, less than the jurisdictional minimum of this Court.

3   

**COUNTERCLAIM II**

4   **Aiding and Abetting Tortious Misconduct**

5   **Against Labor Smart/LTNC**

6       86.    The Tuckers incorporate the foregoing paragraphs as if fully repeated here.

7       87.    As fully described above, LTNC knew of the relationships and contracts

8   with Tucker, including but not limited to:  Tucker's standing as a Director of LTNC, the

9   July 2021 Agreement, the Pavlik Stock Agreement, and various grants of common stock

10   to the Tuckers and/or their business entities.

11       88.    LTNC was fully aware of the relationship between Takeover and LTNC

12   (and that Takeover's Board of Directors previously managed Takeover, while Takeover

13   ostensibly managed the affairs of LTNC).

14       89.    Through the actions described in this Complaint, LTNC knowingly and

15   intentionally assisted, encouraged, participated, or caused the Third-Party Defendants to:

16   a) breach various fiduciary duties owed to Tucker; b) breach various agreements with

17   Tucker, both written and implied; c) interfere with Tucker's voting and financial rights

18   in Takeover and LTNC; d) deprive Tucker of payment(s) owed to him by Takeover; e)

19   interfere with the Tuckers' shares/ability to sell shares of LTNC stock.

20       90.    Moreover, LTNC has substantially participated and assisted Takeover in

21   shutting down its business, reopening under Next Gen, in an effort to avoid liabilities

22   owed by Takeover to Jason Tucker (i.e., assisting Takeover in committing a fraudulent

23   transfer or avoidance).

24       91.    LTNC's actions have caused significant damages to the Tuckers in an

25   amount to be proven at trial but, in no event, less than the jurisdictional limit set for this

26   Court.

### THIRD-PARTY CLAIM I
### Breach of Fiduciary Duties

**Against Holley, McBride, and Pavlik**

92.    The Tuckers incorporate the foregoing paragraphs as if fully repeated here.

93.    Holley, McBride, and Pavlik were each Officers and Directors of LTNC and Takeover when the relationship began with Tucker.  Pursuant to Nevada law (where both entities were domiciled at all relevant times), these Third-Party Defendants owed Tucker fiduciary duties of care and loyalty, as he was a shareholder in each entity. Moreover, Tucker was entitled to receive the duties of loyalty owed to Takeover and LTNC as he remained an Officer and Director of Takeover and a Director of LTNC.

94.    Third-Party Defendants Holley, McBride, and Pavlik each breached their fiduciary duties by taking the actions described in this Complaint, including but not limited to:  a) using/misusing Takeover funds for personal use; b) hiding corporate waste; c) misleading Tucker about the over-pledging of Takeover share ownership before he joined Takeover; d) improperly staging a "takeover" of Takeover; e) failing to pay Tucker funds/salary he had earned while working for Takeover; f) freezing Tucker out of LTNC management decisions and voting of his LTNC Preferred Shares;  and g) thwarting Tucker's ability to sell/transfer his stock by manufacturing a "restriction."

95.    The actions of Holley, McBride, and Pavlik have caused significant damages to the Tuckers in an amount to be proven at trial but, in no event, less than the jurisdictional limit set for this Court.

### THIRD-PARTY CLAIM II
### Breach of Contract

**Against Holley, McBride, and Pavlik**

96.    The Tuckers incorporate the foregoing paragraphs as if fully repeated here.

97.    Holley, McBride, and Pavlik each entered the July 2021 Agreement,

- 24 -

promising Tucker an ownership of 25% of the Shares of Takeover and promising Tucker that he would receive "monthly payments, draws and/or salary" equal to the amounts paid to Holley and McBride.

98. Holley, McBride, and Pavlik breached the July 2021 Agreement by failing to provide Tucker "equal" payments and, instead, authorizing that Holley and McBride would receive exponentially more each month than Tucker while Holley and McBride hid charges from and payments to themselves from Tucker.

99. The July 2021 Agreement further obligated Holley, McBride and Pavlik to give Tucker 12 Preferred Shares (4 from each Holley, McBride, and Pavlik) and 750M common shares once LTNC received a "current" status from OTC markets.

100. Although LTNC has received "current" status on the OTC markets, and despite that the Tuckers made demand for the Preferred Shares owned by Holley and McBride and the 750M common shares, each Holley, McBride, and Pavlik have ignored the July 2021 Agreement and have refused to ensure that Tucker receive his promised shares.

101. The actions of Holley, McBride, and Pavlik have caused significant damages to the Tuckers in an amount to be proven at trial but, in no event, less than the jurisdictional limit set for this Court.

**THIRD-PARTY CLAIM III**
**Breach of the Covenant of Good Faith and Fair Dealing**

**Against Holley, McBride, and Pavlik**

102. The Tuckers incorporate the foregoing paragraphs as if fully repeated here.

103. Holley, McBride, and Pavlik each entered the July 2021 Agreement with Tucker, agreeing that the contract would be governed by Arizona law.

104. Every contract in Arizona, including the July 2021 Agreement, contains an implied covenant to act in good faith and fair dealing that extends beyond the written

- 25 -

words of the parties' contract(s).  This implied duty of good faith requires that neither party do anything to impair the rights of the other, denying benefits of a party's bargain.

105.    By taking the actions described in this Complaint, Holley, McBride, and Pavlik breached the implied covenant of good faith and fair dealing in multiple ways.

106.    Holley, McBride, and Pavlik exercised their contractual power beyond the risks that Tucker assumed when he entered the July 2021 Agreement, and Tucker did not anticipate (nor could he have anticipated) the actions that would be taken by Holley, McBride, and Pavlik at the time he entered the July 2021 Agreement.

107.    The actions of Holley, McBride, and Pavlik have caused significant damages to the Tuckers in an amount to be proven at trial but, in no event, less than the jurisdictional limit set for this Court.

### THIRD-PARTY CLAIM III
### Aiding and Abetting Tortious Misconduct

#### Against Zarro and Next Gen

108.    The Tuckers incorporate the foregoing paragraphs as if fully repeated here.

109.    As fully described above, both Zarro and Next Gen knew of the relationships and contracts with Tucker, including but not limited to:  Tucker's position as an Officer and Director of Takeover, Tucker's position as a Director of LTNC, the July 2021 Agreement, the Pavlik Stock Agreement, and various grants of common stock to the Tuckers and/or their business entities.

110.    Zarro and Next Gen were each fully aware of the relationship between Takeover and LTNC (and that Takeover's Board of Directors previously managed Takeover, while Takeover ostensibly managed the affairs of LTNC).

111.    Through the actions described in this Complaint, Zarro and Next Gen have been instrumental and have substantially participated and encouraged Takeover, LTNC, Holley, McBride, and Pavlik to commit multiple wrongdoings, including but not limited

to:  a) controvert the liabilities owed by Takeover to Tucker (and to others) by simply "shutting down" that business and opening Next Gen in its stead; b) commit various breaches of fiduciary duties owed to Tucker; c) avoid payments owed/due to Tucker and/or his business entities; d) interfere with Tucker's voting and financial rights in Takeover and LTNC; and e) interfere with the Tuckers' shares/ability to sell shares of LTNC stock.

112.   Zarro, personally, has substantially participated and assisted the Third-Party Defendants in continued wrongdoing by attempting to strongarm the Tuckers into resolving this lawsuit, making threats if they did not comply.

113.   The actions taken by Zarro and Next Gen have caused damages to the Tuckers in an amount to be proven at trial but, in no event, less than the jurisdictional limit set for this Court.

### THIRD-PARTY CLAIM III
### Defamation *Per Se*

#### Against McBride

114.   The Tuckers incorporate the foregoing paragraphs as if fully repeated here.

115.   As fully described above, McBride has engaged in a reckless campaign of making false and inflammatory claims against Jason Tucker, including but not limited to:  claiming that Tucker uses false names on his passport; that Tucker travels under assumed names; that Tucker is wanted by "organized crime" parties, and that Tucker is the reason Takeover failed.

116.   McBride's statements are false, and McBride knew they were false at the time he published them.

117.   In addition to his false and defamatory comments, McBride also made multiple inflammatory comments and threats of violence to Tucker, his wife, and non-party Deppoleto, Jr.

- 27 -

118.    The defamatory comments, which are purposeful and intended to harm Tucker's business reputation, are defamatory *per se,* and special damages need not be proven on this claim.

119.    Nonetheless, McBride has caused financial damages to the Tuckers in an amount that will be proven at trial, which damages include emotional harm and distress in addition to the loss of reputation.

## **PRAYER FOR RELIEF**

WHEREFORE, the Tuckers having stated their claims, hereby prays for Judgment as follows:

A.    For judgment against Counter-Defendant and all Third-Party Defendants;

B.    For compensatory, consequential, incidental, and/or equitable damages in amounts to be proven at trial (but in no event less than the statutory minimum for jurisdiction in this Court);

C.    For exemplary or punitive damages as deemed appropriate;

D.    For attorneys' fees and costs incurred herein; and

E.    For all further relief that the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

The Tuckers hereby respectfully demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

RESPECTFULLY SUBMITTED this 8th day of July, 2024.

**MANOLIO & FIRESTONE, PLC**

By:   /s/ Veronica L. Manolio
       Veronica L. Manolio
       8686 E. San Alberto Dr., Suite 200
       Scottsdale, Arizona 85258
       *Attorneys for the Tucker Defendants,*
       *Counterclaimants, and Third-Party Claimants*

- 28 -