EXHIBIT C

```
                IN THE UNITED STATES DISTRICT COURT

               IN AND FOR THE DISTRICT OF ARIZONA


LABOR SMART, INC.,                  )
                                    )
              Plaintiff,            )
                                    )
vs.                                 ) Case No.
                                    ) 2:22-cv-00357-PHX-
JASON AND MELISSA TUCKER,           ) DJH
                                    )
              Defendants.           )
_____)
                                    )
And related Counterclaims and       )
Third-Party Claims.                 )
_____)




         VIDEOCONFERENCED DEPOSITION OF JASON TUCKER

                    December 10, 2025
            Witness Location:  Santa Fe, Mexico
                       9:00 a.m. MST




REPORTED STENOGRAPHICALLY BY:
ROBIN JASPER, RPR
Certified Reporter
Certificate No. 50286

PREPARED FOR:
ASCII/CONDENSED

(Certified copy)
```



**Griffin Group International**
888.529.9990 | 602.264.2230

1  Q. Which one did it receive?
2  **A. It received -- the Next Level Up Gamer Shot was**
3  **received -- excuse me, it was about to receive a trademark**
4  **registration number, and then there were copyright --**
5  **there was a copyright registration on file with the U.S.**
6  **Copyright Office.**
7  Q. Well, I don't think you understood my question.
8  There's a difference between applying for a trademark and
9  obtaining a legally-recognized trademark from the U.S.
10 Patent Office.
11      Do you understand that distinction?
12 **A. Yes. But it was the way that you were asking the**
13 **question.**
14 Q. So let me re-ask it.
15      Did Takeover ever actually receive from the
16 U.S. Patent Office a trademark for any mark?
17 **A. No.**
18 Q. Did Takeover actually receive a copyright for
19 anything from the U.S. Patent Office?
20 **A. No. The patent office doesn't issue copyright**
21 **registrations.**
22 Q. Who does?
23 **A. The United States Copyright Office.**
24 Q. Did the U.S. Copyright Office ever actually issue
25 Takeover a copyright for anything?



```
 1      A.    Yes.

 2      Q.    What?

 3            MS. MANOLIO:  Form.

 4            THE WITNESS:  The can art.

 5  BY MR. LEVINE:

 6      Q.    C-A-N art?

 7      A.    If you want to spell it that way, yes.

 8      Q.    How would you spell it?

 9      A.    The same way.

10      Q.    When did -- is there any other copyright actually

11  received from the U.S. Copyright Office for Takeover?

12      A.    I don't remember everything that went into the

13  copyright, or into the can art file off the top of my

14  head.  But it would all have fallen under that number.

15      Q.    At the risk of asking a, perhaps an obvious

16  question, when you call it "can art," are you talking

17  about the art that is actually on a can for a product sold

18  by Takeover?

19      A.    It was used for that.  But if we would have used

20  it anywhere else, in any other medium, I would suggest

21  that the artwork is still the same.  So it's the artwork,

22  but, yes, it was also used on a can.

23      Q.    Okay.  Is there any other intellectual property

24  where Takeover received an actual registration from either

25  the U.S. Patent Office or the U.S. Copyright Office for
```



1          Do I have that right?
2     A.   No.
3     Q.   So let me re-ask the question.
4          When did you become a shareholder in
5  Takeover?
6     A.   June 2021.
7     Q.   Did you actually receive shares in Takeover in
8  June of '21?
9     A.   Again, same thing, I don't understand the
10 question.
11    Q.   Well, did you receive a stock certificate in June
12 of --
13    A.   There weren't any stock certificates.
14    Q.   Sir, just let me finish my question before you
15 begin answering.
16         In June of 2021, what is the basis for you
17 to tell us that you became a shareholder in Takeover?
18    A.   I entered into an agreement with the principals
19 of Takeover, and we moved forward based on that agreement,
20 and it moved to written form later.  I was promised
21 shares.
22    Q.   All right.  You were promised -- your testimony
23 is you were promised shares in June of 2021, correct?
24    A.   Yes.
25    Q.   And those promises came from Toby, Mike and Joe,



1  you the exhibit number, and we can put it on the record.
2  And I will shoot you this over.
3  BY MR. LEVINE:
4      Q.   So, Mr. Tucker, we can scroll down.  This is, I
5  believe it's a two-page document.
6               Do you recognize this document?
7      A.   Could you scroll all the way down?  And as I
8  asked previously, or started to, I was furnished with a
9  Dropbox folder.  If you could tell me the number in the
10 Dropbox folder, that would be helpful.
11     Q.   53.
12     A.   Thank you.  I recognize this document.
13     Q.   So is this the document that you mentioned in
14 earlier testimony about the agreement with Toby, Joe and
15 Mike?
16     A.   No.  I had this agreement with Toby -- I had the
17 Takeover agreement with Toby, Joe and Mike.  This is the
18 written version of that agreement with some additions.
19     Q.   So was the agreement with Takeover in writing or
20 was it oral?
21     A.   It was oral, and then it went to notes that went
22 to our counsel.
23     Q.   When was the oral agreement made?
24     A.   June 2021.
25     Q.   Where were you when that agreement was made?



```
 1      A.   Yes.
 2      Q.   When?
 3      A.   It was a draft that was done, I believe, like the
 4  next month, but nothing -- it took Eric -- Eric is a busy
 5  litigator and he had a crazy trial calendar and some
 6  things going on, so it took him on long time to actually
 7  get it onto paper for us.  So that was eventually done, I
 8  believe, in November.
 9      Q.   And was it Eric that -- did Eric deliver this
10  written agreement to the four of you?
11      A.   I think Eric delivered it to me and then I put it
12  onto DocuSign and circulated it between us.
13      Q.   Was the agreement ever signed?
14      A.   Yes.
15      Q.   Was it signed in November?
16      A.   Yes.
17      Q.   Just to be clear, we are talking about November
18  of '21?
19      A.   Yes.
20           MR. LEVINE:  Let's go off the record a
21  moment.
22           (An off-the-record discussion ensued.)
23           MR. LEVINE:  The parties have agreed to mark
24  the July 2021 two-page Agreement as Exhibit 49.
25           Agreed, Veronica?
```



```
 1  amount?
 2      A.   Yes.
 3      Q.   So whatever it was -- strike that.
 4           Who was supposed to pay you pursuant to item
 5  1 C?
 6      A.   Takeover Industries.
 7      Q.   Did the four of you -- strike that.
 8           Did Toby, Mike and Joe make any personal
 9  agreement on their own behalf pursuant to item 1 C?
10           MS. MANOLIO:  Form.
11           THE WITNESS:  I don't understand your
12  question.
13  BY MR. LEVINE:
14      Q.   Is it your testimony that the payments you were
15  to receive under 1 C were to come from Takeover?
16      A.   Yes.
17      Q.   And if Takeover did not make equal payments, what
18  did you understand your remedy or recourse was?
19           MS. MANOLIO:  Form.
20           THE WITNESS:  I didn't -- it wasn't even
21  contemplated.  I had no reason to doubt these guys.  I
22  wasn't doubting anything.  I never even thought about it
23  until much later.
24  BY MR. LEVINE:
25      Q.   Do you believe, as you sit here today, that you
```



1  did not receive monthly payments equal to each other?
2     A.    I know that to be a fact.
3     Q.    And as I understand it, you should have received
4  equal pay from Takeover, is that correct?
5     A.    Yes.
6     Q.    Do you believe, under section 1 C of this
7  document, that Toby, Mike and Joe owe you any money
8  because Takeover failed to pay you an amount equal to the
9  others?
10           MS. MANOLIO:  Form.
11           THE WITNESS:  I'm going to go with yes.
12 BY MR. LEVINE:
13    Q.    Why?
14    A.    Toby had agreed to pay over $243,000 back to the
15 company.  Those funds would have been utilized to balance
16 out, which we later found out from his theft, and then
17 Mike's theft, that what was going on wasn't going on.  So
18 they took actions to satisfy themselves at the expense of
19 the company and all of us.  And so I would imagine that
20 some liability falls onto them and they are not absolved.
21    Q.    Let me ask you a different question.
22           So my understanding is that you reached this
23 agreement in June and July 2021 and then it was reduced to
24 writing in November 2021.
25           Is that correct?



1    A.   I don't even know how to answer your
2 hypothetical.
3    Q.   If you were -- again, I'm focusing on item 1 C.
4          If you were paid more per month than any of
5 the other three, did you think you had any personal
6 liability to pay Toby, Mike or Joe for the difference
7 between what you were paid and what they were paid?
8          MS. MANOLIO: Object to form.
9          MR. FREEMAN: Object to form.
10 BY MR. LEVINE:
11    Q.   Go ahead, answer the question.
12    **A.   With the access that I had, me personally, no.**
13    Q.   All right. Now I want to move to the second
14 paragraph where it discusses Labor Smart.
15          Do you see that?
16    **A.   Yes.**
17    Q.   All right. So we are going to take these one at
18 a time.
19          When did you learn that Toby, Mike and Joe
20 held 51 preferred shares in Labor Smart?
21    **A.   I don't remember, specifically.**
22    Q.   Was it sometime prior to November 2021?
23    **A.   Yes.**
24    Q.   Was it in the June 2021 meeting at the Westin?
25    **A.   I think I knew it then.**



1    Q.   So as I understand item 2 B, Toby, Mike and Joe
2  were each going to give you 4 of their preferred shares
3  when Labor Smart received its current status.
4             Is that a correct interpretation?
5    **A.   That's how I understood that it would probably go**
6  **down, yes.**
7    Q.   When did Labor Smart receive its current status?
8    **A.   I believe it was April of 20 -- was it last year**
9  **or this year?**
10   Q.   Well, I can't give --
11   **A.   I think it was April 2024.  We could check on DC**
12 **markets for that.**
13   Q.   Yeah, I think that's correct.  So let's just --
14 I'm going to rely on April of 2024.  So let's assume
15 that's a correct time frame, Mr. Tucker.
16            Would it have been sometime after the
17 current status was received in April of 2024 when you were
18 supposed to receive the shares of preferred shares in
19 Labor Smart, item 2 B?
20   **A.   In April 2024.**
21   Q.   And were you supposed to receive 4 preferred
22 shares from each of Toby, Mike and Joe?
23   **A.   I don't think we defined it in here.  I was just**
24 **supposed to receive 12 preferred shares.  My understanding**
25 **was, is they were coming from Toby, Mike and Joe.  But if**



1  they would have cut a different deal amongst each other as
2  to how many shares they were going to transfer, similar
3  as the previous question of Takeover, as long as I got 12
4  preferred shares from them, it didn't matter the order.
5      Q.   Then at the end of the day, this transfer, the
6  number of preferred shares are set forth in item 2 C.
7           Do I have that right?
8      A.   The number of preferred shares that I will get --
9      Q.   And that --
10     A.   -- or I'm entitled to, that I was supposed to
11 get?
12     Q.   Yes.
13     A.   Yes.
14     Q.   And the remaining shares for Toby, Mike and Joe
15 are each 13, as set forth in item 2 C?
16     A.   As listed, yes.
17     Q.   Now let's talk about 2 D, as in David.
18              Jason shall receive 750 common shares.
19              I assume it's common shares in Labor Smart.
20 Is that correct?
21     A.   750 million common shares in Labor Smart.
22     Q.   All right.  And who was to deliver those shares?
23     A.   My understanding was, is that they amongst each
24 other had 6 billion common shares and that I was to
25 receive 750 million common shares.



1    Q.   And did you care where they came from, whether
2  equal from Toby, Joe and Mike, or all from one or a
3  different proportion?  Did you care?
4    A.   As I -- I didn't even contemplate it, whether it
5  came from the company or them as individuals.  As long
6  as -- again, as long as I got my 12 preferred shares and
7  my 750 million shares of Labor Smart and my 25 percent of
8  Takeover, I didn't care how they did the math to get
9  there.
10   Q.   And what is it -- what did you understand item D,
11 where it states "at the same rate as Toby McBride or is
12 assigns," what did you understand that to mean?
13   A.   I'm not really sure the full extent of that
14 anchor.  But my understanding was Toby was the driving
15 force behind these decisions, and so it was to be bound
16 to -- it was basically -- the way it was explained to me
17 is that that was a non-dilution situation.
18   Q.   Who explained that to you?
19   A.   I think it was something we had discussed and
20 Eric had brought up.  But I'm not going to go into
21 conversations I had with Eric as counsel.
22   Q.   Well, I thought Eric was representing Takeover?
23   A.   He was representing Takeover.  So if you want me
24 to speak about that, he said, look, he said you guys need
25 a non-dilution provision, I just threw that in there,



1    Q.   Okay.  Tell me what those are.
2    A.   First of all, it's paragraph 93, not 23, I think
3 you said.  But either way, it's my 25 percent ownership of
4 Takeover.
5    Q.   So was that a financial obligation that Takeover
6 owed you?
7    A.   Yes.  Oh, Takeover had an obligation of the 200
8 million shares that it owned of Labor Smart.
9         MR. LEVINE:  Read that back, please.
10            (The requested portion of the record was
11 read by the court reporter.)
12 BY MR. LEVINE:
13   Q.   What was the obligation?
14   A.   I was entitled to 25 percent of the 800 million
15 shares of Labor Smart that Takeover owned.  We did the
16 math earlier.  That's 200 million shares.
17   Q.   That was Takeover's obligation to you, correct?
18   A.   Absolutely.
19   Q.   Got it.  Thank you.
20   A.   You're welcome.  Takeover had been fleeced.  That
21 seemed like the only thing that was left out of the
22 offers.  It's the only way I was going to get my 25
23 percent.
24   Q.   I want to move now to the first claim that you
25 have against Holley, McBride and Pavlik, page 17.  This is



1  minutes, please.
2          MS. MANOLIO:  Okay.
3          MR. LEVINE:  Thank you.
4          (The deposition was at recess.)
5          MR. LEVINE:  Let's go back on the record.
6          Veronica, I just want to confirm that the
7  Tuckers are withdrawing the claim for contract damages
8  associated with Melissa and Oak Creek Wellness' claim for
9  contract damages.  Am I correct?
10         MS. MANOLIO:  You are correct.  And I did
11 put that in writing to you in an e-mail, and you are
12 absolutely welcome to rely on that and my word, yes.
13         MR. LEVINE:  Got it.  Thank you.
14 BY MR. LEVINE:
15    Q.   Mr. Tucker, I'm going to approach now a very
16 sensitive topic, and that is the defamation claim against
17 Mr. McBride.  So I recognize that it's very sensitive and
18 I want to be respectful of this, but I do need to ask some
19 questions.
20         First of all, are you personally claiming
21 that you were damaged as a result of comments made by
22 Toby?
23    **A.   Yes.**
24    Q.   So explain to me how you believe you were damaged
25 by the comments made by Toby.



1  comments?
2      A.   Not less than a million dollars.
3      Q.   And how do you arrive at a million dollars?
4      A.   Lost business, it's presumed, and the fact that
5  part of my ability to market my business is obviously to
6  market what I do in the business and to be seen as
7  somebody who is an exemplary person in that space, I can
8  no longer do that because of what Toby did.  It's as
9  simple as that.  I can't even make a tweet.  I was accused
10 three days ago in a post by a shareholder of Labor Smart
11 that I stole IP and that my greasy fingers are on things.
12 That's just this last week.  And that was one post of
13 several.  This is an ongoing -- so even if I don't do
14 anything, I'm still taken out for a walk.
15     Q.   So Battleship, is it a corporation or an LLC?
16     A.   It's a corporation.
17     Q.   Where is it domesticated, under what state?
18     A.   Washington state.
19     Q.   Does it file tax returns?
20     A.   Yes, it does.
21     Q.   Has it filed a 2024 tax return?
22     A.   I think that 2024 is being redone right now
23 because of payments that it was due.
24     Q.   So do you know what the gross income was of
25 Battleship in the years 2021 through today?



```
 1     Q.   How long did the restriction last before it was
 2  released?
 3     A.   Like 90 days.
 4     Q.   And do you remember when the restriction started
 5  and when it was released?
 6     A.   Well, the restriction started at the time that I
 7  took possession of the shares.
 8     Q.   But it didn't -- when did you -- okay.
 9              And when was that?  That was after you
10  bought it from Pavlik?
11     A.   Well, when he finally got around to being able to
12  execute all of the documents that were necessary in order
13  to effectuate the transfer and provide his driver's
14  license and he wasn't able to get a medallion stamp, so
15  then it needed to be a notary stamp with Toby
16  certificating that Joe was Joe.  So whenever that took
17  place, the restriction -- the shares were restricted for
18  Joe, they transferred over to Battleship, and the
19  restriction stayed until we requested the restriction to
20  be removed.
21     Q.   When did you request --
22     A.   I was no longer an insider at that point, and the
23  Rule 144 had expired, the requirement.
24     Q.   When did you request that the restriction be
25  removed?
```

