LAW OFFICES
**MANOLIO & FIRESTONE, PLC**
8674 E. San Alberto Drive
Scottsdale, Arizona 85258
(480) 222-9100
vmanolio@mf-firm.com
Veronica L. Manolio, SBN 020230
*Attorneys for Tucker Defendants, Counterclaimants,*
  *And Third-Party Claimants*

# IN THE UNITED STATES DISTRICT COURT

# IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Labor Smart, Inc.,<br><br>      Plaintiff,<br><br>v.<br><br>Jason and Melissa Tucker,<br><br>      Defendants.<br><br>And related Counterclaims<br>and Third-Party Claims. | Case No. 2:22-cv-00357-PHX-DJH<br><br>**JASON AND MELISSA TUCKERS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**Oral Argument Requested**<br><br>(Before the Hon. Diane J. Humetewa) |

Now having all claims by Plaintiff Labor Smart, Inc. ("LTNC")[1] against them either dismissed by the Court or by Stipulation of LTNC, Defendants, Counterclaimants, and Third-Party Claimants Jason and Melissa Tucker[2] hereby seek <u>partial</u> summary judgment pursuant to Rule 56, Fed.R.Civ.P., on three (3) of their own claims as follows:

---

[1] "LTNC" is the over-the-counter stock symbol for Labor Smart, and these names may be used interchangeably to identify Labor Smart in pleadings and evidence.

[2] As noted in prior pleadings as well as the prior Order of Judge Tuchi (Doc. 189 at fn. 2), the spouses of Jason Tucker, Michael Holley, and Thomas Zarro have each been named for the purpose of reaching marital estates on liability. None of the women are alleged to have engaged in any wrongdoing or acts relevant to any claims, so the references to **conduct** shall be singular in this motion (*i.e.*, "Tucker," "Holley," and "Zarro") while the intended **liability** shall be attributed to the marital communities. The Tuckers do not intend to forego joint community liability by any singular references herein.

1. On the Third-Party Claim for Breach of Fiduciary Duties (Claim I) against Michael Holley and Toby McBride.

2. On the Third-Party Claim for Breach of Contract (Claim III) against Michael Holley, Toby McBride, and Joseph Pavlik.

3. On the Third-Party Claim for Defamation (Claim IX) against McBride.

Judgment is warranted on these claims based on significant and indisputable evidence of misappropriation of funds, hiding corporate waste, intentional wrongdoing, and McBride's widespread defamation campaign against Tucker. The remaining claims, as well as the proper measure of damages, are factual in nature and must be left to a jury. Thus, the Tuckers seek only liability in their favor on Third-Party Claims I, III and IX and ask that the remainder of the case be set for a jury trial as soon as practicable.

## I. RELEVANT FACTS [3]

Third-Party Defendants Michael Holley and Toby McBride have each spent decades in the beverage industry, working with various employers and entities, and they were longtime friends and colleagues well before forming Takeover Industries, Inc.

---

[3] First, this is a very truncated version of the facts. Both the underlying and procedural histories are too voluminous to condense to a 17-page motion, so this "fact" section is meant only to address the limited issues presently before the Court.

Second, only the **material** facts are accompanied by citations to supporting evidence. There are multiple background facts stated herein which are only intended to help give context without being "material" to the dispositive determinations set forth for summary adjudication. *See, e.g., Hunton v. American Zurich Insurance Company*, 2018 U.S. Dist. LEXIS 37058, *2; 2018 WL 118552, 16-cv-00539, PHX-DLR (D. Ariz. 2018), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 ((A fact is material only if it may affect the outcome of the case, and material factual issues must be determined by a finder of fact because they may reasonably be resolved in favor of either party. Other factual disputes (that do not affect the outcome of a case) should be deemed **non-**material and lacking a genuine dispute for purposes of summary adjudication; non-material facts (expositional facts) need not be separately listed or identified, as they may not be disputed in any way that matters to the outcome of dispositive motions.)).

### *2021*

January – Takeover was formed as a start-up beverage company in Nevada. (Ex. 1 at 15-16; Ex. 2). Holley and McBride were then Takeover's sole officers and directors. (Ex. 1 at 16-17). Takeover's initial business dealings included only filing as an entity with the State of Nevada, talking to manufacturers and suppliers, and creating a website and setting up email. (Ex. 1 at 17-18). It had no products or assets yet. *Id*.

March – Just after forming Takeover, Holley met Ryan Schadel of Labor Smart through a "friend of a friend." (Ex. 1 at 22-23). Labor Smart agreed to "purchase" Takeover, and Takeover would "control" the Series A (voting) shares of Labor Smart. (Ex. 1 at 23). At that time, Takeover was owned 50/50 by Holley and McBride, but no shares of Takeover were issued. *Id*. at 24. Though Labor Smart agreed to pay Takeover some large sum of money, neither Holley nor McBride can explain the deal terms. (Ex. 1 at 23-30; Ex. 3 at 26-28, 30-34). Neither knows what Takeover sold nor how much money it received. *Id*.; (Ex. 1 at 34-41). There is no evidence of a stock transfer certificate or other formalities to this deal. Holley was only clear he wanted Labor Smart to "own" the beverage company because it was a publicly traded company, and he wanted Takeover in the public market. (Ex. 1 at 77-78).

When Takeover was formed, Holley was the "person responsible for the money of Takeover," including "paying bills, taking in money, et cetera." (Ex. 1 at 21). Holley and McBride agreed to pay themselves $20,000 per month ($240,000/year) from Takeover, knowing it was not yet profitable. (Ex. 1 at 87-90; Ex. 3 at 135-136). They took these funds as "distributions," as they were not W-2 employees. (Ex. 1 at 90).

Holley and McBride operated Takeover acting as if they were doing so for the benefit of **Labor Smart** shareholders, yet they never opened a Labor Smart bank account; all of the Labor Smart business, *including selling Labor Smart stock*, was conducted through Takeover's books/banking. (Ex. 1 at 31-32, 41-42, 71, 74-75, 78-79.)

May – In roughly May 2021, Holley and McBride hired Tucker as a consultant to help with Takeover trademarks and intellectual property ("IP") issues, knowing his business was in the IP arena. Tucker assisted Takeover in negotiating agreements with athletes and personalities and was "doing a good job" as Takeover intended to bring notoriety or exposure to its brand and its water. (Ex. 1 at 59-60, 64-65).

June – By June 2021, Holley, McBride, and Joseph Pavlik all flew to Arizona to meet in-person with Tucker to discuss business. While the gentlemen have different opinions on what was discussed during the June meeting, there is undisputed evidence (Meeting Minutes) of the meeting, signed by each Holley, McBride, Pavlik and Tucker. (Ex. 5). Neither Holley nor McBride dispute signing these Meeting Minutes. (Ex. 1 at 257-262; Ex. 3 at 54-55, 57-58). The Minutes clearly indicate that Tucker was to be appointed as the President of Takeover. (Ex. 4).

Subsequent to the June Meeting, a written agreement was drafted and signed memorializing the parties' various agreements, which included restatement of some of the information in the June Meeting Minutes but also outlining other obligations. (Ex. 5). This document was approved by additional Meeting Minutes (Resolutions) making the parties agreements retroactive to July 1, 2021 (hereinafter "the July 2021 Agreement"), and the Agreement contains the following material terms:

    a. Holley, McBride, Pavlik, and Tucker were each to receive 25% of the shares in Takeover;

    b. Pavlik and Tucker were each to be named as Directors of Takeover;

    c. Holley, McBride, Pavlik, and Tucker were each entitled to receive monthly payments, draws and/or salary equal to each other;

    d. Holley, McBride, and Pavlik collectively held 51 Preferred Shares (17 shares each) in LTNC, which equaled 51% of the voting rights;

    e. 12 of the Preferred Shares were to be released to Tucker when LTNC received a "current" status from OTC Markets or another market equivalent;

    f. When LTNC received a "current" status, Tucker was to receive 750M common shares of LTNC valued at the same rate as McBride's shares;

    g. None of the parties' LTNC shares could be diluted without "collective" agreement;

    h. Further changes to the Agreement had to be in writing; and

    i. The Agreement was governed by Arizona law. *Id*. (Ex. 5).

In their Answer to the Tuckers' claims, Holley, McBride and Pavlik **admitted** entering the July 2021 Agreement and stated only that the document "speaks for itself." (Doc. 184, on file, at ¶¶24, 107, 113.) However, these gentlemen went on to **specifically admit** the agreements as set forth in paragraphs a, b, c, d, h, and i, above. (*Id*. at ¶24). In other words, Holley, McBride and Pavlik all admit that Tucker was made an Officer (President) of Takeover, was to be given 25% of the shares of Takeover, and was to receive monthly draws, payments or salary equal to Holley and McBride.

October – Though Tucker proceeded in good faith to act as President of Takeover, he had no access to financials of Takeover (and Labor Smart had no books or accounting records since all the accounting was done through Takeover). By late October 2021, Holley became extremely ill and hospitalized with COVID-19. It was during his hospitalization that Tucker first became aware of multiple financial issues, because until December 8, 2021, Holley was still running all financial aspects of Takeover and remained the sole person in charge of making payments for Takeover. (Ex. 1 at 98-99).

December – By late December 2021, Tucker had discovered enough evidence of financial wrongdoing by Holley to take the issue to the Directors of Takeover, and Holley was removed by a vote of all remaining Directors (McBride, Pavlik and Tucker).

### 2022

March – this lawsuit was filed in March 2022, with Takeover seeking redress against Holley for his various breaches and misappropriation of funds. McBride was not originally sued and continued in his role as a fellow Officer/Director of Takeover.

Unfortunately, in late March 2022, Tucker discovered (from an audit of 2021 credit cards) that McBride had charged more than $243,000 in personal expenses on his Takeover credit card. (Ex. 6). McBride readily acknowledged this, signing the Reconciliation form. *Id*. Tucker has testified that McBride agreed to repay Takeover by taking less than the agreed-upon $20,000 per month of distributions in 2022, but McBride says he cannot "recall" what happened, only that he admits he put "some" personal expenses on his Takeover credit card. (Ex. 3 at 164). McBride has zero evidence that he ever paid back any of the personal expenses he charged to Takeover. (Ex. 3 at 165).

September – by September 2022, it was discovered that McBride had continued to charge personal expenses on his Takeover card. (Ex. 7) McBride was asked to take a leave of absence from Takeover while the matter was fully investigated, and he readily agreed and apologized profusely for his misuse of Takeover funds. (Ex. 8, Ex. 9[4]).

October/November – As a result of being put on leave, McBride contacted Holley, and these gentlemen (along with Pavlik) decided to "re-align" themselves and oust Tucker from running Takeover. These men staged a "Takeover of Takeover" in November 2022, and they ousted Tucker from his Takeover Officer and Director positions. Around this same time, Thomas Zarro began offering substantial participation and encouragement for the continued (mis)conduct. The facts and evidence behind these actions are what form the basis of the Tuckers' claims for Aiding and Abetting, Abuse of Process, Fraudulent Transfer, and various other fiduciary duties that are not yet ripe in this motion. These facts are mentioned here simply to give the Court context and timing.

---

[4] Exhibit 9 is an audio recording of a Board Meeting, and is being provided to the Court as part of the Non-Electronic Evidence submitted to the Clerk via USB drive pursuant to the Court's Order (Doc. 231). Exhibit 9 is a "clipped" segment of the full Meeting, intended to act as a "pin cite" to specific evidence cited. However, Exhibit 9(a) is also included on the USB drive, containing the full meeting of 22:10 minutes.

Upon "re-aligning" and voting himself back into power, McBride began calling Tucker, using disgusting language and slurs (calling Tucker's wife a whore and a slut), and threatening physical violence against him. McBride then contacted Takeover investor, Josh Rapkin, to inform him that Tucker was a "con man" and lying about Tucker's business performance with Takeover. While these horrific things were not necessarily actionable at that time, McBride's misconduct escalated.

***2023***

January – by the beginning of 2023, Zarro was acting in complete participation with and encouraging Holley, McBride, and Pavlik to take actions that harmed Tucker. Zarro also determined that McBride needed to be terminated, and McBride left Takeover in early 2023.

July – despite no longer being part of Takeover or Labor Smart, McBride resorted to an online forum to publicly defame Tucker. McBride admits he sat for a several-hour "podcast" interview with a Labor Smart shareholder, Sharmila Viswasam, which was published online and viewed several hundred times (if not more). (Ex. 3 at 219, 293-294, 296-299; Ex. 10). While McBride now admits he is "not proud" of the interview (*id.* at 296), during the four-part publication, McBride made multiple statements about Tucker, attacking him personally and intentionally harming his reputation in ***at least*** these ways:

1. McBride accused Tucker of stealing intellectual property and having the mafia looking for him because of his IP theft. (Ex. 11(e), (f), (g)[5]) McBride claimed he "verified" through others these things were true. *Id*.

---

[5] All of Exhibit 11, with its subparts, is included on the USB drive being filed pursuant to Doc. 231, the Order permitting non-electronic evidence. Exhibits 11(a), (b), (c) and (d) are the four-part podcasts referred to in this section, in their entirety. The exact "pin cites" to the statements listed above are "clips" of the full videos, more particularly cited as Exhibits 11(e) to (o). The full version of the podcast(s) are provided in the event this Court will need to consider full context to decide any defense(s) McBride may raise.

- 7 -

2. McBride accused Tucker of wire fraud/bank fraud. (Ex. 11(h)).

3. McBride accused Tucker of having multiple aliases and traveling under false names. (Exs. 11(e), (f), (g), *supra*). To "support" this lie, McBride even suggested that his prior **attorney** (Jennifer Reiter) heard Tucker boast about false passports. (*Id*. at 11(g)).

4. McBride accused Tucker of fleeing the United States to avoid consequences of his theft. (Ex. 11(i)).

5. McBride accused Tucker of trying to commit insurance fraud. (Ex. 11(j))

In addition to these and other defamatory and inflammatory comments McBride made, he continued to threaten Tucker multiple times. (Exs. 11(k), (l), (m), (n), (o)).

### *2023 -2024*

As this lawsuit progressed, it became more obvious why Holley and McBride chose to "realign" themselves — they had been lying and stealing from Takeover throughout all of 2021. Specifically, the **undisputed** evidence now demonstrates:

1. Holley paid himself **$348,770.00** in "distributions" from Takeover in 2021. (Ex. 12[6] at 1-2)

2. McBride took **$456,500.00** in "distributions" from Takeover in 2021. (*Id*.)

---

[6] Exhibits 7, 12-13, and 15 attached here are each summary charts used to prove the content of voluminous bank records (which are authenticated by a sworn Declaration a Custodian of Records from Bank of America, N.A.) and which each would be admissible pursuant to Rule 1006 of the Federal Rules of Evidence. While the Tuckers do not anticipate any evidentiary objection to the bank records nor to use of summaries in this instance, should any dispute arise, the Tuckers expressly reserve the right to provide the Court the full versions of banking records, which have all been produced and authenticated, including: TUCKER0001106-001347 0248 stmt; TUCKER001348-001603 4234 stmt; TUCKER001604-001793 4362 stmt; TUCKER001794-002147 8537 stmt; TUCKER002148-002149 D100725800200 declaration signed; TUCKER002152-002155 D100725800200 sub. Similarly, the Tuckers reserve the right to rely on the limited records produced by Third-Party Defendants, themselves: TO BN 1264-1619 Bank of America Statement; TO BN 1908-1933 Takeover BofA Bank Stmts_Additional.

- 8 -

3. Holley charged $14,481.00 in credit card expenses to Takeover for multiple items that are deemed personal in nature (like cigars, eating out near his home in Cave Creek, and routinely shopping at Costco). (Ex. 12 at 2; Ex. 13)

4. McBride charged more than $243,000 in personal expenses to his Takeover credit card in 2021 and an additional $66,114.12 in personal expenses in 2022. (Ex. 6; Ex. 7)

5. Holley paid a separate LLC (One Elite Beverages, LLC), which he owned, $51,500 from Takeover without any receipts, invoices, or documentation on Takeover's books. (Ex. 1 at 44, 47, 49, 53-56; Ex. 14 at 127-128).

While Tucker should have been paid "equal" to Holley and McBride, Tucker received only $131,000 in payments in 2021. (Ex. 15). Tucker further learned in discovery that the 25% of Takeover that Holley and McBride promised him in 2021 was an impossibility. Holley and McBride had already "sold" all of the Takeover shares to Labor Smart but expressly hid this sale from Tucker. (Ex. 16 at 39-41, 45-46, 52-55). Holley testified that he and McBride knowingly could not perform at the time they signed the July 2021 Agreement. (Ex. 1 at 276-280). Holley further admitted that, prior to Tucker joining Takeover, Holley did not observe the corporate formalities of governing Takeover. (Ex. 14 at 122). Thus, Tucker did not have corporate documents or other "formalities" to verify the ownership of Takeover shares when promised to him.

## II. LAW AND ARGUMENT

### A. The Parties Agree on the Governing Law.

This case arises from diversity jurisdiction, and each of the parties pled claims under varied laws of Arizona, Nevada and Wyoming. At this time, the parties have met and conferred and ***agree*** on the choice of law for each and every claim, such that the Court need not perform any conflict analysis.[7]

---

[7] This agreement has been documented, in writing, by counsel for the parties. Undersigned does not attach the written agreement nor a Declaration because there is tremendous trust between counsel and no anticipated dispute.

- 9 -

For purposes of this motion, the parties agree that Nevada substantive law applies to the Tuckers' Third-Party Claims of Breach of Fiduciary Duties and Defamation *Per Se* (as both Labor Smart and Takeover were Nevada entities at the time of the alleged bad acts, and the defamation occurred at a time when the Tuckers resided in Nevada), and Arizona law applies to the Third-Party Claim for Breach of Contract (as the contract at issue specifically includes a choice of law provision).

### B. Judgment is Warranted on the Tuckers' Claim for Breach of Fiduciary Duties Against Michael Holley and Toby McBride.

The Tuckers' first claim for relief alleges that Holley and McBride breached fiduciary duties they owed to the Tuckers as shareholders of Labor Smart as well as fiduciary duties owed to Jason Tucker as an officer and director of both Takeover and Labor Smart. While the Tuckers alleged six (6) various breach fiduciary duties, but this request for judgment is **limited** to only three (3): (a) use/misuse of Takeover funds for personal use; (b) hiding corporate waste; and (c) failing to pay Tucker funds/salary he earned while working for/ with Takeover. (*See*, Doc. 179 at 17, §99(a), (b), and (e)). The evidence supporting these 3 specific theories is indisputable, though the remaining theories of fiduciary breaches may be left to a fact-finder to decide.

Under Nevada law, a breach of fiduciary duty claim requires: (1) existence of a fiduciary duty, (2) breach of the duty, and (3) damages that result from the breach. *Guzman v. Johnson*, 438 P.3d 531, 538 (Nev. 2021). These fiduciary duties include the duties of loyalty and care to the corporation. *Chur v. Eighth Jud. Dist. Ct. in and for County of Clark*, 458 P.3d 336, 340 (Nev. 2020). Furthermore, the officers and directors of a Nevada corporation have fiduciary duties to exercise their powers "in good faith" and "with a view to the interests of the corporation." *See*, Nevada Revised Statutes ("NRS") 78.138. When Nevada directors or officers act in ways that involve intentional misconduct, fraud, or a knowing violation of the law, they may be held **individually**

liable for damages stemming from the conduct done under an official capacity. *See, e.g.,* NRS 78.138(7)(b)(1)-(2); *Chur, supra*, at *71-72, internal citations intentionally omitted. When it is shown that an officer or director acted with intentional misconduct, fraud, or a knowing violation, the officer or director may have individual liability for any damages that result to the corporation, its stockholders, or its creditors. *Id*. at NRS 78.138(7).

### *1. Existence of Fiduciary Duty*

Here, there is no dispute that Holley and McBride were officers and directors of both Takeover and Labor Smart who owed fiduciary duties to both entities. Holley and McBride asked Tucker to join Takeover, appointing him as a fellow officer (President) and director as well as a shareholder of Takeover. (Ex. 5). Throughout 2021, Holley continued to act as an officer and director, and he had sole control over the financial accounts of Takeover until December 8, 2021. (Ex. 1 at 98-99). McBride remained an officer and shareholder of Takeover until 2023, and he certainly was an officer and director in 2022. (*See, e.g.,* Ex. 7, 8, 9).

### *2. Breach of Fiduciary Duties*

In their capacities as officers and directors of Takeover, Holley and McBride both pledged to Tucker that he would be paid "equal" to them in "monthly payments, draws and/or salary." (Ex. 5). Holley and McBride further agreed that their monthly payments were to be $20,000 each or $240,000 per year. (Ex. 1 at 87-90; Ex. 3 at 135-136). In breach of these promises, Holley knowingly, intentionally, and harmfully paid himself **$348,770** from Takeover funds in 2021. (Ex. 12). Holley additionally spent $14,481 of Takeover funds on his personal expenses in 2021. (Ex. 12, Ex. 13). McBride, took **$456,500** in Takeover funds in 2021 (Ex. 12), and additionally charged more than **$243,000** to Takeover credit cards for personal expenses. (Exs. 6, 12).

Undisputed evidence is clear that, while Tucker was to be paid "equal" with Holley and McBride, he received $131,000 in 2021 and never charged a single personal

charge to his Takeover credit card. Tucker abided by the parties' agreements, as well as his duties owed to Takeover, while *Holley paid himself nearly half a million dollars* and *McBride took almost three-quarters of a million dollars* in 2021 alone. (Exs. 6, 12, 13 *compared* to Ex. 15). McBride then went on to continue his pattern of misuse/abuse into 2022, racking up another $66,114 in personal charges on his credit card, which he fully admitted and accepted fault. (Exs. 7, 8, 9).

There cannot be any dispute that Holley and McBride were acting in their own self-interests when brazenly paying themselves hundreds of thousands of dollars in Takeover's first year of business, and when a significant portion of Takeover's funds were from selling stock of Labor Smart. Holley and McBride were supposed to be acting to raise the value of stock for shareholders' benefits, while they shamelessly shopped, ate, and traveled abound with their pockets filled of investors' funds. Such actions could never be considered as taken in "good faith" nor with a "view" of Takeover, Labor Smart, or any shareholders in mind. These actions can only be deemed intentional misconduct, and taking the actions while simultaneously promising co-officers and directors to be "equal" is fraudulent, not just a mere breach. NRS 78.138(7)(b)(2).

Holley and McBride clearly hid their actions, evidenced by Holley keeping full and total control over the Takeover financials until December 2021. Had Holley not been hospitalized, there is no telling <u>when</u> Tucker would have learned of these misdealings. What is worse, however, is that Holley and McBride used this lawsuit and "realignment" of their positions to oust Tucker from Takeover entirely in November 2022, hoping he would never discover the significant wrongdoing and financial malfeasance.

### 3. Damages

The **fact** of damage is not at issue. Tucker was clearly damaged by the gross misconduct of Holley and McBride. The **amount** of damages is all that should be left to a jury to decide.

First, there is no doubt that Tucker was pledged 25% of Takeover and should have been a shareholder of the entity, though he was misled. (Ex. 5; Ex. 16 at 39-41, 45-46, 52-55). But whether Tucker is deemed a shareholder or a mere "creditor" of Takeover and Labor Smart, it is clear that Tucker was financially harmed by Holley and McBride overpaying themselves, misusing corporate funds for personal gain, and failing to pay Tucker the minimum of $20,000 per month which was agreed. Tucker was harmed by not getting "equal" funds or benefits, despite that he was working around the clock for Takeover, trying to make it succeed. At a ***minimum***, Tucker should be entitled to the full amount of what he was promised ($20,000/month), which equates to $160,000 in underpayment. (Ex. 15) (Tucker was underpaid $45,000 in 2021 and $115,000 in 2022.) However, a jury may reasonably determine that Holley and McBride owe Tucker amounts to be "equal" to what they received, as it was their fiduciary responsibility to have done so. Based on the intentional, wrongful, and even fraudulent misconduct, a a jury should be given discretion to decide the full and fair amount of money Holley and McBride owe for intentionally breaching their fiduciary obligations of care and loyalty.

**C.     Judgment is Warranted on the Tuckers' Claim for Breach of Contract.**

Regardless whether Holley and McBride had breached fiduciary duties, these gentlemen and Pavlik all owed Tucker **contractual** duties that have been breached.

In Arizona, breach of contract is proven simply by showing: (1) existence of a contract; (2) breach; and (3) resulting damages. *Graham v. Asbury*, 112 Ariz. 184, 185 (1975). The July 2021 Agreement is admittedly a signed contract, and not only have Holley, McBride and Pavlik admitted to its existence, but they even specified in their Answer the contract terms that are undisputed. *See*, Doc. 184 at p. 5, ¶24. They specified their agreement and understanding that: a) Tucker was promised 25% of the shares/ownership in Takeover; b) Tucker was a Director of Takeover; c) Tucker was entitled to receive "equal" amounts of monthly payments, draws and/or salary. *Id*.

- 13 -

Undisputed evidence proves that Tucker was never given 25% of the shares or ownership in Takeover and, in fact, Holley and McBride knew at the time they signed the July 2021 Agreement that they could not fulfill this promise. (Ex. 1 at 276-280). Undisputed evidence proves that Tucker was not paid "equal" to the monthly payments, draws, and salary of the other officers and directors of Takeover. (Exs. 6, 7, 12, 13, 15). And, there is no doubt that Tucker has suffered financial losses from these breaches.

Once again, the fact of damage is clear. Only the amount should be left to a trier of fact, as the parties dispute what is "equal" payment to Tucker and what the value is to be attributed to Tucker's loss of 25% of Takeover. Accordingly, liability on this claim should be adjudicated now, and the damage amount left to the jury to decide.

### D. Judgment is Warranted on the Tuckers' Claim for Defamation *Per Se*.

Under Nevada law, a claim for defamation requires proof of: (1) a false and defamatory statement; (2) an unprivileged communication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages. *Clark County School District v. Virtual Educational Software, Inc.*, 125 Nev. 374, 385 (Nev. 2009), citing *Pope v. Motel 6*, 121 Nev. 307, 316 (Nev. 2005) (other citations omitted). Defamation that imputes a person's lack of fitness for business, trade, or profession or that tends to injure the plaintiff in his/her business is deemed defamation *per se*. *Clark County, supra* at 385, citing *K-Mart Corporation v. Washington*, 109 Nev. 1180, 1192 (Nev. 1993). Claims for defamation *per se* primarily serve to protect the personal reputation of individuals, and when one's personal reputation is at risk, he need not provide proof of injury to economic interests or business losses. *Clark County* at 385-86. Defamation *per se* simply does not require proof of special damages in the form of pecuniary loss. *Id*. at 386-87. It is presumed that defamation *per se* caused damages.

This case is riddled with McBride's inflammatory, defamatory, and threatening statements, including those published online and viewed by hundreds. (Exs. 10, 11).

1 Within the plethora of repulsive statements, there is undisputed evidence that McBride accused Tucker of theft (and, particularly theft of IP, which is his primary business); McBride accused Tucker of being hunted by the mob or the mafia; McBride accused Tucker of wire fraud/bank fraud; McBride accused Tucker of traveling under false passports; and, McBride accused Tucker of trying to commit insurance fraud. (Exs. 11(a) to (o)). These statements, at a minimum, are defamatory *per se*.

McBride has never raised a defense of "truthfulness" in this case. McBride did not raise privilege for any of his communications. He has never argued that he was only stating his "opinion" – nor could he, when he continually lied about having "proof" during his publication but yet he never produced a single piece of proof to back the statements listed above. In fact, the only affirmative defenses McBride raised are failure to state a claim, estoppel, unclean hands, laches and waiver. (Doc. 184 at 15, ¶88.)

Based on the undisputed evidence, and McBride's lack of defense (but only his comment that he is "not proud" of his podcast (Ex. 3 at 296)), there can be no doubt that McBride defamed Tucker in multiple ways. There can also be no doubt that the attacks were deliberate to attack Tucker's profession in IP, his trustworthiness, and his overall fitness for business, such that damages must be presumed. *Clark County* at 385-86; *see also, Dinkins v. Schinzel*, 362 F.Supp. 916, 923-924 (Nev. 2019). A finding of liability is appropriate now, with the amount of presumed damages to be left for a trier of fact.

### III.    CONCLUSION

Based on the undisputed evidence set forth in this motion, the Tuckers should now be granted summary judgment on the **liability** portions of their Third-Party Claims I (for Breach of Fiduciary Duties as to Michael Holley and Toby McBride), III (Breach of Contract as to Michael Holley, Toby McBride, and Joseph Pavlik), and IX (Defamation *Per Se*) as against Toby McBride. The damages attributable to these claims, as well as liability and damages for all other remaining claims should be reserved for a jury.

DATED this 9th day of January, 2026.

**MANOLIO & FIRESTONE, PLC**

By: /s/ Veronica L. Manolio
    Veronica L. Manolio
    8674 E. San Alberto Drive
    Scottsdale, Arizona 85258
    *Attorneys for the Tucker Defendants,*
*Counterclaimants, and Third-Party Claimants*

**FREEMAN LAW FIRM, INC.**

By: /s/ Spencer D. Freeman
    Spencer D. Freeman
    1107 ½ Tacoma Ave S.
    Tacoma, WA 98402
    *Attorneys for the Tuckers as Third-Party*
*Claimants Against Takeover Industries, Inc.*
*and Joseph Pavlik*