```
            IN THE UNITED STATES DISTRICT COURT

            IN AND FOR THE DISTRICT OF ARIZONA
```

Labor Smart, Inc.,            )
                              )
          Plaintiff,          )
                              )
vs.                           ) Case No.
                              ) 2:22-cv-00357-PHX-DJH
Jason and Melissa Tucker,     )
                              )
          Defendant.          )
                              )
                              )
And related Counterclaims     )
and Third-Party Claims.       )
                              )


        VIDEO-RECORDED DEPOSITION OF MICHAEL HOLLEY
            (and Videoconference via Zoom)



            Scottsdale, Arizona
            November 3, 2025
              9:15 a.m.




REPORTED BY:              CARRIE REPORTING, LLC
Kristy A. Ceton, RPR, CRR  Certified Reporters
AZ CR No. 50200           12725 W. Indian School Rd.
                          Suite F-100
                          Avondale, AZ 85392
CERTIFIED COPY            (480) 429-7573

2

1          VIDEO-RECORDED DEPOSITION OF MICHAEL HOLLEY

2     commenced at 9:15 a.m., on November 3, 2025, at

3     Manolio & Firestone, 8674 East San Alberto Drive,

4     Scottsdale, Arizona, and Videoconference via Zoom,

5     before Kristy A. Ceton, RPR, CRR, Arizona Certified

6     Court Reporter No. 50200.

7

8                           *  *  *

9

10    APPEARANCES:

11       For the Plaintiff:

12              PAUL M. LEVINE, P.C.
                By:  Paul M. Levine, Esq.
13              8502 East Via de Ventura
                Suite 230
14              Scottsdale, Arizona 85258
                plevine@pmlevinepc.com
15
         For the Defendants:
16
                MANOLIO & FIRESTONE, PLC
17              By:  Veronica L. Manolio, Esq.
                8674 East San Alberto Drive
18              Scottsdale, Arizona 85258
                vmanolio@mf-firm.com
19
         - and -
20
                FREEMAN LAW FIRM, INC.
21              By:  Spencer D. Freeman, Esq.
                1107 1/2 Tacoma Avenue S.
22              Tacoma, Washington 98402
                sfreeman@freemanlawfirm.org
23              (via Zoom)

24

25

Deposition of: Michael Holley                        November 3, 2025

3

1    APPEARANCES, CONT'D:

2        Also Present:

3            Craig Onuschak, the videographer

4            Jason Tucker

5            Melissa Tucker (via Zoom)

6            Tom Zarro (via Zoom)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of: Michael Holley                          November 3, 2025

15

```
 1   intentional and deliberate, I am.  I'm Italian and I
 2   talk fast.
 3              MR. LEVINE:  Okay.  I was going to say
 4   Italian and/or New Yorker.
 5              MS. MANOLIO:  New York attitude, but not
 6   from there.
 7         Q.  BY MS. MANOLIO:  Okay.  So let me tell
 8   you what I would like to do today.
 9         A.  Okay.
10         Q.  I want to go through and get a bunch of
11   background.  And I want to start with asking you
12   questions in your individual capacity as Mike Holley.
13   Not asking you to bind the company to anything at
14   this point.  We'll separate out when I'm going to ask
15   specific questions about binding Labor Smart or
16   whether Labor Smart had information.
17              Is that fair to you?
18         A.  Sounds good.
19         Q.  All right.  So, as I understand it, and,
20   again, from prior testimony you've given, you and
21   Toby McBride were buddies; is that correct?
22              MR. LEVINE:  Objection.  Form.
23              THE WITNESS:  Yes.
24         Q.  BY MS. MANOLIO:  And some time in early
25   2021, you decided to form a new beverage company; is
```

Deposition of: Michael Holley                    November 3, 2025

16

```
 1   that right?
 2         A.    Yes.
 3         Q.    And that's Takeover Industries?
 4         A.    Yes.
 5         Q.    What month did you establish Takeover
 6   Industries?
 7         A.    Not exactly sure.
 8         Q.    If I told you that your prior testimony
 9   it was February of 2021, does that help refresh your
10   memory?
11         A.    It sounds about right.   Yeah.
12         Q.    Okay.   And I will tell you from all the
13   documents we've seen in this case, it looks like the
14   company was actually formed in Nevada; is that true?
15         A.    Yes.
16         Q.    In February of '21?
17         A.    Okay.
18         Q.    After you formed Takeover, what specific
19   things did you --  I'm sorry.  Let me ask a backup.
20              Was there anyone else involved at the
21   origination of Takeover Industries, besides yourself
22   and Mr. McBride?  Any other officers or directors?
23              MR. LEVINE:  Objection.  Form.
24              Are you asking if there's other officers
25   or directors?
```

1          MS. MANOLIO:  Yes.  That's what I just

2     asked.  Were there --

3          MR. LEVINE:  Well --

4          MS. MANOLIO:  At the end.

5     Q.   BY MS. MANOLIO:  Were there any other

6     officers or directors in February of 2021, other than

7     yourself and Mr. McBride?

8     A.   No.

9     Q.   Okay.  And what specifically did you and

10    Mr. McBride do in February of 2021 to get Takeover

11    started or get it going?

12    A.   In what way?

13    Q.   What -- what did you do to start up this

14    company that you were starting?  What kind of

15    contracts did you enter?  Did you have an office?

16    Did you order product?  What did you do to get the

17    company on its feet?

18          MR. LEVINE:  Objection.  Form.

19          THE WITNESS:  I guess we filed for the

20    company with the State of Nevada.

21    Q.   BY MS. MANOLIO:  Okay.

22    A.   We started talking to manufacturers,

23    suppliers, personnel, started a website, e-mails.

24    Q.   Anything else?

25    A.   That sounds good.

1      Q.   That's all you can remember?  Is there
2  anything else that needed to be done in the initial
3  phase of start-up that you can think of other than
4  those things you just mentioned?
5           MR. LEVINE:  Objection.  Form.
6           THE WITNESS:  No.
7      Q.   BY MS. MANOLIO:  When did you -- when did
8  Takeover -- excuse me.  I'll try to do my best when I
9  say "you" to mean Mike Holley.
10          When did Takeover hire its first
11 personnel, its first member of personnel?
12     A.   I don't recall.
13     Q.   Who would have that information?
14     A.   I'm sure I could find it if I looked up
15 for it.
16     Q.   Do you know who the first person was that
17 Takeover hired?
18     A.   I'm not sure.
19     Q.   Do you -- do you know how many employees
20 Takeover had at any time when you were the CFO or the
21 COO of Takeover?
22     A.   Do I know how many employees?
23     Q.   Correct.
24     A.   Approximately.
25     Q.   How many?

Deposition of: Michael Holley                    November 3, 2025

21

1  financial officer and chief operating officer, and

2  you answered yes?

3          A.   So I was mistaken.  I was not the chief

4  financial officer when it was founded.

5          Q.   Who was the chief financial officer when

6  it was founded?

7          A.   There wasn't one.

8          Q.   So when you and Mr. McBride founded

9  Takeover, who was the person who was going to be

10 responsible for the money of Takeover, paying bills,

11 taking in money, et cetera?

12         A.   I was.

13         Q.   And that's consistent with your prior

14 testimony, right?  You were in charge of the money

15 all of 2021; is that right?

16         A.   Not all of '21.

17         Q.   Until what date?

18         A.   I believe December 8th.

19         Q.   Okay.  So from the time Takeover was

20 founded until December 8th of 2021, you, Mike Holley,

21 were in charge of the finances of Takeover?

22         A.   Yes.

23         Q.   Okay.  Got it.

24              All right.  So after Takeover gets

25 started and you have these operating costs, at what

Deposition of: Michael Holley                    November 3, 2025

22

1    point did Takeover hire its first manufacturer?

2            A.    I don't recall.

3            Q.    Do you know about how long it took for

4    Takeover to get product out on the shelves anywhere

5    or product in production anywhere?

6            A.    I believe it was April.

7            Q.    Okay.

8            MR. LEVINE:  2021?

9            THE WITNESS:  Yeah.

10           Q.    BY MS. MANOLIO:  Now, who is -- and tell

11   me if I'm saying the name wrong, Ryan Schadel.  Is it

12   Schadel?

13           A.    I think so, yeah.

14           Q.    Who is Ryan Schadel?

15           A.    He was a former CEO of Labor Smart.

16           Q.    How do you know him?

17           A.    Only through the -- the dealings with

18   Labor Smart.  Excuse me.

19           Q.    How did you and/or Mr. McBride come to be

20   introduced to Ryan Schadel?

21           A.    I guess a friend of a friend.

22           Q.    And you don't know who that is, as you

23   sit here today?

24           A.    Not exactly, no.

25           Q.    Okay.  But you can definitely say it

Deposition of: Michael Holley                    November 3, 2025

23

```
 1   wasn't someone you knew --
 2        A.   Correct.
 3        Q.   -- prior to getting involved with
 4   Takeover?
 5        A.   Correct.
 6        Q.   Okay.  Tell me what the deal was supposed
 7   to be with Takeover being purchased by Labor Smart.
 8   What did you understand that deal was to be?
 9        A.   What the deal was to be?
10        Q.   Yes.
11        A.   The deal was that Labor Smart would
12   purchase Takeover, and then Takeover would control
13   the Series A preferred shares.
14             THE VIDEOGRAPHER:  That was Melissa
15   Tucker who just signed in.
16             MS. MANOLIO:  Thank you.
17             THE WITNESS:  And 6.8 billion shares --
18   common shares of Labor Smart.
19        Q.   BY MS. MANOLIO:  So help me understand.
20             Ryan Schadel owns a company called Labor
21   Smart, Inc.?
22        A.   Correct.
23        Q.   In '21, right?
24        A.   Uh-huh.
25        Q.   That's a yes?
```

Deposition of: Michael Holley                                    November 3, 2025

24

1          A.   Yes.

2          Q.   And I'm sorry.  I don't mean to be rude.

3          A.   No.

4          Q.   We just have to have definitive answers

5    for our record?

6          A.   Okay.

7          Q.   So Mr. Schadel owns Labor Smart, Inc.

8    And you and Toby McBride own Takeover Industries,

9    Inc.; is that right?

10         A.   Correct.

11         Q.   Did you and Toby McBride own 50/50, or

12   was it split in a different percentage?

13         A.   50/50.

14         Q.   And did you ever issue shares to

15   yourselves in Takeover?

16         A.   No.

17         Q.   So it was set up as a company and there

18   were shareholders, but shares were never issued or

19   just not at that time?

20         A.   No shares were issued.

21         Q.   Okay.

22         A.   At that time.

23         Q.   At that time?

24         A.   Correct.

25         Q.   Were shares later issued in Takeover?

Deposition of: Michael Holley                    November 3, 2025

25

```
 1          A.   Yes.
 2          Q.   Okay.  We'll get there, then.  I'll let
 3   you tell me about it when it happens.
 4               So help me understand.
 5               Mr. Schadel is going to pay money to
 6   Takeover, and then Takeover, in turn, is going to run
 7   the board of Labor Smart and get $68 billion in
 8   shares of Labor Smart.  Is that what you said?
 9               MR. LEVINE:   Objection.   Form.
10               THE WITNESS:   No.
11          Q.   BY MS. MANOLIO:   Okay.   Then explain it
12   to us a little clearer.
13          A.   6.8 billion shares, not billion dollars.
14          Q.   I'm sorry.  I meant shares.
15               Okay.  So Ryan's paying -- or Labor Smart
16   is paying Takeover?
17          A.   Correct.
18          Q.   And what was the amount of money Takeover
19   was to be paid?
20          A.   I don't recall.
21          Q.   Your earlier testimony was around
22   $500,000.  Does that help refresh your memory?
23          A.   I believe it was around 300,000.
24          Q.   Have you ever gone through the bank
25   statements that Takeover produced in this case to
```

Deposition of: Michael Holley                                   November 3, 2025

26

```
 1    look at any figures or any numbers at all?
 2              MR. LEVINE:  Objection.  Form.
 3              THE WITNESS:  Yes.
 4         Q.   BY MS. MANOLIO:  Have you done any of
 5    that in preparation for deposition today?
 6         A.   I guess so, yes.
 7         Q.   Okay.  And, as you sit here today, do you
 8    remember having seen throughout the documents what
 9    Ryan Schadel or his companies were paid -- or paid,
10    excuse me, to Takeover?
11         A.   Not in total.
12         Q.   Okay.  So Labor Smart's paying some sum
13    of money to Takeover.  What did Takeover give to
14    Mr. Schadel in return for the money it received?
15         A.   Takeover.
16         Q.   Well, he's paying you to own Takeover,
17    and then Takeover is going to control his company.
18    What benefit is that to him?
19              MR. LEVINE:  Objection.  Form.
20              THE WITNESS:  I don't know.
21         Q.   BY MS. MANOLIO:  So do you have any idea,
22    as you sit here, what consideration Takeover gave in
23    response to either making around 300,000 or around
24    $500,000 from Mr. Schadel?
25              MR. LEVINE:  Objection.  Form.
```

Deposition of: Michael Holley                          November 3, 2025

27

1              THE WITNESS:  An operating beverage

2    company.

3         Q.   BY MS. MANOLIO:  You weren't operating at

4    that point yet, right?

5              MR. LEVINE:  Objection.  Form.

6              THE WITNESS:  In what way?

7         Q.   BY MS. MANOLIO:  Well, you told me

8    earlier that you started in February '21.

9         A.   Okay.

10        Q.   And you think you didn't go into

11   manufacturing until April of '21.  And the deal with

12   Ryan was consummated in March of '21.  So in March of

13   '21, when the deal was consummated, Takeover wasn't a

14   functioning beverage company yet, was it?

15             MR. LEVINE:  Objection.  Form.

16             THE WITNESS:  It was in the process,

17   yeah.

18        Q.   BY MS. MANOLIO:  Okay.  So when he --

19   excuse me -- Labor Smart or Mr. Schadel bought

20   Takeover or purchased its shares, whatever he did,

21   was he to become an owner of Takeover on paper?

22        A.   No.

23        Q.   Was he to become a shareholder in

24   Takeover?

25        A.   No.

Deposition of: Michael Holley                                November 3, 2025

28

```
 1        Q.   Then how was he purchasing an operating
 2   beverage company?
 3        A.   I don't believe Mr. Schadel personally
 4   purchased it.
 5        Q.   How did Labor Smart purchase a beverage
 6   company?
 7             MR. LEVINE:  Objection.  Form.
 8             THE WITNESS:  With the before-mentioned
 9   shares.
10        Q.   BY MS. MANOLIO:  So your position is that
11   because Takeover received -- let me make sure I get
12   it right -- 6.8 billion shares --
13        A.   Correct.
14        Q.   -- Takeover received money and shares?
15             MR. LEVINE:  Objection.  Form.
16        Q.   BY MS. MANOLIO:   Correct?
17        A.   Correct.
18        Q.   What did Labor Smart receive in return?
19        A.   A beverage company.
20        Q.   So Takeover was supposed to be run by
21   Labor Smart?  Was that the intent?
22        A.   I'm not sure.
23        Q.   Have you ever entered a purchase
24   agreement like this before?
25             MR. LEVINE:  Before this one?
```

```
 1          Q.    BY MS. MANOLIO:  Correct.

 2          A.    Not exactly.

 3          Q.    Okay.  What does that mean?

 4          A.    It was -- I've done a different one

 5    before.  It was reverse merger.

 6          Q.    With --  I did not hear that.

 7          A.    A reverse merger.

 8          Q.    A reverse merger.

 9                And what would you consider this one to

10    be?  In your words, not mine.

11          A.    This was a purchase.

12          Q.    Okay.  And Labor Smart was purchasing a

13    company that was going to be a beverage company; is

14    that right?

15          A.    Correct.

16          Q.    Okay.  So at the time Takeover sold, it

17    didn't have any financials or any pro forma to

18    provide to Labor Smart, did it?

19          A.    I guess not.

20          Q.    Did Mr. Schadel retain a number of shares

21    in Labor Smart?

22          A.    I'm not sure.

23          Q.    I'm trying to just understand what the

24    benefit would have been to Labor Smart to go out and

25    spend either 300,000 or 500,000 to purchase a company
```

Deposition of: Michael Holley                                    November 3, 2025

30

1    that's not yet functioning and doesn't have any

2    historical financials.  What was the benefit supposed

3    to be to the other side?

4          A.    I don't know.

5          Q.    I think you told me in the hearing

6    testimony, earlier, I asked you what the benefit was,

7    and you said:  Nothing, really.  Do you remember

8    that?

9          A.    I don't remember.

10         Q.    Okay.  I think the question I asked you

11   was whether or not Labor Smart was getting anything.

12   And you said, they were paying for actually nothing.

13               Do you remember those words?

14         A.    No.

15         Q.    Okay.

16               THE VIDEOGRAPHER:  Spencer Freeman just

17   signed in.

18               MS. MANOLIO:  Thank you.

19         Q.    BY MS. MANOLIO:  At the time Takeover is

20   signed in 2021, was Joe Pavlik involved?

21         A.    Yes, as a consultant.

22         Q.    Okay.  At what point did he become either

23   a director or an officer of Takeover?

24         A.    November of '21.

25         Q.    Okay.  And at what -- what was his

Deposition of: Michael Holley                          November 3, 2025

31

1    position?  Was he an officer or a director as of

2    November '21?

3            A.   I believe a director.

4            Q.   And did he get paid for his work?

5            A.   Yes.

6                 MR. LEVINE:  Objection.  Form.

7            Q.   BY MS. MANOLIO:  Okay.  All right.

8                 I'm going go back to the purchase.  So

9    Takeover gets purchased by Labor Smart.  Isn't it

10   true then Takeover was a, quote, wholly owned

11   subsidiary of Labor Smart?  That's what you guys have

12   pled in this case; is that fair?

13           A.   Yes.

14           Q.   At the point when you set up Takeover,

15   did Takeover establish bank accounts?

16           A.   Yes.

17                MR. LEVINE:  I'm sorry.  Would you read

18   the question again?

19                (The record was read by the court

20   reporter as follows:  "At the point when you set up

21   Takeover, did Takeover establish bank accounts?")

22                THE WITNESS:  Yes.

23           Q.   BY MS. MANOLIO:  And the answer was yes.

24                When Takeover was purchased by Labor

25   Smart, did you transfer that banking to Labor Smart?

Deposition of: Michael Holley                    November 3, 2025

32

```
 1        A.   No.
 2        Q.   And, in fact, it's my understanding in
 3   this case that Labor Smart never had a bank account
 4   until November of 2024, which is last year; is that
 5   right?
 6        A.   I believe so, yeah.
 7        Q.   So the entire time that Takeover
 8   conducted business from '21 through November of 2024,
 9   is it fair to say all of that business was conducted
10   through a Takeover bank account or accounts, plural?
11        A.   I believe so, yes.
12        Q.   All right.  So what was the purpose of
13   keeping the banking and the money in Takeover if
14   Labor Smart technically owns the business?
15        A.   I'm sorry.  Can you repeat?
16        Q.   Sure.  And let me just back up a minute.
17             When Labor Smart purchased Takeover, did
18   Labor Smart retain shares or percentage in Takeover?
19        A.   Did Labor Smart?
20        Q.   Yes.
21        A.   Retain shares of Takeover?  Yes.
22        Q.   Or did it accept shares?
23        A.   Of Takeover?
24        Q.   Of Takeover.
25             MR. LEVINE:  Objection.  Form.
```

Deposition of: Michael Holley                    November 3, 2025

33

```
 1              Do you understand the question?
 2              THE WITNESS:  Not exactly.
 3         Q.   BY MS. MANOLIO:  Okay.  Labor Smart
 4    purchases Takeover.  Takeover, the corporation,
 5    presumably has either shares or you do a percentage
 6    of interest, right?
 7         A.   Correct.
 8         Q.   Did Labor Smart own any portion of
 9    Takeover?
10         A.   Yes.
11         Q.   What was the percentage?
12         A.   At that time, 100 percent.
13         Q.   So Labor Smart is now the 100 percent
14    owner of Takeover rather than you and Mr. McBride
15    being the owners?
16         A.   Correct.
17         Q.   Okay.  And was there anything documented
18    on paper to say, Labor Smart owns 100 percent of the
19    shares of Takeover, or any words to that effect?
20              MR. LEVINE:  Objection.  Form.
21              THE WITNESS:  Was anything documented?
22         Q.   BY MS. MANOLIO:  Yes.
23         A.   I believe so, yes.
24         Q.   Okay.  So there is some sort of a share
25    transfer or a share certificate issuing the shares of
```

Deposition of: Michael Holley                    November 3, 2025

34

1    Takeover into the name of Labor Smart?

2              MR. LEVINE:  Objection.  Form.

3              THE WITNESS:  I believe so.

4         Q.   BY MS. MANOLIO:  And when would that have

5    happened?

6         A.   I'm not sure exactly.

7         Q.   At that point, you are the chief

8    operating officer and the person in control of the

9    money of Takeover, correct?

10        A.   Yes.

11        Q.   And who else would have that information

12   if you don't?

13        A.   I'm not sure.  Toby McBride.

14        Q.   Well, we've heard from Toby McBride a lot

15   that he says he had nothing to do with the money of

16   Takeover or paying any bills of Takeover.  Do you

17   agree with that statement or disagree?

18              MR. LEVINE:  Objection.  Form.

19              THE WITNESS:  Yeah.  I don't know what

20   that means.

21        Q.   BY MS. MANOLIO:  Okay.  Was it ever

22   Toby's role to manage administrative paperwork for

23   Takeover Industries?

24        A.   No.

25        Q.   So as the COO, would it have been your --

35

1    or your responsibility to maintain the share

2    certificates of Takeover?

3         A.    Yes.

4         Q.    And yet, as you sit here today, you don't

5    know whether or not a share certificate was ever

6    issued or when to Labor Smart for the purchase of

7    Takeover?

8         A.    I do believe that it was -- yes, it was

9    issued.  I just don't remember when.

10        Q.    Okay.  All right.

11             So after Takeover is purchased by Labor

12   Smart, what was the first payment that came in, if

13   you remember the amount of the first payment that

14   came in from Labor Smart?

15        A.    I don't remember.

16             MR. LEVINE:  Objection.  Form.

17        Q.    BY MS. MANOLIO:  Do you know who Alpha

18   Capital Group is?

19             MR. LEVINE:  I'm sorry?

20        Q.    BY MS. MANOLIO:  Alpha Capital Group.

21        A.    No.

22        Q.    Okay.  How many payments did Labor Smart

23   make to Takeover for its purchase?

24             MR. LEVINE:  Objection.  Form.

25             THE WITNESS:  I don't remember.

Deposition of: Michael Holley                    November 3, 2025

36

```
1              MS. MANOLIO:  What's the form objection
2     so I can make sure I clear it up?
3              MR. LEVINE:  Read the question back,
4     please.
5              (The record was read by the court
6     reporter as follows:  "How many payments did Labor
7     Smart make to Takeover for its purchase?")
8              MR. LEVINE:  I think it assumes payments
9     were made and it assumes there was an obligation to
10    make payments.
11         Q.   BY MS. MANOLIO:  You just told us you
12    entered a stock purchase agreement, right?  With --
13    Takeover entered a stock purchase agreement from
14    Labor Smart, correct?
15         A.   From Takeover, correct.
16         Q.   And Labor Smart was purchasing Takeover
17    for -- you said today around 300,000?
18         A.   Yes.
19         Q.   And you previously said around 500,000.
20    Do you remember that?
21         A.   I remember the 300,000, yes.
22         Q.   Did Takeover --  Excuse me.
23              Did Labor Smart have an obligation to pay
24    Takeover for its stock purchase agreement?
25         A.   I don't recall.
```

37

```
 1          Q.   You had a written stock purchase
 2   document, right?
 3          A.   I don't have it in front of me.
 4          Q.   I will absolutely get there.
 5               But what your lawyer's objecting to is
 6   that I haven't established that Takeover was to be
 7   paid by Labor Smart.  I thought we pretty much
 8   established that; am I wrong?  Labor Smart was
 9   supposed to pay Takeover under the stock purchase
10   agreement, wasn't it?
11          A.   I believe so, yes.
12          Q.   And, in fact, Labor Smart made multiple
13   payments to Takeover for the purchase, did it not?
14          A.   I believe so, yes.
15          Q.   Okay.  When you received the first
16   payment from Labor Smart, how much of that payment
17   did you and Mr. McBride pay to yourselves?
18          A.   I don't know.
19          Q.   As the chief financial officer -- or
20   excuse me -- the chief operating officer and the
21   person in charge of financials for Takeover, had you
22   done a pro forma or an analysis to find out what the
23   costs were going to be to make this business
24   operational and prepared to get product out for sale?
25          A.   Yes.
```

Deposition of: Michael Holley                          November 3, 2025

38

1        Q.   Why haven't you ever produced that in

2   this matter?

3             MR. LEVINE:   The --  You're asking him

4   why it hasn't been produced?

5             MS. MANOLIO:  Correct.

6        Q.   BY MS. MANOLIO:

7             Do you know why that hasn't been produced

8   in this matter?

9        A.   I don't know if it still exists.

10       Q.   Okay.  When you did your pro forma, what

11   was the monthly -- and I use these words -- the

12   monthly nut you had to crack, the monthly amount of

13   money you needed to keep Takeover running in its

14   first year of operations?

15       A.   I don't remember.

16       Q.   Can you give me an estimate?

17       A.   I don't remember.

18       Q.   Was it -- you know, you're going to tell

19   me if you're somewhere in the $500,000 a year realm

20   or it's going to cost us $1 million a year to run

21   this company?  You don't have any better

22   understanding of how much money your company was

23   going to take to run?

24       A.   No.

25       Q.   Now, how many years do you have in the

Deposition of: Michael Holley                                November 3, 2025

39

1    industry, the beverage industry now?

2              MR. LEVINE:  Today?

3         Q.   BY MS. MANOLIO:  Correct.  Today.

4         A.   Approximately 30.

5         Q.   Okay.  So in '21, it was four years ago,

6    at 26 years in business --

7              Had you ever run a beverage company

8    before?

9         A.   Yes.

10        Q.   And what company was that?

11        A.   Multiple companies.

12        Q.   Okay.  Did you have experience in

13   understanding the monthly needs of any of the

14   companies you ran as to what the capital needed to be

15   to make the company operational month after month?

16        A.   Yes.

17        Q.   And with all that history and your

18   background and knowledge, as you sit here today, you

19   can't tell me any sort of estimate of what Takeover

20   needed to run on a monthly basis?

21        A.   It would vary.

22        Q.   Okay.  I get everything varies in

23   business.  I'm asking you if you have an estimate?

24        A.   I don't recall.  No.

25        Q.   How would you know if the company had

Deposition of: Michael Holley                                    November 3, 2025

40

1    excess money and/or if the company was in arrears?

2           A.   How would I know?

3           Q.   Yes.  At the time, how would you know?

4           A.   I guess, looking at the bills and looking

5    at the bank account.

6           Q.   Aside from just getting bills in, don't

7    you have to be planning and projecting for the future

8    of a brand-new business that's in its first year?

9           A.   Well, yes.

10          Q.   Okay.  How was Takeover going to make its

11   bills or pay its bills if you don't even know, as you

12   sit here today, what the number was that it needed

13   for operations on an ongoing basis?

14          A.   I told you this.  I don't recall.

15          Q.   How much money did Takeover take in in

16   the first year of business?

17          A.   I don't recall.

18          Q.   Aside from getting paid from Labor Smart,

19   what other -- and selling product, what other ways

20   did Takeover get funds into its coffers?

21          A.   I believe that there were individual

22   investors.

23          Q.   And what did the individual investors

24   receive for their investments?

25          A.   Shares.

Deposition of: Michael Holley                                    November 3, 2025

41

1       Q.   Shares of what?

2       A.   Either Labor Smart or Takeover.

3       Q.   Okay.  Well, let's be really clear here.

4            Takeover no longer owned any shares after

5    the initial purchase from Labor Smart, right?  I

6    think you told us that when Labor Smart purchased

7    Takeover, Takeover gave 100 percent of its shares to

8    Labor Smart.  Did I get that right?

9       A.   Yes.

10      Q.   So any individual investor that came in

11   after the point of Ryan Schadel or Labor Smart

12   purchasing Takeover, there were no more shares of

13   Takeover to give out; isn't that true?

14           MR. LEVINE:  Objection.  Form.

15           THE WITNESS:  I believe so.

16      Q.   BY MS. MANOLIO:  So if an individual

17   investor came in after the purchase was complete from

18   Labor Smart to Takeover, they would receive shares in

19   Labor Smart, in the parent company; isn't that

20   correct?

21      A.   Correct.

22      Q.   In fact, every investor that Takeover had

23   would get shares in Labor Smart and those shares

24   would then be done through a subscription agreement

25   in Labor Smart; is that right?

Deposition of: Michael Holley                                    November 3, 2025

42

1          A.   I believe mostly, yes.

2          Q.   Well, what's not mostly?  What's missing

3     from everyone?

4          A.   I believe that there was a -- a note or a

5     loan.

6          Q.   Okay.

7          A.   But it was still guaranteed by shares of

8     Labor Smart.

9          Q.   Okay.  So just so we're very clear.

10              What you had told me is that there were

11     individual investors.  Just for purposes of today,

12     can we agree that an investor and a loan are two

13     different things?

14          A.   Okay.

15          Q.   Do you understand --

16          A.   Yes.

17          Q.   -- the distinction I'm making?  Okay.

18              So an investor gives money and they

19     return -- get something in return; meaning, they got

20     shares in Labor Smart.  So they're purchasing,

21     correct?

22          A.   Some of them, yes.

23          Q.   And those people who are individual

24     investors aren't expecting to get a return on their

25     capital they gave you.  They're expecting to get a

Deposition of: Michael Holley                                    November 3, 2025

59

1   of Takeover at that time?

2           A.   No.

3           Q.   Okay.  How did you first meet Jason

4   Tucker?

5           A.   I don't actually recall.

6           Q.   Does the name John Quinn mean anything to

7   you?

8           A.   John Quinn, yes.

9           Q.   Who is John Quinn?

10          A.   I think he was a facilitator.  He might

11  have been the one that knew Ryan Schadel.

12          Q.   Okay.  And did he -- was he the person

13  who introduced you to Jason Tucker?

14          A.   I believe so.  I think he was introduced

15  to Toby.

16          Q.   Okay.  And what was the -- the reason for

17  Takeover first interacting with Jason Tucker?

18          A.   I guess we needed help with the

19  trademarks, things like that.

20          Q.   And what was your understanding of what

21  Jason did or what his backgrounds were?

22          A.   He was, like, a trademarker, an IP

23  specialist.

24          Q.   And so did you agree to hire his company

25  or him personally, either one, to help Takeover?

```
 1              MR. LEVINE:  Objection.  Form.
 2              THE WITNESS:  As a consultant.
 3         Q.   BY MS. MANOLIO:  Okay.  And do you happen
 4    to remember when that was?  What month?
 5         A.   I don't recall.
 6         Q.   We can agree it was in 2021?
 7         A.   Yes.
 8         Q.   Is that fair?
 9              Okay.  And the reason I say, like, I'm
10    just making that an assumption, we know that all of
11    the things that transpired in the first year of 2021,
12    you were in charge of up until December 8th,
13    financially, correct?
14         A.   Correct.
15         Q.   Okay.  So Jason Tucker gets brought on as
16    a consultant.  What specifically was he doing for
17    Takeover at the time he was first introduced?
18         A.   I don't exactly know.
19         Q.   Okay.  Who would be able to give -- aside
20    from Mr. Tucker, who from the Takeover side would
21    have better grasp on what Jason Tucker was doing?
22         A.   Probably Toby.
23         Q.   Okay.  Was there a point in time when
24    Mr. Tucker was offered a director position and an
25    ownership in Takeover?
```

Deposition of: Michael Holley                    November 3, 2025

64

```
1   consultant?
2        A.    Yes.
3        Q.    And what was he doing in the summer
4   months of 2021?  Excuse me.
5        A.    I believe he was negotiating agreements
6   with athletes and personalities.
7        Q.    And was he doing a good job, in your
8   opinion, of negotiating those?
9             MR. LEVINE:  Objection.  Form.
10            THE WITNESS:  I don't remember.
11       Q.    BY MS. MANOLIO:  Well --
12            MR. LEVINE:  Are you asking him now or
13   back at the time?
14       Q.    BY MS. MANOLIO:  No.  At the time, was he
15   doing a good job negotiating those?
16       A.    I believe he was, yeah.
17       Q.    And, in fact, he achieved getting the
18   final agreement between Takeover and Manny Pacquiao;
19   isn't that correct?
20       A.    I believe that there was many people
21   involved, but yes.
22       Q.    It was finally entered once Jason got
23   involved.  Can we agree on that part?
24       A.    I don't recall.
25       Q.    And what about the performer, T-Pain?
```

Carrie Reporting, LLC - Certified Reporters
480.429.7573

1    Did Mr. Tucker negotiate an agreement between

2    Takeover and T-Pain?

3          A.    Yes.

4          Q.    And both -- so both Mr. Pacquiao and

5    T-Pain are big names.  They're celebrities.  Can we

6    agree with that?

7          A.    Okay.

8          Q.    Yes, you agree?

9          A.    Yes.

10          MR. LEVINE:  Depends on your audience.

11          MS. MANOLIO:  They're celebrities to

12    someone, Paul.

13          MR. LEVINE:  There you go.

14          Q.   BY MS. MANOLIO:  And isn't it true that

15    they were intended, the contracts with those

16    gentlemen were each intended to bring notoriety or

17    exposure to Takeover and its water?

18          A.    Yes.

19          Q.    Okay.  Now --

20          A.    Or products, yes.

21          Q.    Okay.  At what time did Takeover have any

22    product in addition to the hydrogen water we talked

23    about earlier?

24          A.    I don't know the exact date, but we

25    formulated a Gamer Shot.

Deposition of: Michael Holley                    November 3, 2025

71

```
 1                    MR. LEVINE:  Just a second.
 2                    Objection.  Form.
 3                    Go ahead.
 4             Q.   BY MS. MANOLIO:  At the time that you --
 5   excuse me -- at the time that Takeover issued its
 6   first Labor Smart share certificate, how many shares
 7   were there of Labor Smart stock?
 8                    MR. LEVINE:  Objection.  Form.
 9                    THE WITNESS:  Takeover never issued any
10   shares of Labor Smart.
11             Q.   BY MS. MANOLIO:  Takeover took the money
12   in and Labor Smart issued the shares, right?
13             A.   Labor Smart would issue the shares, yes.
14             Q.   Why wasn't the money for any of these
15   investments going into Labor Smart?
16             A.   I don't know.
17             Q.   I mean, people were buying Labor Smart
18   stock, but you were taking the money in through
19   Takeover, right?
20             A.   Labor Smart didn't have a bank account.
21             Q.   You at that point were running Labor
22   Smart, weren't you?
23                    MR. LEVINE:  Objection.  Form.
24                    THE WITNESS:  Not exactly, no.
25             Q.   BY MS. MANOLIO:  Okay.  Who was running
```

1    wasn't a -- an original officer or director of Labor

2    Smart, was he?

3           A.   You didn't ask me that.  You said during

4    '21.

5           Q.   Okay.  At the time when you took over

6    Labor Smart, and I mean Takeover, we all agree --

7           A.   No, I was not a director.

8           Q.   Okay.  Takeover gets purchased, if you

9    will, gives 100 percent of its shares to Labor Smart.

10   The same people who were running Takeover at

11   formation were you and McBride, and then you and

12   McBride were the parties responsible for having Labor

13   Smart issue shares to investors; isn't that fair?

14          A.   No.

15          Q.   Who was responsible for issuing

16   investment shares?

17          A.   Not initially.  So, initially, it was

18   Joseph Pavlik.

19          Q.   Okay.  So did Joseph Pavlik as the

20   president and what -- and board of director -- was he

21   the sole director?

22          A.   I believe so.

23          Q.   Okay.  Did he ever come to you guys and

24   say, Why are we taking money into Takeover to sell

25   Labor stock -- Labor Smart stock, or any words to

Deposition of: Michael Holley                    November 3, 2025

75

1    that effect?

2         A.   Not that I remember.

3         Q.   Did any of you ever clue in, we're taking

4    money in one company, but issuing stock of a

5    different company for that money?  Did you ever have

6    that discussion with either Mr. McBride or

7    Mr. Pavlik?

8         A.   What discussion?

9         Q.   You need me to read back the question?

10        A.   Sure.

11             (The record was read by the court

12    reporter as follows:  "Did any of you ever clue in,

13    we're taking money in one company, but issuing stock

14    of a different company for that money?  Did you ever

15    have that discussion with either Mr. McBride or

16    Mr. Pavlik?")

17             THE WITNESS:  Did we "clue in"?  I don't

18    know.  What does that mean?

19        Q.   BY MS. MANOLIO:  Okay.  The question was,

20    did you ever have the discussion, we're taking in

21    money into Takeover and depositing it in a Takeover

22    bank account, and, in return, we're issuing stock of

23    a separate company?  Did you ever have that

24    discussion with them?

25        A.   Depends on the time of year, yeah.

1        A.    Okay.

2        Q.    -- to own all of the stock in Takeover,

3  right?

4        A.    Correct.

5        Q.    And then Takeover became a subsidiary of

6  Labor Smart, presumably to drive up the stock prices

7  of Labor Smart, right?

8              MR. LEVINE:  Objection.  Form.

9              THE WITNESS:  I guess so.  I don't know.

10       Q.    BY MS. MANOLIO:  Well, don't guess here.

11             You negotiated a deal and signed a deal

12  on behalf of Takeover that you were going to be

13  purchased out by a staffing company, right?

14       A.    Okay.

15       Q.    Labor Smart was a staffing company?

16       A.    Yes.

17       Q.    You negotiated the purchase agreement and

18  signed it with Mr. Schadel on behalf of Labor Smart?

19       A.    Yes.

20       Q.    And the thought was, you wanted Labor

21  Smart to own the beverage company because Labor Smart

22  was a publicly traded company and you could get into

23  the publicly traded market; isn't that right?

24       A.    Yes.

25       Q.    I mean, we've talked about this, you and

Deposition of: Michael Holley                    November 3, 2025

78

1    I, at the prior hearing, and you gave testimony on it
2    in the Nevada case, right?
3           A.   I don't know.  What's the question?
4           Q.   The whole point of you -- Takeover
5    wanting to do business as Labor Smart was because
6    Labor Smart was a publicly traded company and you
7    wanted to be able to trade on the open market at some
8    point?
9           MR. LEVINE:  Objection.  Form.
10          Q.   BY MS. MANOLIO:  Isn't that true?
11          A.   That I wanted to trade?
12          Q.   Takeover.
13          A.   Takeover wanted to trade shares on the
14   open market?
15          Q.   You wanted to be a publicly traded
16   company, right?
17          MR. LEVINE:  Objection.  Form.
18          THE WITNESS:  Yes.
19          Q.   BY MS. MANOLIO:  Okay.  So once Takeover
20   is purchased -- and Labor Smart owns everything,
21   right?  Labor Smart paid to own 100 percent of
22   Takeover?
23          A.   Correct.
24          Q.   Why then were you not conducting the
25   financial affairs of Labor Smart stock through a

1    Labor Smart bank account?

2         A.    I don't know.

3         Q.    Why were you not conducting the

4    day-to-day business operations of the beverage

5    company that was purchased by Labor Smart through

6    Labor Smart?

7              MR. LEVINE:  Objection.  Form.

8              THE WITNESS:  I don't know.

9         Q.    BY MS. MANOLIO:  At the time Labor Smart

10   purchased the stock, was Labor Smart current on the

11   market to be able to trade shares publicly?

12        A.    Current, no.

13        Q.    And were you aware of that before the

14   purchase -- the stock purchase was consummated?

15        A.    Yes.

16        Q.    And was the goal to make Labor Smart

17   become current so that it could trade on the open

18   market?

19        A.    Ideally, yes.

20        Q.    And you knew that it was going to be some

21   sort of a process, I would have said an uphill

22   battle, but some sort of a process that you would

23   have to go through to get Labor Smart current?

24        A.    Yes.

25        Q.    And in that market, you also call it

Deposition of: Michael Holley                                    November 3, 2025

87

```
 1          Q.   Isn't it true that the first Labor Smart
 2   payment that came in was $90,000?
 3          A.   No idea.
 4          Q.   Okay.  I'll show you records and we'll go
 5   through them.
 6               So what you're telling me is that at that
 7   time when money came in in March of '21, the
 8   agreement you and Mr. McBride had was you were going
 9   to pay yourselves $5,000 a week or $20,000 a month
10   each; is that right?
11          A.   I believe so, yes.
12          Q.   And how long was that agreement in place?
13          A.   I don't know.
14          Q.   In the prior testimony, that you were
15   supposed to be paying yourselves 20 grand throughout
16   the entire year of '21?  Do you remember that?
17          A.   I believe so, yes.
18          Q.   Does that help refresh your memory?
19          A.   Okay.
20          Q.   And, in fact, in the pleadings that your
21   lawyer filed for you in this case, the allegation is
22   that at the formation, you and Mr. McBride agreed
23   that you would compensate yourselves $20,000 a month?
24          A.   Okay.
25          Q.   Is that fair?
```

Deposition of: Michael Holley                          November 3, 2025

88

1          A.   I believe so, yeah.

2          Q.   At the time that Takeover was formed, you

3   did not have this deal with Labor Smart yet, did you?

4          A.   Not exactly, no.

5          Q.   Was it already in the works; meaning, you

6   knew this was going come to fruition?

7          A.   I believe so.

8          Q.   Okay.  So was the agreement that we're

9   going to take five grand a month supposed to happen

10  as soon as Labor Smart paid, or were you going to

11  wait until the company was actually making profit

12  from selling its product?

13         A.   No.  You know, companies don't make

14  profit for years.  So people still get paid.

15         Q.   And so you and Mr. McBride were each

16  going to take $240,000 a year from a brand-new

17  company, knowing that you would have to take that

18  money out of the investors' money or the sale price

19  from Labor Smart; is that right?

20         A.   Not exactly, no.

21         Q.   Well, then tell me how I'm wrong so I can

22  understand.

23         A.   So you -- you're saying that I assumed

24  that we were going to take money from product or

25  investors?

1          Q.    No.   What I'm saying, specifically, is,

2    you just told me, companies don't become profitable

3    for years.

4          A.    Okay.

5          Q.    That was your testimony, right?

6          A.    Yes.

7          Q.    So you knew in 2021, Takeover was not

8    going to be profitable, right?

9          A.    I did not know that, no.

10         Q.    You just told us most companies take

11   years and years.   So based on your knowledge and

12   understanding and 26 years in the beverage industry,

13   you had a good indication that the company wouldn't

14   be profitable in year one, didn't you?

15         A.    Possibility, correct.   Yeah.

16         Q.    So assuming it wouldn't be profitable in

17   year one, you and Mr. McBride each agree you're going

18   to pay yourselves $240,000 a year?

19         A.    Yeah.   If feasible, yes.

20         Q.    And so that you knew that the money that

21   you would have to be paying yourselves with would be

22   investors' money?

23               MR. LEVINE:   Objection.   Form.

24               THE WITNESS:   I did not know that, no.

25         Q.    BY MS. MANOLIO:   How were you going to

Deposition of: Michael Holley                    November 3, 2025

90

1    pay yourselves if you knew with your experience,

2    company's not going to be profitable year one?  How

3    else were you going to get money in?

4            A.    To be profitable is not to say that the

5    company does not make money.

6            Q.    Okay.  So you were thinking that sales

7    would be enough to pay all of the bills of the

8    company, plus pay you each $240,000 a year in year

9    one?

10           A.    Correct.

11           Q.    Okay.  And, to be clear, in year one, in

12   just 2021, how were you and Mr. McBride paying

13   yourselves?

14                 MR. LEVINE:  Form.

15           Q.    BY MS. MANOLIO:  What I mean is, were you

16   W-2 employees?

17           A.    No.

18           Q.    How were you taking money out of the

19   company?

20           A.    Taking distributions.

21           Q.    And at the end of 2021, did you pay taxes

22   on all of the distributions you received from Labor

23   Smart -- or excuse me -- from Takeover in year one?

24           A.    No.

25                 MR. LEVINE:  Objection.  Form.

98

1    or used routinely; is that right?

2              A.    A box at a UPS Store, I believe.

3              Q.    Okay.  And same thing for Stockton.  No

4    physical presence of the company there, meaning not a

5    rental, not a --

6              A.    No.  Never in California.

7              Q.    Okay.

8              MR. LEVINE:  You said -- you meant

9    Stockton, California?

10             MS. MANOLIO:  Correct.

11             MR. LEVINE:  Okay.

12             Q.    BY MS. MANOLIO:  All right.  Tell me what

13   happened in October of '21 when you got sick.

14             MR. LEVINE:  Objection.  Form.

15             Q.    BY MS. MANOLIO:  And if --  Do you need

16   me to go back and lay foundation?  I think you and I

17   both already know because we've talked before and

18   you've given lots of testimony.

19             In October of '21, you got COVID, right?

20             A.    Correct.

21             Q.    And at some point, you got hospitalized;

22   is that fair?

23             A.    Yes.

24             Q.    Do you happen to remember when you got

25   hospitalized?

Deposition of: Michael Holley                    November 3, 2025

99

1          A.   Not the exact date, no.

2          Q.   Do you think it was early October, late

3    October?

4          A.   Late October.

5          Q.   And if I remember correctly, you told me

6    that you were in the hospital until December 29th or

7    30th; is that right?

8          A.   I believe so, yes.

9          Q.   So you were hospitalized for almost two

10   months?

11         A.   Yes.  Over two months.

12         Q.   Okay.  When you went into the hospital,

13   were you still running the financial aspects of

14   Takeover?

15         A.   Yes.

16         Q.   And, in fact, you told us earlier you

17   were able to do it and continue to do it all the way

18   through December 8th.  Did I have that right?

19         A.   Correct.

20         Q.   Now, how were you able to run the

21   finances of Takeover while you're hospitalized in

22   October and November of '21?

23         A.   With help.

24         Q.   Okay.  And with help from whom?

25         A.   Toby McBride.

257

1    with -- where you thought it was at the JW Marriott?

2            A.   I believe so.

3            Q.   Was there ever any other meeting that you

4    met with the directors of Takeover Industries in

5    Scottsdale, Arizona, other than the time that you

6    guys met at the JW Marriott or whatever hotel?

7                 MR. LEVINE:  Objection.  Form.

8                 THE WITNESS:  Yeah.  I met with Toby

9    numerous times before that.

10           Q.   BY MS. MANOLIO:  Okay.  Not Toby.  The

11   directors?

12           A.   Yeah.  That's what I said.  The

13   directors.  Myself and Toby were directors.

14           Q.   And at this time, all four of you were

15   present; meaning, Mr. McBride, yourself, Mr. Tucker,

16   and Joe Pavlik, were you not?

17           A.   I believe so, yes.

18           Q.   And in June of '21, there are resolutions

19   that are considered and reviewed, and it says "and

20   motioned."

21                Do you see that?

22           A.   Where do we see that?

23           Q.   All right.  Let's go to the second

24   paragraph first.  "The directors reviewed the need to

25   expand members of the company to guide the company as

Deposition of: Michael Holley                    November 3, 2025

258

1    it moves forward and the need to expand the board of

2    directors."

3              Did I read that fairly?

4        A.    Okay.

5        Q.    Did I read it fairly?   It's a yes or no.

6        A.    That's a yes.

7        Q.    Okay.  And you talked earlier about there

8    was a time you and Toby agreed you needed to expand

9    the board of directors because the company was

10   growing.  Do you remember that whole discussion this

11   morning?

12       A.    I do.

13       Q.    And is this referencing that discussion?

14       A.    No.

15       Q.    So this is a separate discussion about

16   the need to expand the board of directors of

17   Takeover?

18       A.    I think they're getting convoluted.

19       Q.    Okay.  Why did you sign this document if

20   it's convoluted?

21            MR. LEVINE:  Objection.  Form.

22            THE WITNESS:  I'm sure it was probably

23   something I signed when I was in the hospital.

24       Q.    BY MS. MANOLIO:  Okay.  You told us today

25   that you were able to do business from the hospital,

259

1    right?

2            A.   Partially, yes.

3            Q.   And you were still in control of the

4    finances for the first month plus that you were in

5    the hospital; isn't that true?

6            A.   Partially, yes.

7            Q.   Well, what's partially?

8            A.   I had help, yes.

9            Q.   You had your daughter helping make

10   payments on behalf of Takeover; is that right?

11           A.   Yes.

12           Q.   And who else was responsible for the

13   financials of Takeover while you were hospitalized?

14           A.   Toby McBride.

15           Q.   Okay.  This resolution at least says that

16   -- the directors of Takeover.  And that would be you

17   and Toby?

18           A.   Okay.

19           Q.   Is that right?

20           A.   Yes.

21           Q.   You and Toby were resolved that you,

22   Toby, Joe Pavlik, and Jason were to be appointed or

23   reelected as directors of the company.  Did I read

24   that fairly?

25           A.   Yeah.  Mostly.

November 3, 2025

260

1     Q.   Okay.  What was it that I didn't read,
2  other than saying the full names?
3     A.   That's it.
4     Q.   That's it?
5     A.   Yes.
6     Q.   Okay.  And understand, I was doing that
7  just for --
8     A.   Yeah.
9     Q.   -- brevity.
10          So the next one is, resolving that
11  Michael Holley be reelected as the treasurer of the
12  company.
13          Did I read that right?
14     A.   Yes.
15     Q.   "Resolved that Michael Holley be
16  appointed the chief financial officer and chief
17  operating officer of the company."
18          Did I read that right?
19     A.   You read that correctly.
20     Q.   "Resolved that Toby McBride be reelected
21  as the secretary of the company."
22          Did I read that right?
23     A.   Yes.
24     Q.   Toby was also appointed CEO, wasn't he?
25     A.   Yes.

Deposition of: Michael Holley                    November 3, 2025

261

```
 1        Q.    And then Jason Tucker was made president
 2   of the company; is that correct?
 3        A.    Jason was to be appointed president, yes.
 4        Q.    Appointed as the president of Takeover
 5   Industries?
 6        A.    Of the company.
 7        Q.    The company is Takeover in this instance,
 8   right?
 9        A.    Yes.
10        Q.    And let me tell you, Mr. Holley, the
11   reason I ask it that way, is there are a lot of
12   documents in this case where "the company" is used to
13   define Labor Smart and Takeover together.   So on this
14   resolution, I'm very particular.
15              I want to make sure when we talk about
16   the company, we're only talking about Takeover at
17   this moment; is that fair?
18        A.    That we're only talking about Takeover?
19        Q.    Correct.
20        A.    Yes.
21        Q.    In Exhibit 8 --
22        A.    I don't know about the other part.
23        Q.    Sure.
24              In Exhibit 8, this only refers to
25   Takeover; is that right?
```

Deposition of: Michael Holley                    November 3, 2025

262

```
1          A.   Yes.
2          Q.   And the last resolution -- or the second
3     to last resolution, is that Joe Pavlik would be
4     appointed the chief science officer of Takeover; is
5     that fair?
6          A.   Yes.
7          Q.   Okay.  Then it says, further resolved
8     that you'll do paperwork to fulfill these
9     resolutions, or words to that effect; is that fair?
10         A.   Yes.
11         Q.   And then it says, "By unanimous vote, the
12    directors passed the motion and approved all
13    appointments and elections."
14              Did I read that part fairly?
15         A.   You read that correctly.
16         Q.   "There being no further business, the
17    meeting is adjourned."
18              On the next page, do you dispute having
19    signed this document via DocuSign?
20         A.   Not on June 10th.
21         MR. LEVINE:  I'm sorry.  What?
22         Q.   BY MS. MANOLIO:  The question was, do you
23    dispute having signed it?
24         A.   No.
25         Q.   Okay.  And I think what you're saying is,
```

Deposition of: Michael Holley                                    November 3, 2025

276

1                    MR. LEVINE:  Objection.  Form.

2                    THE WITNESS:  I don't know.

3           Q.  BY MS. MANOLIO:  All right.  So we can at

4    least agree, as we sit here today, you don't know of

5    any evidence that disputes your signature on any

6    document in here that's been produced in this case

7    where you've electronically signed, do you?

8           A.  I don't.

9           Q.  This --  The agreement that is at

10   TUCKER55 and 56 is signed or date-stamped as of

11   August 5th, 2021.

12               Do you see that date on the last page?

13           A.  I do.

14           Q.  And the agreement itself says that it's

15   an agreement that was made in Scottsdale in July

16   2021, between Toby, yourself, Joe Pavlik, in their

17   respective positions of Labor Smart and Takeover

18   Industries, and in your individual capacities.

19               Did I read that part fairly so far in the

20   first paragraph?

21                    MR. LEVINE:  Objection.  Form.

22                    THE WITNESS:  I believe so.

23           Q.  BY MS. MANOLIO:  And the agreement was

24   made between you, Holley, Pavlik, as shareholders, in

25   your individual capacities, and the agreement was

277

1    made with Jason Tucker; is that right?

2              A.    I don't know.

3              Q.    Is that what it reads?

4              A.    I believe so.

5              Q.    Well, read it and tell me if you agree

6    with that or not.

7              A.    What's the question?

8              Q.    Did I read it fairly, that it was an

9    agreement between yourself, McBride, and Pavlik as

10   the shareholders of Takeover, and Jason Tucker, on

11   the other hand?

12             A.    That's what it says.

13             Q.    Okay.  In July of 2021, is it true that

14   you, McBride, and Mr. Pavlik had formed various

15   companies and held management positions servicing the

16   beverage industry including the NXT LVL brand?

17             MR. LEVINE:  Objection.  Form.

18             THE WITNESS:  As of that date?

19             Q.  BY MS. MANOLIO:  Yes.

20             A.   I believe so.

21             Q.   I mean, as of that date, you had done

22   business as Takeover, and you had previously done

23   business in other beverage companies; isn't that

24   right?  You told us that earlier?

25             A.   I have, yes.

278

1          Q.   And at that date, Mr. Pavlik was running
2    Elevate; is that right?
3          A.   I don't know.
4          Q.   You were paying Elevate; is that fair?
5          A.   I don't really know what Elevate is,
6    though.
7          Q.   We talked about it earlier.
8          A.   I know that it's his LLC, but I'm not
9    sure what it does.
10         Q.   Okay.
11         A.   If it's a beverage company or anything.
12         Q.   Okay.  Got it.
13              Is it true that you were entering this
14   agreement because Takeover wanted to hire on Jason
15   Tucker?
16              MR. LEVINE:  Objection.  Form.
17              THE WITNESS:  I'm not sure.
18         Q.   BY MS. MANOLIO:  Okay.  Underneath the
19   agreement where it says "Now, therefore," the very
20   first thing says, Takeover Industries, which was a
21   Nevada company, the parties were agreeing that each
22   of you would receive 25 percent of the shares in
23   Takeover.
24              Did I read that fairly?
25         A.   You did read that fairly.

Carrie Reporting, LLC - Certified Reporters
480.429.7573

Deposition of: Michael Holley                    November 3, 2025

279

1          Q.   How could Takeover sell -- or excuse me.

2               How could Takeover give its shares to the

3     four of you as directors when Takeover did not own

4     any shares of Takeover in July of '21?

5               MR. LEVINE:  Objection.  Form.

6               THE WITNESS:  Exactly.  Correct.

7          Q.   BY MS. MANOLIO:  So in July of '21 --

8          A.   It could not.

9          Q.   -- you could not have performed that

10    position, correct?

11         A.   No.

12              MR. LEVINE:  When you say --

13              Objection.  Form.

14         Q.   BY MS. MANOLIO:  In July of '21, Takeover

15    Industries owned zero shares -- excuse me.  You and

16    Mr. McBride owned zero shares of Takeover Industries;

17    is that right?

18         A.   Correct.

19         Q.   Because Labor Smart owned 100 percent of

20    the shares of Takeover Industries?

21         A.   Correct.

22         Q.   And so if Mr. Tucker takes the position,

23    yeah, they told me we were each going to be 25

24    percent owners in Takeover, that could never have

25    happened; isn't that right?

Carrie Reporting, LLC - Certified Reporters
480.429.7573

Deposition of: Michael Holley                                    November 3, 2025

280

1            MR. LEVINE:  Objection.  Form.

2            THE WITNESS:  Yes.  Correct.

3        Q.   BY MS. MANOLIO:  Now, just last month

4   when you filed your bankruptcy petition, you told a

5   federal court that Jason Tucker owns 49 percent of

6   the shares in Takeover.  Are you aware of that?

7        A.   I did not say that.

8        Q.   You what?

9        A.   I did not say that.

10       Q.   Well, when it asks who the owners are --

11  or excuse me -- who the shareholders are, you listed

12  yourself and Mr. Tucker as the shareholders of

13  Takeover Industries.

14       A.    Preferred shareholders, possibly.

15       Q.   Okay.  How many preferred shares were

16  there of Takeover Industries?

17       A.    I don't know the exact total.

18       Q.    Is it your contention, as you sit here

19  today, that even as recently as last month, you and

20  Jason each owned roughly 49 percent of the shares of

21  Takeover Industries?

22       A.    No.

23       Q.    Do you have any idea why the shareholders

24  listed on the Takeover bankruptcy application include

25  yourself and Mr. Tucker?

484

```
 1   STATE OF ARIZONA      )
                           ) ss.
 2   COUNTY OF MARICOPA    )

 3

 4            BE IT KNOWN that the foregoing
     proceedings were taken by me, KRISTY A. CETON, a
 5   Certified Reporter, in and for the County of
     Maricopa, State of Arizona; that the witness before
 6   testifying was duly sworn to testify to the whole
     truth; that the questions propounded to the witness
 7   and the answers of the witness thereto were taken
     down by me in shorthand and thereafter reduced to
 8   typewriting under my direction; that the witness
     requested reading and signing said deposition; that
 9   the foregoing pages are a true and correct transcript
     of all proceedings had, all done to the best of my
10   skill and ability.
              I FURTHER CERTIFY that I am in no way
11   related to any of the parties hereto, nor am I in any
     way interested in the outcome hereof.
12            I FURTHER CERTIFY that I have complied
     with the ethical obligations set forth in ACJA
13   7-206(J)(1)(g)(1) and (2).

14
     Kristy A. Ceton                    50200_____
15   Certified Reporter                 CR Number

16
     _____          11.17.2025
17   Certified Reporter Signature       Date

18
              I CERTIFY that this Registered Reporting
19   Firm has complied with the ethical obligations set
     forth in ACJA 7-206(J)(1)(g)(1) and (2).
20
     Carrie Reporting, LLC              R1064
21   Registered Reporting Firm          RRF No.

22
                                        11.17.2025
23   Registered Reporting Firm          Date
24   Signature

25
```