IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

Labor Smart, Inc.,              )
                                )
          Plaintiff,            )
                                )
vs.                             ) Case No.
                                ) 2:22-cv-00357-PHX-DJH
Jason and Melissa Tucker,       )
                                )
          Defendant.            )
                                )
                                )
And related Counterclaims       )
and Third-Party Claims.         )
                                )


          VIDEO-RECORDED DEPOSITION OF TOBY MCBRIDE
                (Videoconference via Zoom)



                Stockton, California
                 November 5, 2025
                   8:04 a.m.




REPORTED BY:               CARRIE REPORTING, LLC
Kristy A. Ceton, RPR, CRR  Certified Reporters
AZ CR No. 50200            12725 W. Indian School Rd.
                           Suite F-100
                           Avondale, AZ 85392
CERTIFIED COPY             (480) 429-7573

2

```
 1        VIDEO-RECORDED DEPOSITION OF TOBY MCBRIDE
 2   commenced at 8:04 a.m., on November 5, 2025, at
 3   Stockton, California, Videoconference via Zoom,
 4   before Kristy A. Ceton, RPR, CRR, Arizona Certified
 5   Court Reporter No. 50200.
 6
 7                        *  *  *
 8   APPEARANCES:
 9      For the Plaintiff:
10           PAUL M. LEVINE, P.C.
             By:  Paul M. Levine, Esq.
11           8502 East Via de Ventura
             Suite 230
12           Scottsdale, Arizona 85258
             plevine@pmlevinepc.com
13
     For the Defendants:
14
             MANOLIO & FIRESTONE, PLC
15           By:  Veronica L. Manolio, Esq.
             8674 East San Alberto Drive
16           Scottsdale, Arizona 85258
             vmanolio@mf-firm.com
17
     - and -
18
             FREEMAN LAW FIRM, INC.
19           By:  Spencer D. Freeman, Esq.
             1107 1/2 Tacoma Avenue S.
20           Tacoma, Washington 98402
             sfreeman@freemanlawfirm.org
21
22
23
24
25
```

3

```
 1   APPEARANCES, CONT'D:

 2       Also Present:

 3           Craig Onuschak, the videographer

 4           Jason Tucker

 5           Melissa Tucker

 6           Lindsay Cook

 7           Michael Holley

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of: Toby McBride                                    November 5, 2025

26

1    personally.  I'm not asking you and Holley.

2            A.   No.  Understood.

3            Q.   Okay.  Do you remember signing the stock

4    purchase agreement between Labor Smart and Takeover?

5            A.   Yes.

6            Q.   As you sit here today, what was your

7    understanding of what the agreement was supposed to

8    do?  What was it for?

9            A.   I'm trying to remember.  I don't recall.

10           Q.   All right.  Forget the agreement for a

11   moment.  What was the -- what was the business deal

12   between Labor Smart and Takeover?

13           A.   We were -- I believe we were going to

14   create a beverage company.

15           Q.   Okay.  What -- what did you have to sell

16   to Labor Smart in order for Labor Smart to pay money

17   to Takeover?

18           A.   Will you say it again?

19           Q.   Sure.

20                What did Takeover have to sell to Labor

21   Smart for Labor Smart to pay money to Takeover?

22           A.   Don't recall.

23           Q.   Did you have any assets in the first

24   month of Takeover?

25           A.   No.

Carrie Reporting, LLC - Certified Reporters
480.429.7573

Deposition of: Toby McBride                          November 5, 2025

27

1                    MR. LEVINE:  Objection.  Form.

2          Q.    BY MS. MANOLIO:  I'm sorry.  The answer
3   was no?

4          A.    No.

5          Q.    Did you guys have any intellectual
6   property at that point?

7                    MR. LEVINE:  Objection.  Form.

8                    THE WITNESS:  I don't remember.

9          Q.    BY MS. MANOLIO:  Did you have a website
10  up in March of 2021?

11         A.    Not sure.  Not that I remember.

12         Q.    Did you have a logo developed yet?

13         A.    No.

14         Q.    Did you have any manufacturers online who
15  were ready to start manufacturing a product for you?

16         A.    We have known manufacturers our whole
17  lives, so...

18         Q.    That wasn't the question.

19                Had Takeover retained or paid any
20  manufacturers to manufacture products for you in
21  March of '21?

22         A.    No.

23         Q.    Had you developed specifically what the
24  beverages were that you were going to sell?

25                    MR. LEVINE:  Objection.  Form.

1            THE WITNESS:  I'm trying to think what we

2    were -- I don't recall at this time.

3        Q.   BY MS. MANOLIO:  And, just to be clear,

4    because I'm not trying to trick you.  I'm trying to

5    understand.  I'm talking about the first month of

6    business.

7            So in March of --  You were formed in

8    February.  By March of '21, had Joe Pavlik come

9    aboard Takeover yet?

10           MR. LEVINE:  Objection.  Form.

11           THE WITNESS:  Joe was always -- been

12   there.  So I mean, Joe was there through the process.

13       Q.   BY MS. MANOLIO:  What does that mean when

14   you say --

15       A.   Well, he was just there as a consultant,

16   so...

17       Q.   Okay.  Were you doing consulting work and

18   paying Mr. Pavlik in March of 2021?

19       A.   I don't believe anybody was getting paid.

20   We were working for free.

21       Q.   And that's because there was no capital

22   in the company; is that right?

23       A.   Yes, ma'am.  And I'm not trying to be

24   contentious with you.  I'm just --  So my apologies.

25       Q.   No worries.

Deposition of: Toby McBride                                    November 5, 2025

30

1    number and a dash before it, those are exhibits that

2    have already been marked in this case.  So I'll just

3    tell you 3.

4              A.   You can call me Toby.  Mr. McBride is my

5    grandfather.  So it makes me feel older.

6              Q.   I'll do my very best.  I'll tell you,

7    it's always my habit and I will probably revert

8    back --

9              A.   I do the same thing.

10             Q.   But I'll try.

11             A.   Yes, ma'am.  So 7.

12             Q.   No.  Yes.  7.  You're right.

13             A.   Does it say "Stock Purchase Agreement"?

14             Q.   That is it.  You got it.

15                  Now, Mr. McBride, if you look at the

16   bottom right-hand corner of the first page, there is

17   a number there that starts with TUCKER, and then it

18   has a number.

19                  Do you see that?

20             A.   Hold on a second.  00061?

21             Q.   It should have started with 57 on the

22   first page.

23             A.   It probably did.  I just --  Okay.  Let

24   me go back up.  I see it says "Purchase Agreement."

25                  Oh, yeah.  I see the first page.  My

Deposition of: Toby McBride                     November 5, 2025

1    apologies.

2          Q.   No worries.

3              So I'll just tell you in our world, as

4    lawyers, we call those Bates numbers.

5          A.   What are they called?

6          Q.   Bates, B-a-t-e-s.

7          A.   Bates.

8          Q.   Bates numbers.  So if I refer to a Bates

9    number, I'm talking about the -- the stamp in the

10   corner.

11         A.   I understand what it is now.

12         Q.   Perfect.

13              Okay.  So let's look at the first page of

14   Exhibit No. 7.  Do you recognize this as being the

15   stock purchase agreement between Labor Smart and

16   Takeover and the -- or excuse me, and the

17   shareholders of Takeover?

18         A.   I believe so.

19         Q.   And, again, just so I'm clear for the

20   record.  As you sit here today, with -- you can't

21   articulate to me what the exact mechanisms of this

22   agreement were to mean, can you?

23         A.   Can you say that again?

24         Q.   Sure.

25              As you sit here today, can you tell me

Carrie Reporting, LLC - Certified Reporters
480.429.7573

1    what the exact mechanisms of this agreement?  And

2    what I mean by that is, what Takeover was selling in

3    order to get money from Labor Smart.

4           A.   Not that I recall.

5           Q.   All right.  I want you to look at the

6    section that says "Recitals."

7           A.   One second.  Still on the first page?

8           Q.   Still on the first page.

9           A.   Okay.  I got it.

10          Q.   And I'm going to look at the -- the

11   recitals each start with the word "Whereas," and then

12   it's a sentence.  I would like you to go down to the

13   fourth one.

14          A.   One, two, three, four.  Okay.

15          Q.   And it reads, "In connection with the

16   purchase, buyer wishes to acquire from sellers, and

17   sellers wish to transfer to buyer controlling

18   interest in Takeover Industries, Inc., so that

19   Takeover Industries, Inc., becomes a wholly owned

20   subsidiary of buyer."

21               Did I read that fairly?

22          A.   I believe so.

23          Q.   And the buyer was Labor Smart, Inc.,

24   right?

25          A.   I believe so.

Deposition of: Toby McBride                                November 5, 2025

33

```
 1        Q.   So what was the controlling interest in
 2   Takeover that you and Mr. Holley were selling to
 3   Labor Smart?
 4             MR. LEVINE:  Objection.  Form.
 5             THE WITNESS:  I don't recall.
 6        Q.   BY MS. MANOLIO:  Do you understand that
 7   the intention was to sell Labor Smart all the shares
 8   of Takeover Industries?
 9        A.   Can you say that again?
10        Q.   Sure.
11        A.   Sorry.
12        Q.   Do you understand that the intent of this
13   document was for Takeover to sell all the shares of
14   Takeover to Labor Smart?
15        A.   Yes, I think so.
16        Q.   Okay.  So would that mean that shares had
17   to have been issued in order to sell them?
18             MR. LEVINE:  Objection.  Form.
19             THE WITNESS:  Say that one more time.
20        Q.   BY MS. MANOLIO:  Would that mean that
21   shares of Takeover had to have been issued in order
22   for you to be selling them to Labor Smart?
23        A.   Not sure.
24        Q.   Okay.  Do you have any idea what the
25   value of the shares Takeover was selling to Labor
```

1    Smart was?
2         A.    No.
3         Q.    Do you have any idea what the amount of
4    money was Labor Smart agreed to pay Takeover under
5    this agreement?
6         A.    No.
7         Q.    Okay.  And, Mr. McBride, just give me a
8    minute.
9         A.    Take your time.
10        Q.    I'm going to remove a few paragraphs
11   based on answers you've given.  So I don't want to
12   waste anyone's time.
13        A.    Forgive me, my eyes are stinging on my
14   left eye.  So forgive me.
15        Q.    No worries.  All right.  Let me know when
16   you're feeling better and --
17        A.    I'm good.
18        Q.    -- turn to the second -- or scroll to the
19   second page of the document, please.
20        A.    Uh-huh.
21        Q.    And under the first No. 1, it says,
22   "Purchase and sale of shares."
23              Do you see that?
24        A.    Yes.
25        Q.    Under letter B, it says "Purchase price."

54

1    officer done at the same time as Mr. Tucker's officer

2    appointment?

3          A.    I believe so, yeah.

4          Q.    And, again, not trying to trip you up.  I

5    want to make sure I understand.  Because my

6    understanding was you and Mr. Holley founded the

7    company, and you were the only shareholders.  And

8    then at some point, you brought Mr. Pavlik and

9    Mr. Tucker into officer positions at the same time.

10   Just tell me if I have that right or not.

11         A.    Yeah.

12         Q.    It sounds right to you?

13         A.    Yes, ma'am.

14         Q.    Okay.  So was that discussion during the

15   June meeting in Arizona?

16         A.    No, I don't think so.

17         Q.    Okay.  When Mr. Tucker was offered a

18   position, what was his position with Takeover?

19         A.    Oh, I don't recall.

20         Q.    Was he not given the title of president

21   of Takeover?

22              MR. LEVINE:  Objection.  Form.

23              THE WITNESS:  I don't -- I don't recall.

24         Q.    BY MS. MANOLIO:  All right.  Take a look

25   at Exhibit No. 8 now.  That should be in front of

Deposition of: Toby McBride                                    November 5, 2025

55

1    you.  And these appear to be meeting minutes of a
2    meeting of the directors.  And the date is June 10th
3    of 2021.
4              Do you see where I am reading?
5         A.   Yeah.
6         Q.   And at that -- in June of '21, the only
7    directors of Takeover were yourself and Mr. Holley;
8    is that right?
9         A.   Yes.
10        Q.   Okay.  And I want you to just read the
11   first couple paragraphs to yourself up until the
12   point where it says "Resolved."  You don't have to
13   read it on the record.
14        A.   Okay.
15        Q.   All right.  The first resolution says
16   that Mr. Holley, yourself, Mr. Pavlik, and Mr. Tucker
17   would all be appointed or reelected as directors of
18   the company.
19             Does that help refresh your memory at all
20   of when -- or that Mr. Pavlik and Mr. Tucker were
21   appointed as directors the same time?
22        A.   Yes.
23        Q.   The next resolution is that Michael
24   Holley would be reappointed as the treasurer of the
25   company.

57

1          Those have been -- those would have been
2   responsibilities you leaned on Mike for, where he
3   leaned on you for your relationships in the beverage
4   industry; is that fair?
5          A.   Yes, ma'am.
6          Q.   Okay.  Got it.
7               The next one says, "Resolved that Toby
8   McBride be appointed as the chief executive officer
9   of the company."  That comports with your memory,
10  right?
11         A.   Yes, ma'am.
12         Q.   And then Mr. Pavlik would be appointed as
13  the chief science officer?
14         A.   Okay.
15         Q.   Of the company; is that right?
16         A.   Yes.
17         Q.   Okay.  Then, you know, it just has the
18  unanimous vote language.  And on the second page of
19  this document, can you just tell me if that is your
20  signature?
21         A.   Looks like it.
22         Q.   You're not disputing it is, are you?
23         A.   No.  My -- mine is a scribble.  So yeah.
24         Q.   And is that -- is your normal signature a
25  scribble?

1        A.   Yeah.   Jason hated it.   Mike hated it.
2    They all hated it.   But yes, ma'am.
3        Q.   Should have been a doctor.
4        A.   You would have never got in -- you would
5    have never gotten pills from me, you would have seen
6    that signature show up.
7        Q.   All right.  Let's move on.  So after you
8    guys have this meeting in June of '21 here in
9    Arizona, what did Mr. Tucker start doing for
10   Takeover?
11            MR. LEVINE:  I'm sorry.  Kristy, would
12   you read that back?
13            (The record was read by the court
14   reporter as follows:  "All right.  Let's move on.  So
15   after you guys have this meeting in June of '21 here
16   in Arizona, what did Mr. Tucker start doing for
17   Takeover?")
18            THE WITNESS:  I don't recall at the
19   moment.
20       Q.   BY MS. MANOLIO:  Was Mr. Tucker -- and
21   I'm just trying to refresh your memory.  Was
22   Mr. Tucker helping negotiate sponsorship contracts?
23       A.   Possibly.  Yes.
24       Q.   Does a contract with T-Pain or Nappy Boy
25   Entertainment mean anything to you?

```
1              Do you recall Mr. Tucker giving you

2    information that Mr. Holley had been spending

3    Takeover money on personal expenses?

4         A.   I don't recall.

5         Q.   All right.  We know from prior testimony

6    in this case and, quite simply, your lawyer's

7    pleadings in this case, that the four of you agreed

8    to pay yourselves $240,000 a year or five grand a

9    week.  Is that -- does that comport with your memory?

10             MR. LEVINE:  Objection.  Form.

11             THE WITNESS:  No.

12        Q.   BY MS. MANOLIO:  What was your memory of

13   how you and Mr. Holley were supposed to be

14   compensated at the time you formed Takeover?

15        A.   I don't remember.

16        Q.   If Mr. Holley gave us testimony that it

17   was supposed to it be $5,000 a week, or what I said

18   was 20 grand a month, do you dispute that?

19             MR. LEVINE:  Objection.  Form.

20             THE WITNESS:  No.

21        Q.   BY MS. MANOLIO:  Okay.  Do you dispute

22   that 20 grand a month would equal $240,000 per year?

23        A.   Yes.

24        Q.   You dispute that?

25        A.   No.  My apology.
```

1      Q.   That's okay.

2           Maybe I should have just asked if you

3   agree.  We all agree, if you're getting paid 5 grand

4   a week or 20 grand a month, that equates to $240,000

5   a year; is that fair?

6           A.   Correct.

7      Q.   And so was your understanding that in

8   year one of Takeover, you and Mr. Holley would

9   compensate yourselves at that rate of 240- per year?

10          A.   Yes.

11     Q.   Okay.  Now, I'm looking at this letter,

12  No. 3 here.  Did Mr. Tucker ever express to you that

13  Mr. Holley had received distributions in the amount

14  of 323,770, or any words to that effect?

15          A.   I don't recall.

16     Q.   If that were true, if Mr. Holley had been

17  paid more than $300,000 by December 8th of 2021, can

18  we agree that's more than 240 grand?

19          A.   We can agree, but that's not -- that's

20  not true.

21     Q.   What do you mean?  What's not true?

22          A.   He never took more than what he was

23  supposed to.

24     Q.   He never took more than 240- a year?

25          A.   He -- he -- he took what he was

Deposition of: Toby McBride                              November 5, 2025

164

1          Q.    -- go through them?

2          A.    No.

3          Q.    No?

4          A.    Not --  To the best of my knowledge.  I

5    don't remember that.  I don't remember.

6          Q.    Okay.  Have you ever taken Takeover bank

7    statements or your own personal bank statements to

8    verify how much money you were paid from Takeover in

9    2021?

10         A.    No.

11         Q.    As you sit here today, can you give me

12   any estimate of how much money you received from

13   Takeover in the calendar year 2021?

14         A.    No.

15         Q.    As you sit here today, can you tell me

16   how much money you spent in personal expenses on the

17   credit card of Takeover Industries in 2021?

18         A.    No.

19         Q.    Do you agree that you put personal

20   expenses on your Takeover credit card?

21         A.    Some.

22         Q.    I'm sorry?

23         A.    Some.

24         Q.    What does that mean?

25         A.    A little that was paid back.

Deposition of: Toby McBride                          November 5, 2025

165

1          Q.   How was it paid back and when?

2          A.   I don't recall.

3          Q.   Do you have any records of making payment

4     to Takeover Industries to repay it for personal

5     expenses you charged on your credit card?

6          A.   I'm not sure.

7          Q.   If you had them, would you have produced

8     them in this litigation?

9          A.   Of course.

10         Q.   So I can tell you that to this moment, I

11    have never seen any record of you making payments to

12    Takeover to repay credit card debt.  So what would I

13    be looking for?

14         A.   We've had a secondary and third audit

15    come in that says that there was no misuse of me

16    using the card.

17         Q.   A secondary and third audit of what

18    company?

19         A.   I'm not sure.

20         Q.   You don't know if it was Takeover or

21    Labor Smart when you talk about these audits?

22         A.   Takeover.

23         Q.   Okay.  Have -- has -- have you produced

24    these audit records in the course of this litigation?

25         A.   No.

Deposition of: Toby McBride                    November 5, 2025

219

```
 1    when he makes spontaneous statements, I'm going to
 2    follow up.
 3               And it's relevant, particularly to the
 4    timeline we're going through.
 5               MR. LEVINE:  Okay.  We'll agree to
 6    disagree.
 7               MS. MANOLIO:  I'm sorry?
 8               MR. LEVINE:  I said, we'll agree to
 9    disagree.
10               MS. MANOLIO:  No problem.
11        Q.   BY MS. MANOLIO:  Mr. McBride, by mid-'23,
12    were you over feeling depressed and in a different
13    frame of mind?
14        A.   I don't recall.
15        Q.   Isn't there a time when rather than being
16    sad or depressed to the point of wanting to harm --
17    and I don't ever suggest that you should, but you
18    were downright angry?
19        A.   Don't recall.
20        Q.   Didn't you go on a podcast very angrily?
21        A.   Don't recall.
22        Q.   You don't recall giving a several-hour
23    interview with Sharmila Viswasam?
24        A.   I recall it.
25        Q.   What's that?
```

1          A.    No.

2          Q.    -- from the original voicemail you sent?

3          A.    No.

4                MS. MANOLIO:  Give me just a moment and

5    we might be done.

6          Q.    BY MS. MANOLIO:  Mr. McBride, the next

7    thing I need you to verify is the podcast with

8    Sharmila.  Before I even play anything or show you

9    anything, let me just ask you a question -- a couple

10   of backup questions.  These are just procedural.

11               Do you agree that you participated in a

12   podcast interview with Sharmila Viswasam?

13         A.    Yes, ma'am.

14         Q.    And did -- do you agree that there were

15   four separate parts?

16         A.    I don't remember.

17         Q.    I'm sorry?

18         A.    I don't remember.

19         Q.    Did you ever --  Well, then, I think that

20   probably the smartest thing is, I'll just show you

21   each of the four parts we have, and I'll just tell

22   you that when it was published, there's four

23   different pieces.

24         A.    Oh, I just did one sitting.

25         Q.    Got it.  I understand you're saying you

Deposition of: Toby McBride                                    November 5, 2025

294

1    just did one.  But it's been broken down in four.  So

2    the first few seconds.  If you can identify and

3    verify that's yourself and whether or not you're

4    objecting to the content.

5         A.   Yes, ma'am.

6         Q.   Okay.

7              MR. LEVINE:  Veronica, I'm sorry to

8    interrupt.  But real quick.  My understanding is that

9    the video -- that the excerpts that you have are not

10   the entirety of the interview.

11             MS. MANOLIO:  No.  Well, I wasn't going

12   to play the entire interview today.  I --

13             MR. LEVINE:  That wasn't my point.

14             Go ahead.  I'm sorry.  Just go ahead.

15             MS. MANOLIO:  What -- No.  No.  No.  I

16   need to understand what you're saying.  Are you

17   telling me there's more to it than the four parts I

18   provided you?

19             MR. LEVINE:  My understanding is that the

20   video podcast was three to four hours, maybe.  And

21   that the parts that you sent were, like, an hour and

22   40 minutes.

23             MS. MANOLIO:  Oh, so there's more to it

24   that you guys have?

25             MR. LEVINE:  I don't know -- I don't know

Deposition of: Toby McBride                          November 5, 2025

296

```
1          Q.   Got it.  Okay.
2               And did you ever see the final product
3     when it was published?
4          A.   No, ma'am.
5          Q.   Even to this day, you've never watched
6     the final product?
7          A.   I'm not proud of that.
8          Q.   I understand.  And I'm not trying to ask
9     you about the content.  I just want to know if you
10    have ever seen it because --
11         A.   No.
12         Q.   -- if we are asking you to authenticate
13    it --
14         A.   No.
15         Q.   -- I need to know if you're telling me
16    you can or can't because you've never watched it or
17    listened to it?
18         A.   If it's my voice and my face, then, yes.
19         Q.   All right.  Let me just show you a little
20    bit of the beginning of each.  You can tell me if
21    that was the interview you remembered doing with
22    Sharmila.
23              (The video was played.)
24         Q.   BY MS. MANOLIO:  Mr. McBride, is that you
25    on the video?
```

Deposition of: Toby McBride                          November 5, 2025

297

```
 1            A.   I can't see it.

 2                 MR. LEVINE:  I can't see anything.

 3                 MS. MANOLIO:  I thought it was sharing.

 4   I'm so sorry.  I hit "Share," but didn't hit "Send."

 5                 THE WITNESS:  Yes, that's me.

 6                 THE VIDEOGRAPHER:  Veronica, did you want

 7   this video to be on the video?

 8                 MS. MANOLIO:  It doesn't need to be.

 9   It's fine.

10                 I will represent for the record, this is

11   what was produced in this case as episode one, Toby's

12   Truth Preview, just so we have a good record.

13            Q.   BY MS. MANOLIO:  Mr. McBride, can you

14   verify this is your voice?

15                 (The video was played.)

16                 THE WITNESS:  Yes, ma'am.

17            Q.   BY MS. MANOLIO:  Okay.  And are you

18   disputing that you participated in this -- this

19   segment that's being shown to you --

20            A.   No.

21            Q.   -- that is roughly 8 minutes and 14

22   seconds?

23            A.   No.

24                 MS. MANOLIO:  I'm going to play for you

25   what has been identified in this case as part 2.
```

Carrie Reporting, LLC - Certified Reporters
480.429.7573

Deposition of: Toby McBride                                    November 5, 2025

298

```
 1                    (The video was played.)
 2                    THE WITNESS:  That's me.  Yes.
 3          Q.   BY MS. MANOLIO:  Are you agreeing that
 4   you participated in this particular interview with
 5   Shar that is roughly 25 minutes and 42 seconds?
 6          A.   Yes, ma'am.
 7          Q.   And this is the same day, right?  This is
 8   what you said, it was all the same?
 9          A.   Yeah.  I'm wearing the same shirt.  Yeah.
10          Q.   Are you?
11          A.   Yes, ma'am.  No.  This shirt is the same
12   in every video.
13                    MS. MANOLIO:  All right.  Part 3, for the
14   record, is how this one is identified.
15                    (The audio was played.)
16                    THE WITNESS:  Yes, ma'am.
17          Q.   BY MS. MANOLIO:  Same questions,
18   Mr. McBride.  Is that you in this video?
19          A.   Yes, ma'am.
20          Q.   Are you verifying that this is
21   authentically the podcast that you did with Ms. Shar
22   at roughly 35 minutes and 20 seconds?
23          A.   Yes, ma'am.
24          Q.   No dispute, right?  No dispute?
25          A.   No, ma'am.
```

Deposition of: Toby McBride                                    November 5, 2025

299

```
 1                 MS. MANOLIO:  Okay.  The final one is
 2    part 4, for the record.  It's how it's labeled.
 3                 (The video was played.)
 4                 THE WITNESS:  Yes, ma'am.
 5            Q.   BY MS. MANOLIO:  Is this your appearance
 6    in part 4 of the locked-in video part 4?
 7            A.   Yes, ma'am.
 8            Q.   And you're telling me you will not
 9    dispute the authenticity of this video?
10            A.   No, ma'am.
11            Q.   Okay.
12                 THE WITNESS:  Are we good, Paul?
13                 MS. MANOLIO:  Give me just one moment and
14    then I think we'll be done.  Let me just make sure
15    there's nothing I'm missing.
16                 THE VIDEOGRAPHER:  Stay on the record,
17    Veronica?
18                 MS. MANOLIO:  I'll be very quick.
19                 THE VIDEOGRAPHER:  Okay.
20                 MS. MANOLIO:  All right.  I think we got
21    all the things that I said I wanted to authenticate
22    and verify for the record.
23                 Paul, we will have to reconvene about
24    whether we're reconvening on this, whether I'm going
25    to file a motion with the Court, how we're going to
```

Deposition of: Toby McBride                                  November 5, 2025

302

```
 1    STATE OF ARIZONA        )
                              ) ss.
 2    COUNTY OF MARICOPA      )

 3

 4            BE IT KNOWN that the foregoing
      proceedings were taken by me, KRISTY A. CETON, a
 5    Certified Reporter, in and for the County of
      Maricopa, State of Arizona; that the witness before
 6    testifying was duly sworn to testify to the whole
      truth; that the questions propounded to the witness
 7    and the answers of the witness thereto were taken
      down by me in shorthand and thereafter reduced to
 8    typewriting under my direction; that the witness
      requested reading and signing said deposition; that
 9    the foregoing pages are a true and correct transcript
      of all proceedings had, all done to the best of my
10    skill and ability.
              I FURTHER CERTIFY that I am in no way
11    related to any of the parties hereto, nor am I in any
      way interested in the outcome hereof.
12            I FURTHER CERTIFY that I have complied
      with the ethical obligations set forth in ACJA
13    7-206(J)(1)(g)(1) and (2).

14
      Kristy A. Ceton                     50200_____
15    Certified Reporter                  CR Number

16
      _____            11.21.2025
17    Certified Reporter Signature        Date

18
              I CERTIFY that this Registered Reporting
19    Firm has complied with the ethical obligations set
      forth in ACJA 7-206(J)(1)(g)(1) and (2).

20

21    Carrie Reporting, LLC                 R1064
      Registered Reporting Firm            RRF No.

22
      _____            11.21.2025
23    Registered Reporting Firm            Date

24    Signature

25
```

Carrie Reporting, LLC - Certified Reporters
480.429.7573