IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| LABOR SMART, INC., Plaintiff, vs. JASON AND MELISSA TUCKER, Defendants. | Case No. 2:22-cv-00357-PHX-DJH |
| And related Counterclaims and Third-Party Claims. | |

VIDEOCONFERENCED DEPOSITION OF JASON TUCKER

December 10, 2025
Witness Location: Santa Fe, Mexico
9:00 a.m. MST

REPORTED STENOGRAPHICALLY BY:
ROBIN JASPER, RPR
Certified Reporter
Certificate No. 50286

PREPARED FOR:
ASCII/CONDENSED

(Certified copy)

Q. Which one did it receive?
**A. It received -- the Next Level Up Gamer Shot was received -- excuse me, it was about to receive a trademark registration number, and then there were copyright -- there was a copyright registration on file with the U.S. Copyright Office.**
Q. Well, I don't think you understood my question. There's a difference between applying for a trademark and obtaining a legally-recognized trademark from the U.S. Patent Office.
Do you understand that distinction?
**A. Yes. But it was the way that you were asking the question.**
Q. So let me re-ask it.
Did Takeover ever actually receive from the U.S. Patent Office a trademark for any mark?
**A. No.**
Q. Did Takeover actually receive a copyright for anything from the U.S. Patent Office?
**A. No. The patent office doesn't issue copyright registrations.**
Q. Who does?
**A. The United States Copyright Office.**
Q. Did the U.S. Copyright Office ever actually issue Takeover a copyright for anything?

A. **Yes.**
Q. What?
MS. MANOLIO: Form.
**THE WITNESS: The can art.**
BY MR. LEVINE:
Q. C-A-N art?
**A. If you want to spell it that way, yes.**
Q. How would you spell it?
**A. The same way.**
Q. When did -- is there any other copyright actually received from the U.S. Copyright Office for Takeover?
**A. I don't remember everything that went into the copyright, or into the can art file off the top of my head. But it would all have fallen under that number.**
Q. At the risk of asking a, perhaps an obvious question, when you call it "can art," are you talking about the art that is actually on a can for a product sold by Takeover?
**A. It was used for that. But if we would have used it anywhere else, in any other medium, I would suggest that the artwork is still the same. So it's the artwork, but, yes, it was also used on a can.**
Q. Okay. Is there any other intellectual property where Takeover received an actual registration from either the U.S. Patent Office or the U.S. Copyright Office for

Do I have that right?

**A. No.**

Q. So let me re-ask the question.

When did you become a shareholder in Takeover?

**A. June 2021.**

Q. Did you actually receive shares in Takeover in June of '21?

**A. Again, same thing, I don't understand the question.**

Q. Well, did you receive a stock certificate in June of --

**A. There weren't any stock certificates.**

Q. Sir, just let me finish my question before you begin answering.

In June of 2021, what is the basis for you to tell us that you became a shareholder in Takeover?

**A. I entered into an agreement with the principals of Takeover, and we moved forward based on that agreement, and it moved to written form later. I was promised shares.**

Q. All right. You were promised -- your testimony is you were promised shares in June of 2021, correct?

**A. Yes.**

Q. And those promises came from Toby, Mike and Joe,

you the exhibit number, and we can put it on the record. And I will shoot you this over.

BY MR. LEVINE:

Q. So, Mr. Tucker, we can scroll down. This is, I believe it's a two-page document.

Do you recognize this document?

**A. Could you scroll all the way down? And as I asked previously, or started to, I was furnished with a Dropbox folder. If you could tell me the number in the Dropbox folder, that would be helpful.**

Q. 53.

**A. Thank you. I recognize this document.**

Q. So is this the document that you mentioned in earlier testimony about the agreement with Toby, Joe and Mike?

**A. No. I had this agreement with Toby -- I had the Takeover agreement with Toby, Joe and Mike. This is the written version of that agreement with some additions.**

Q. So was the agreement with Takeover in writing or was it oral?

**A. It was oral, and then it went to notes that went to our counsel.**

Q. When was the oral agreement made?

**A. June 2021.**

Q. Where were you when that agreement was made?

A. **Yes.**

Q. When?

A. **It was a draft that was done, I believe, like the next month, but nothing -- it took Eric -- Eric is a busy litigator and he had a crazy trial calendar and some things going on, so it took him on long time to actually get it onto paper for us. So that was eventually done, I believe, in November.**

Q. And was it Eric that -- did Eric deliver this written agreement to the four of you?

A. **I think Eric delivered it to me and then I put it onto DocuSign and circulated it between us.**

Q. Was the agreement ever signed?

A. **Yes.**

Q. Was it signed in November?

A. **Yes.**

Q. Just to be clear, we are talking about November of '21?

A. **Yes.**

MR. LEVINE: Let's go off the record a moment.

(An off-the-record discussion ensued.)

MR. LEVINE: The parties have agreed to mark the July 2021 two-page Agreement as Exhibit 49.

Agreed, Veronica?

amount?

**A. Yes.**

Q. So whatever it was -- strike that.

Who was supposed to pay you pursuant to item 1 C?

**A. Takeover Industries.**

Q. Did the four of you -- strike that.

Did Toby, Mike and Joe make any personal agreement on their own behalf pursuant to item 1 C?

MS. MANOLIO: Form.

**THE WITNESS: I don't understand your question.**

BY MR. LEVINE:

Q. Is it your testimony that the payments you were to receive under 1 C were to come from Takeover?

**A. Yes.**

Q. And if Takeover did not make equal payments, what did you understand your remedy or recourse was?

MS. MANOLIO: Form.

**THE WITNESS: I didn't -- it wasn't even contemplated. I had no reason to doubt these guys. I wasn't doubting anything. I never even thought about it until much later.**

BY MR. LEVINE:

Q. Do you believe, as you sit here today, that you

did not receive monthly payments equal to each other?

**A. I know that to be a fact.**

Q. And as I understand it, you should have received equal pay from Takeover, is that correct?

**A. Yes.**

Q. Do you believe, under section 1 C of this document, that Toby, Mike and Joe owe you any money because Takeover failed to pay you an amount equal to the others?

MS. MANOLIO: Form.

**THE WITNESS: I'm going to go with yes.**

BY MR. LEVINE:

Q. Why?

**A. Toby had agreed to pay over $243,000 back to the company. Those funds would have been utilized to balance out, which we later found out from his theft, and then Mike's theft, that what was going on wasn't going on. So they took actions to satisfy themselves at the expense of the company and all of us. And so I would imagine that some liability falls onto them and they are not absolved.**

Q. Let me ask you a different question.

So my understanding is that you reached this agreement in June and July 2021 and then it was reduced to writing in November 2021.

Is that correct?

**A. I don't even know how to answer your hypothetical.**

Q. If you were -- again, I'm focusing on item 1 C.

If you were paid more per month than any of the other three, did you think you had any personal liability to pay Toby, Mike or Joe for the difference between what you were paid and what they were paid?

MS. MANOLIO: Object to form.

MR. FREEMAN: Object to form.

BY MR. LEVINE:

Q. Go ahead, answer the question.

**A. With the access that I had, me personally, no.**

Q. All right. Now I want to move to the second paragraph where it discusses Labor Smart.

Do you see that?

**A. Yes.**

Q. All right. So we are going to take these one at a time.

When did you learn that Toby, Mike and Joe held 51 preferred shares in Labor Smart?

**A. I don't remember, specifically.**

Q. Was it sometime prior to November 2021?

**A. Yes.**

Q. Was it in the June 2021 meeting at the Westin?

**A. I think I knew it then.**

Q. So as I understand item 2 B, Toby, Mike and Joe were each going to give you 4 of their preferred shares when Labor Smart received its current status.

Is that a correct interpretation?

**A. That's how I understood that it would probably go down, yes.**

Q. When did Labor Smart receive its current status?

**A. I believe it was April of 20 -- was it last year or this year?**

Q. Well, I can't give --

**A. I think it was April 2024. We could check on DC markets for that.**

Q. Yeah, I think that's correct. So let's just -- I'm going to rely on April of 2024. So let's assume that's a correct time frame, Mr. Tucker.

Would it have been sometime after the current status was received in April of 2024 when you were supposed to receive the shares of preferred shares in Labor Smart, item 2 B?

**A. In April 2024.**

Q. And were you supposed to receive 4 preferred shares from each of Toby, Mike and Joe?

**A. I don't think we defined it in here. I was just supposed to receive 12 preferred shares. My understanding was, is they were coming from Toby, Mike and Joe. But if**

**they would have cut a different deal amongst each other as to how many shares they were going to transfer, similar as the previous question of Takeover, as long as I got 12 preferred shares from them, it didn't matter the order.**

Q. Then at the end of the day, this transfer, the number of preferred shares are set forth in item 2 C.

Do I have that right?

**A. The number of preferred shares that I will get --**

Q. And that --

**A. -- or I'm entitled to, that I was supposed to get?**

Q. Yes.

**A. Yes.**

Q. And the remaining shares for Toby, Mike and Joe are each 13, as set forth in item 2 C?

**A. As listed, yes.**

Q. Now let's talk about 2 D, as in David.

Jason shall receive 750 common shares.

I assume it's common shares in Labor Smart. Is that correct?

**A. 750 million common shares in Labor Smart.**

Q. All right. And who was to deliver those shares?

**A. My understanding was, is that they amongst each other had 6 billion common shares and that I was to receive 750 million common shares.**

Q. And did you care where they came from, whether equal from Toby, Joe and Mike, or all from one or a different proportion? Did you care?

**A. As I -- I didn't even contemplate it, whether it came from the company or them as individuals. As long as -- again, as long as I got my 12 preferred shares and my 750 million shares of Labor Smart and my 25 percent of Takeover, I didn't care how they did the math to get there.**

Q. And what is it -- what did you understand item D, where it states "at the same rate as Toby McBride or is assigns," what did you understand that to mean?

**A. I'm not really sure the full extent of that anchor. But my understanding was Toby was the driving force behind these decisions, and so it was to be bound to -- it was basically -- the way it was explained to me is that that was a non-dilution situation.**

Q. Who explained that to you?

**A. I think it was something we had discussed and Eric had brought up. But I'm not going to go into conversations I had with Eric as counsel.**

Q. Well, I thought Eric was representing Takeover?

**A. He was representing Takeover. So if you want me to speak about that, he said, look, he said you guys need a non-dilution provision, I just threw that in there,**

minutes, please.

MS. MANOLIO: Okay.

MR. LEVINE: Thank you.

(The deposition was at recess.)

MR. LEVINE: Let's go back on the record.

Veronica, I just want to confirm that the Tuckers are withdrawing the claim for contract damages associated with Melissa and Oak Creek Wellness' claim for contract damages. Am I correct?

MS. MANOLIO: You are correct. And I did put that in writing to you in an e-mail, and you are absolutely welcome to rely on that and my word, yes.

MR. LEVINE: Got it. Thank you.

BY MR. LEVINE:

Q. Mr. Tucker, I'm going to approach now a very sensitive topic, and that is the defamation claim against Mr. McBride. So I recognize that it's very sensitive and I want to be respectful of this, but I do need to ask some questions.

First of all, are you personally claiming that you were damaged as a result of comments made by Toby?

**A. Yes.**

Q. So explain to me how you believe you were damaged by the comments made by Toby.

comments?

A. **Not less than a million dollars.**

Q. And how do you arrive at a million dollars?

A. **Lost business, it's presumed, and the fact that part of my ability to market my business is obviously to market what I do in the business and to be seen as somebody who is an exemplary person in that space, I can no longer do that because of what Toby did. It's as simple as that. I can't even make a tweet. I was accused three days ago in a post by a shareholder of Labor Smart that I stole IP and that my greasy fingers are on things. That's just this last week. And that was one post of several. This is an ongoing -- so even if I don't do anything, I'm still taken out for a walk.**

Q. So Battleship, is it a corporation or an LLC?

A. **It's a corporation.**

Q. Where is it domesticated, under what state?

A. **Washington state.**

Q. Does it file tax returns?

A. **Yes, it does.**

Q. Has it filed a 2024 tax return?

A. **I think that 2024 is being redone right now because of payments that it was due.**

Q. So do you know what the gross income was of Battleship in the years 2021 through today?

Q. How long did the restriction last before it was released?

**A. Like 90 days.**

Q. And do you remember when the restriction started and when it was released?

**A. Well, the restriction started at the time that I took possession of the shares.**

Q. But it didn't -- when did you -- okay.

And when was that? That was after you bought it from Pavlik?

**A. Well, when he finally got around to being able to execute all of the documents that were necessary in order to effectuate the transfer and provide his driver's license and he wasn't able to get a medallion stamp, so then it needed to be a notary stamp with Toby certificating that Joe was Joe. So whenever that took place, the restriction -- the shares were restricted for Joe, they transferred over to Battleship, and the restriction stayed until we requested the restriction to be removed.**

Q. When did you request --

**A. I was no longer an insider at that point, and the Rule 144 had expired, the requirement.**

Q. When did you request that the restriction be removed?