# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Labor Smart, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | 2:22-cv-00357-PHX-DJH |
| Jason and Melissa Tucker, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| And related Counterclaims | ) | |
| and Third-Party Claims. | ) | |
| | ) | |

DEPOSITION OF TOM ZARRO
(Videoconference via Zoom)

Scottsdale, Arizona
November 4, 2025
9:46 a.m.

REPORTED BY:
Kristy A. Ceton, RPR, CRR
AZ CR No. 50200

CARRIE REPORTING, LLC
Certified Reporters
12725 W. Indian School Rd.
Suite F-100
Avondale, AZ 85392
(480) 429-7573

CERTIFIED COPY

DEPOSITION OF TOM ZARRO

commenced at 9:46 a.m., on November 4, 2025, at Scottsdale, Arizona, Videoconference via Zoom, before Kristy A. Ceton, RPR, CRR, Arizona Certified Court Reporter No. 50200.

* * *

APPEARANCES:

For the Plaintiff:

PAUL M. LEVINE, P.C.
By: Paul M. Levine, Esq.
8502 East Via de Ventura
Suite 230
Scottsdale, Arizona 85258
plevine@pmlevinepc.com

For the Defendants:

MANOLIO & FIRESTONE, PLC
By: Veronica L. Manolio, Esq.
8674 East San Alberto Drive
Scottsdale, Arizona 85258
vmanolio@mf-firm.com

- and -

FREEMAN LAW FIRM, INC.
By: Spencer D. Freeman, Esq.
1107 1/2 Tacoma Avenue S.
Tacoma, Washington 98402
sfreeman@freemanlawfirm.org
(via Zoom)

Also Present:

Jason Tucker

Melissa Tucker

Jason Tucker

Mr. McBride in year one of Takeover?
A. I was.
Q. Okay. So let's start from the beginning.
As far as I understand, you first became involved with Takeover by way of a loan; is that correct?
A. Correct.
Q. And my understanding is that loan was a $300,000 loan and you had a note on it; is that correct?
A. Correct.
Q. When was that note entered?
A. I want to say June of '21.
Q. Who came to you to get that loan?
A. All my dealings were with Jason Tucker.
Q. So Jason Tucker was the one who asked you to loan money to Takeover?
A. I don't recall the exact sequence, but everything was done with Jason.
Q. Okay. And what was Jason's role with Takeover when he asked you to enter a note for $300,000 to Takeover? Do you know?
A. I believe Jason was in charge. Like, Jason was the number one.
Q. So it was your understanding that Jason

was an officer of Takeover?

A. At the time, Veronica, yeah, that was my belief.

Q. Okay.

A. Like, he was the one negotiating the -- the note with me.

Q. Got it.

And you don't know the exact date of that note, as you sit here today?

A. I believe it was June of '21.

Q. But you don't know a date?

A. No, ma'am.

Q. Okay.

A. No, ma'am.

Q. And that's fair. I'm just trying to understand. And the reason why I'm telling you that I need to know the date is, do you understand Mr. Tucker's position is that Mike Holley and Toby McBride voted Jason in to be an officer and director as of June 2021?

A. I don't know the -- I don't know all those inner workings. I just know Jason was the guy I trusted to get it done and then pay me back.

Q. Okay. And after your note was entered, how much were you repaid toward your note from

Takeover?
A. I -- I want to say five or six payments over the next year. Again, that's a guess.
Q. As you sit here today, do you have any understanding of how much money Takeover still owes you on that note?
A. Forgive me, Veronica, I'm guessing. 160- to 180- with interest and all that.
Q. Now, my understanding from looking at the bank records is the payments that you were making were roughly $26,000 each; is that right?
A. The payments that I was receiving, yes.
Q. Correct. Okay.
A. Yeah.
Q. And was that the agreement, that you would be paid at that amount monthly until the note was paid back?
A. I believe so.
Q. Okay. What have you done to collect the 160- to $180,000 owed to you by Takeover?
A. Currently or back when Jason was in charge?
Q. Well, let's start with when the -- when Takeover first became in arrears. Do you know when that was?

have an objection.

Q. BY MS. MANOLIO: Okay. Mr. Zarro --

A. Yes.

Q. -- how did you get involved to become an officer and director of Takeover? What -- what was the impetus for that?

A. I was involved by nature of the default from Takeover, Labor Smart paying me. My conversations with Jason were about the turmoil, and I jumped in to see what I could do to -- to solve the problems and try and help.

Q. Let's break that down.

You just said in your answer, you were involved with Takeover/Labor Smart paying me. Labor Smart never borrowed money from you, did it?

A. My note is in Labor Smart, the parent company.

Q. Your note is in Labor Smart?

A. Yes, ma'am.

Q. Well, then why would Takeover be paying payments on your note?

A. I don't know.

MR. LEVINE: Objection. Objection. Form.

THE WITNESS: You would have to ask

A. Yes.
Q. Were you aware that a lawsuit was filed against Joe Pavlik, Mr. McBride, and Mr. Holley in Florida in January of 2023?
A. Yes.
Q. You were not a party to this lawsuit, were you?
A. No. No.
Q. Takeover was not a party to this lawsuit, was it?
A. No.
Q. Labor Smart was not a party to this lawsuit, was it?
A. No.
Q. And Mr. Sequeira was a plaintiff in this lawsuit; isn't that right?
A. Yes.
Q. Jon Sisson was a plaintiff in this lawsuit, right?
A. Yes.
Q. All right. Feel free to close that out.
And let's look at Exhibit No. 32.
A. Okay.
Q. Why were you involved in a settlement agreement related to a case in which you were not

named in February of 2023?

A. I became involved in the whole LTNC Takeover drama, for lack of a better word, strictly trying to help get the discord over and back to try to keep the business going for the purpose of the shareholders of the parent company. It truly was a ministry.

Q. Truly was a what?

A. Ministry. Ministry. Trying to help the people.

Q. Let me be very clear here.

You're talking about wanting to protect the shareholders of Labor Smart was the reason for your involvement, right?

A. Well, and the creditors of Takeover and the shareholders of Takeover, like, the whole group. It wasn't like these people, but not those people. It was clear there was tremendous misinformation, and I jumped in to just try and help.

Q. All right. You've said a lot of things. We're going to unpack them.

Number one is, when you say the ministry, you're trying to say that you were being altruistic and trying to help everyone else. Do I have that part right?

A. That, you definitely have right.
Q. All right. However, what you're talking about is resolution of a lawsuit where the shareholders of Labor Smart weren't at risk; isn't that true?
MR. LEVINE: Objection. Form.
THE WITNESS: I disagree.
Q. BY MS. MANOLIO: Labor Smart was not a party to this lawsuit, was it?
A. No.
Q. This was against Holley, Pavlik, and McBride individually, correct?
A. Correct.
Q. Takeover's not a party, right?
A. Correct.
Q. All right. The Recitals of this document --
And let me ask, if you were coming into this with all altruistic means, what part of negotiation did you have for the terms of this settlement?
MR. LEVINE: Objection. Form.
Do you understand the question?
THE WITNESS: I do.
Just -- just to serve as somewhat of a

Q. Who was the board of directors of Labor Smart in February of 2023 when this settlement was negotiated?
A. I don't know.
Q. If a provision just above says that Mr. McBride is removed as a director of Labor Smart, clearly, he can't vote as a Labor Smart director to agree to new appointees, can he?
A. I don't know.
Q. Was Mr. Pavlik a director of Labor Smart at the time this settlement was negotiated?
A. I don't know.
Q. Did Mr. Pavlik have any preferred shares of Labor Smart stock that are voting shares at the time this was negotiated?
A. I don't believe so.
Q. In fact, do you understand, as you sit here today, that in February of 2023, Mr. Tucker held preferred shares in Labor Smart?
A. Yes.
Q. At this time, when this was negotiated, do you know how many preferred shares Michael Holley held in Labor Smart?
A. I don't recall. I don't know.
Q. Do you know how many preferred shares

Toby McBride held?
A. No. No. Not at this time. Not at that time, no.
Q. Did anyone do anything to ensure that there was a proper vote? And by that, I mean a majority vote of the shareholders of Labor Smart to enter this agreement that gave away Labor Smart shares?
A. I don't know.
Q. As you sit here today, do you have any understanding that Mr. Holley ever owned more than 17 preferred shares?
A. I don't recall. He -- he certainly may have. I just don't recall.
Q. Did you hear testimony yesterday of Mr. Holley that there were 51 preferred shares, which represented 51 percent of the vote in Labor Smart?
A. I'm aware of that. I don't recall yesterday, but I'm aware that 51 --
Q. So if Mr. Tucker held 17 of those preferred shares, wouldn't it stand to reason that these gentlemen couldn't reach 51 percent unless Jason Tucker also voted his preferred shares?
A. I don't know.
Q. So who had authority to enter this

agreement on behalf of Labor Smart?

A. I don't know.

Q. You, however, have been designated by Labor Smart as the person from Labor Smart with the most knowledge of 2023 dealings of the company.

A. Okay.

Q. And, as you sit here today, you'll never be able to tell us who had authority to enter the settlement of this lawsuit? Do I have that right?

MR. LEVINE: Objection. Form.

THE WITNESS: The answer to the question is, I just don't know. I don't know the answer to your question.

Q. BY MS. MANOLIO: Did Labor Smart at any time put this settlement agreement out to its shareholders and ask them to give a vote as to whether or not it was proper and should be entered on behalf of Labor Smart?

A. I don't know.

Q. Do you know if any inclination, anything was done to make sure that Takeover Industries had the requisite people voting on this to make it a valid agreement for Takeover?

A. I just don't know, Veronica.

Q. However, as a result of this agreement,

STATE OF ARIZONA )
) ss.
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing proceedings were taken by me, KRISTY A. CETON, a Certified Reporter, in and for the County of Maricopa, State of Arizona; that the witness before testifying was duly sworn to testify to the whole truth; that the questions propounded to the witness and the answers of the witness thereto were taken down by me in shorthand and thereafter reduced to typewriting under my direction; that the witness requested reading and signing said deposition; that the foregoing pages are a true and correct transcript of all proceedings had, all done to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

I FURTHER CERTIFY that I have complied with the ethical obligations set forth in ACJA 7-206(J)(1)(g)(1) and (2).

Kristy A. Ceton 50200_____
Certified Reporter CR Number

Kristy A. Ceton
________________________________ 11.20.2025
Certified Reporter Signature Date

I CERTIFY that this Registered Reporting Firm has complied with the ethical obligations set forth in ACJA 7-206(J)(1)(g)(1) and (2).

Carrie Reporting, LLC R1064
Registered Reporting Firm RRF No.

Michele Durrer 11.20.2025
Registered Reporting Firm Date
Signature