# EXHIBIT L

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

**CASE NO.**

EXHIBIT 31
WIT: Holley
DATE: 11/3/25
Kristy A. Ceton, RPR, CRR

SHARMILA VISWASAM, LUIS A. SEQUEIRA, JON SISSON, and ISAIAH GRIFFIN,

Plaintiffs,

v.

JOSEPH PAVLIK, TOBY MCBRIDE, and MICHAEL HOLLEY,

Defendants.

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Sharmila Viswasam, Luis A. Sequeira, Jon Sisson, and Isaiah Griffin ("Plaintiffs") bring this complaint (the "Complaint") against Defendants Joseph Pavlik, Toby McBride, and Michael Holley ("Defendants"). The following allegations are upon personal knowledge as to their own actions and information and belief as to all other matters, based upon, *inter alia*, the investigation of counsel, which included: (a) a review of public filings made with the United States Securities and Exchange Commission ("SEC"); and (b) a review of press releases, news articles, Twitter and Instagram posts, and other publications. Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein that will be revealed through continued investigation and discovery.

**NATURE OF THE ACTION**

1. Defendants, who unbeknownst to Plaintiffs herein were serial securities fraudsters, engaged in a long-running fraudulent scheme to manipulate the price of Labor Smart, Inc. ("Labor Smart" or "LTNC") stock by, among other things, publishing false and misleading information on

Instagram and through their Twitter accounts (including Twitter Live) about Takeover Industries, Inc. ("Takeover" or the "Company"), a wholly-owned subsidiary of LTNC. Defendants regularly falsely promoted their long-term relationships with "elite athletes" and global brands, and falsely promised endorsements from multiple "Greatest of All Times" ("GOAT") athletes, in order to further their scheme and encourage investors to purchase and/or hold stock in LTNC. However, Defendants knew that they did not have any real prospects of signing the "GOATs" that they promised, that a number of these so-called "GOATs" already were endorsing other competing products, and that they had no intention or ability to develop a successful company that would in any way conform to the company they were describing. Instead, Defendants had one motive and one motive alone: to use the Company as their own personal "piggy bank," stealing money invested by shareholders from the Company to line their own pockets.

2. In fact, the only "GOAT" endorsement deal they actually signed—a deal with legendary boxer Manny Pacquiao—was just a sham so that Defendants could continue to deceptively pump up the price of LTNC stock and induce unwitting investors to purchase and/or hold the stock. Indeed, Manny Pacquiao—who, notably, was introduced to Defendants by Plaintiffs Viswasam and Sisson—was himself a victim of Defendants' fraudulent scheme as Defendants had no intention of making all of the payments due to Mr. Pacquiao under the endorsement contract the Company signed with Mr. Pacquiao or actually to distribute the products in the volumes required to make the Company profitable. Instead, all of Defendants' actions were done to artificially inflate LTNC's stock price and fraudulently induce Plaintiffs' to purchase and/or hold LTNC stock so that Defendants could use the money invested by stockholders, including Plaintiffs, for personal gain.

3. Moreover, from the outset and in furtherance of their fraudulent scheme, Defendants regularly falsely claimed that LTNC would make the minimum financial disclosures required to be "Pink Current" on the over-the-counter ("OTC") markets in compliance with SEC amended Rule 15c2-11 that was to take effect on September 28, 2021, so that LTNC could remain eligible for quotation in the United States OTC markets. In other words, unless Defendants made certain disclosures regarding the Company's financials in order to get LTNC "Pink Current" by September 28, 2021, LTNC would lose its trading status in the OTC markets. However, Defendants knew that they had no intention of becoming "Pink Current" by the September 28, 2021 deadline because the financial disclosures required would disclose that Defendants were using the Company as the centerpiece of their scheme to defraud, raising money from Plaintiffs and others and then embezzling it for their own personal gain. These false and misleading statements were made to artificially inflate LTNC's stock price and fraudulently induce Plaintiffs to continue to purchase and/or hold LTNC stock so that Defendants could continue to use the money invested by stockholders, including Plaintiffs, to line their own pockets.

4. Defendants' scheme ultimately caused LTNC's stock price to spike to a high of ***over 8 cents per share*** and a ***total market capitalization of approximately $1 billion*** on or about April 6, 2021.

5. But, as it became clear that Defendants had no intention to run the Company profitably and instead were using the Company as a vehicle for their scheme to defraud Plaintiffs and other investors, LTNC's stock plummeted to the detriment of its investors, including Plaintiffs. As of January 6, 2023, LTNC stock is trading at ***$0.0001 per share*** and a ***total market capitalization of $788,903***. Further, and shockingly, because LTNC has not made the minimal disclosures required by Rule 15c2-11, LTNC has not been Pink Current and has not been eligible

for quotation in the United States OTC markets since September 28, 2021. Thus, the shares that Plaintiffs hold are virtually untradeable.

6. Making matters worse, Defendants recently staged a complete takeover of the Company, ousting former Takeover President Jason Tucker and his management team, so that they can continue to insulate themselves from claims asserted by or on behalf of the Company, all while continuing to steal and embezzle funds that should be appropriated for the successful growth of the Company. Indeed, upon information and belief, the only reason former Takeover President Jason Tucker was forced out by Defendants was because he had uncovered Defendants' fraudulent scheme and was trying to prevent further embezzlement so that the Company could become profitable and regain its trading status.

7. Plaintiffs bring this action against Defendants for: (1) Violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5; (2) Violations of Florida's Securities and Investor Protection Act, Fla. Stat. § 517.301; (3) Fraud; (4) Civil Conspiracy; and (5) Violations of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201-501.213.

8. Plaintiffs seek, among other things, damages and restitution as a result of Defendants' unlawful conduct.

## JURISDICTION AND VENUE

9. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa). This Court also has supplemental jurisdiction over Plaintiffs' state and common law claims under 28 U.S.C. § 1367(a).

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred and/or

had an effect in this District, and under Section 27 of the Exchange Act (15 U.S.C. § 78aa) because one of the defendants resides in this District, where he communicated and conspired with co-Defendants in furtherance of the fraud scheme and made numerous false and deceptive statements, as described herein. In addition, Plaintiff Griffin resides in this District and, upon information and belief, many other LTNC stockholders reside in this District.

11. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities market.

## PARTIES

12. Plaintiff Sharmila Viswasam, a resident of New Market, Maryland, purchased approximately 2,755,000 shares of LTNC common stock between approximately February 9, 2021 and March 1, 2021.

13. Plaintiff Luis Ahlborn Sequeira, a resident of Switzerland, purchased approximately 189,502,953 shares of LTNC common stock between approximately March 30, 2021 and December 21, 2021.

14. Plaintiff Jon Sisson, a resident of Lancaster, California, purchased approximately 24,915,235 shares of LTNC common stock between approximately February 12, 2021 and August 23, 2021. Plaintiff Sisson is also the Executive Director of the Manny Pacquiao Foundation, which, as explained in further detail below, entered into a joint venture with Takeover in approximately April 2021.

15. Plaintiff Isaiah Griffin, a resident of Lauderhill, Florida, purchased approximately 367,789 shares of LTNC common stock between approximately February 19, 2021 and September 23, 2021.

16. Defendant Joseph Pavlik, one of the masterminds of the conspiracy, is a resident of Fort Lauderdale, Florida. Defendant Pavlik's Fort Lauderdale residence served as a primary hub for him and the other Defendants to join in, coordinate, and execute the conspiracy. Indeed, Defendant Pavlik is Takeover's Chief Science Officer and a Director on Takeover's Board of Directors and, on information and belief, made several, if not all, of the misrepresentations identified below from Florida. In fact, in furtherance of the fraudulent scheme, Defendant Pavlik regularly promoted the Company from Fort Lauderdale, Florida. For example, on June 22, 2021, Defendant Pavlik tweeted the following picture from Fort Lauderdale Beach Park promoting the NXT LVL products.

Day 81: 6/22/21 Takeover Tuesday my NXT LVL AM Kickstart Stack: 1 Hydrogen H2o + 1 @Speedway Coffee + 1 NXT LVL UP Nootropic Energizer + Oxygen from Ocean Air. Ready to attack the day. #NXTLVL #NXTLVLUP #FortLauderdale #tuesdayvibe #tuesdaymotivations



7:17 AM · Jun 22 2021 from Fort Lauderdale Beach Park



TUCKER000517

Case 2:22-cv-00357-DJH Document 247-13 Filed 03/28/24 Page 8 of 36

Defendant Pavlik also served as LTNC's President and Chief Executive Officer from approximately March 1, 2021 through September 8, 2021 and Takeover's President from approximately March 1, 2021 through at least July 2021. Upon information and belief, Defendant Pavlik has been associated with other penny stock pump and dump scams, including Rejuvel Bio-Sciences, Inc. (OTCMKTS: NUUU), a development stage company that purportedly produces, distributes, markets, and sells skincare products worldwide, and NNRF, Inc. (OTCMKTS: NNRI), a purported environmental services company. Regarding NNRI, an online commentator posted: "I heard this is a Joe Pavlik deal. Buyer beware, his deals are always pump and dump scams. One look at his last two deals LTNC and NUUU show what a loser he is."[1]

17. Defendant Toby McBride, a resident of Stockton, California, is the co-Founder and former Chief Executive Officer of Takeover. He currently serves as Director, Secretary, and Treasurer of Takeover, and as a Director of LTNC. Upon information and belief, Defendant McBride has been associated with other penny stock pump and dump scams, including High Performance Beverages Co. ("TBEV"), a purported beverage company. Upon information and belief, TBEV is not a real company; its headquarters is Defendant McBride's house. In connection with TBEV, Defendant McBride published fraudulent announcements regarding the company's performance and prospects, including, at one point, that the company had recently settled legal disputes with Dethrone Royalty, Inc. and would be focusing solely on its "Throwdown" line of beverages. However, upon information and belief, Dethrone Royalty, Inc. is also a shell company with Defendant McBride's address with no real operations. As detailed herein, Defendant McBride is subject to personal jurisdiction in this State pursuant to Florida Statute §48.193(1)(a)(2) for deliberately and knowingly conspiring with the co-Defendants, including

---

[1] *See* https://investorshub.advfn.com/boards/read_msg.aspx?message_id=168920035.

Defendant Pavlik, to mislead investors, such as Plaintiffs, into purchasing LTNC stock at artificially inflated prices.

18. Defendant Michael Holley, a resident of Cave Creek, Arizona, is the co-Founder and former Chief Financial Officer, Chief Operating Officer, and Treasurer of Takeover. He currently serves as interim Chief Executive Officer of LTNC, and is a Director on Takeover and LTNC's Boards of Directors. Upon information and belief, Defendant Holley is also associated with other penny stock pump and dump scams, including the TBEV fraud described above. As detailed herein, Defendant Holley is subject to personal jurisdiction in this State pursuant to Florida Statute §48.193(1)(a)(2) for deliberately and knowingly conspiring with the co-Defendants, including Defendant Pavlik, to mislead investors, such as Plaintiffs, into purchasing LTNC stock at artificially inflated prices.

## FACTUAL ALLEGATIONS

19. In or about approximately January 2021, Defendants Holley and McBride formed Takeover, a Nevada corporation with offices in Nevada and California. Takeover develops and markets performance water products and energy drinks. The products are marketed under the brand NXT LVL. Takeover's two main products are NXT LVL Hydrogen Water and NXT LVL Gamer Shots.

20. On February 27, 2021, Takeover entered into a Stock Purchase Agreement (the "Agreement") with Labor Smart, a publicly traded company on the OTC markets under the ticker symbol "LTNC." Pursuant to that Agreement, Labor Smart agreed to purchase all of Takeover's equity in exchange for 6,800,000,000 restricted shares of LTNC common stock, and Takeover became a wholly owned subsidiary of LTNC. LTNC's acquisition was announced live on Twitter

on February 28, 2021. And, on March 1, 2021, Labor Smart filed a Form 8-K with the SEC disclosing the same.

**A. Defendants Mislead Investors by Promoting Non-Existent Relationships with Global Brands and Endorsements from "GOATs"**

21. Immediately before and after LTNC's acquisition of Takeover, Defendants used the Company as the centerpiece of their scheme to defraud by deceiving investors, including Plaintiffs, into purchasing LTNC stock by, among other things, promoting their non-existent long-term relationships with global brands and endorsements from "GOATs." However, Defendants had no intention of seeing the Company succeed; they simply wished to sell as much LTNC stock as possible at the highest price to generate proceeds to steal for their personal benefit.

22. For example, and as explained in further detail below, Defendant McBride repeatedly used the following business card to knowingly and fraudulently induce potential investors, including Plaintiffs, into purchasing LTNC stock by giving the false appearance that he (and Takeover) was associated with global brands such as Marvel, Star Wars, Disney, and TB12 (a company co-founded by three-time NFL MVP and seven-time Super Bowl winning quarterback Tom Brady and his Body Coach, Alex Guerrero). In truth, however, neither Defendant McBride nor Takeover had any of these relationships.




23. Additionally, as early as the first week in February 2021 and continuing through at least April 2021, Defendant McBride caused a presentation to be distributed to prospective

investors, including Plaintiffs, which associated the Company with Marvel, Star Wars, and TB12. The presentation was false, fraudulent, and deceptive because it gave the appearance that the Company legitimately was on the verge of signing sponsorship deals with these entities, which would have tremendous value to the Company and to investors. That was false, and was done to induce investment. The Defendants had no real prospects or intention of reaching sponsorship deals with these entities.

24. Moreover, on multiple occasions between at least March and August 2021, and as explained in further detail below, Defendant McBride falsely confirmed to Plaintiffs that Takeover had deals in place with each of these companies, including, in particular, with Tom Brady. Defendant McBride knew, however, that this was a lie. Takeover had no deals in place with these companies or with Tom Brady. Defendant McBride also falsely stated that Takeover had a deal in place to put the NXT LVL Hydrogen Water products in Disney Land. This too was a lie, and the other Defendants knew of and condoned Defendant McBride's false statements.

25. In furtherance of their scheme, Defendants also misled potential investors, including Plaintiffs, into believing that they were in the process of signing endorsement deals with "GOATs" when they knew full well that they were not going to sign such endorsements. In other words, Defendants used the potential of these false "GOAT" endorsements as a means of falsely pushing up the stock price and fraudulently inducing Plaintiffs into purchasing and/or holding LTNC stock.

26. On March 3, 2021, Defendant Pavlik, who was the face of the Company's Twitter account using the following Twitter handles (@TakeoverInd, @TakeoverJoe, and @JoePavlik), tweeted that there would be "[m]any GOATS" endorsing NXT LVL products.

27. The next day, in a video posted on Twitter, Defendant Pavlik promised to "bring in the right athletes and distributors." In an effort to earn Plaintiffs' trust, Defendant Pavlik also fraudulently assured investors that "**this is not a scam**," "**this is a real Company**," and that he would not be putting his name on the Company "if he didn't believe in this opportunity." Given Defendant Pavlik's 30 years' experience in the industry and his purported long-standing relationships with "elite athletes," Plaintiffs had no reason to suspect that these statements were false. However, they were.

28. In furtherance of the scheme, on March 9, 2021, Defendant Pavlik wore a Tampa Bay Buccaneers mask while shooting a live Twitter video from the lab where he was supposedly creating a new "beverage" for the Company and TB12, Tom Brady's company. This, too, was false and meant to artificially inflate LTNC's stock price and fraudulently induce Plaintiffs to purchase and/or hold LTNC stock.

29. Defendant Pavlik also held multiple live Twitter interviews with Stanley Barsch (a/k/a StanTheTradingMan) to artificially inflate LTNC's stock price and fraudulently induce investors, including Plaintiffs, into purchasing and/or holding LTNC stock. Defendant Pavlik made false, fraudulent, and deceptive statements to further Defendants' scheme to defraud. For example, on March 19, 2021, Defendant Pavlik told StanTheTradingMan that he couldn't name the "GOATs," but that Defendants and other members of Takeover's sales team had relationships with "**many of the best**," including professional athletes and their trainers. Referring specifically to trainers, Defendant Pavlik said that "gurus for the athletes have tremendous influence" and "**top trainers have used this technology with their athletes**." He continued, we have a "**whole group of elite athletes in our test group**" and "**we are going to make history!**" Defendant Pavlik even

hinted at a potential endorsement deal with the Kansas City Royals. All of the foregoing, however, was a lie.

30. During another interview with StanTheTradingMan on April 6, 2021, Defendant Pavlik was asked when investors could expect to start hearing the names of the "GOATs" whom Defendants represented were signing endorsement deals with the Company. Defendant Pavlik told investors, like Plaintiffs, that if all goes as planned, they should start to see some "GOAT activity" by the third or last week of April. He also assured investors, like Plaintiffs, that the GOATs are "**real**," "**legit**," "**active athletes**" who are the "**greatest of all times**" and "**respected disciplines**." The identity of the GOATs, according to Defendant Pavlik, was going to "**blow [investors'] mind[s]**." But yet again, these were just more lies by Defendant Pavlik to artificially inflate LTNC's stock price and fraudulently induce Plaintiffs to purchase and/or hold LTNC stock.

31. On April 13, 2021, Plaintiffs Viswasam and Sisson attended a ribbon-cutting ceremony for H2forLife, the Company's manufacturing partner, in Blue Ridge, Georgia. At the ribbon-cutting ceremony, Defendant McBride handed Plaintiffs Viswasam and Sisson the false and misleading business card described above and falsely represented that the Company had deals in place with Marvel, Star Wars, Disney, and Tom Brady, which would be announced shortly. Defendant McBride also falsely represented that the Company was going to be "all over."

32. On April 16, 2021, after repeated requests from investors, like Plaintiffs, to reveal the names of these purported "GOATs," Defendant Pavlik tweeted: "**Financials, Goats, Sales. If all this came in one day what fun would that be? #TrustTheProcess**." On April 30, 2021, Defendant Pavlik also tweeted that the "**Goats [are] grazing**." These statements by Defendant Pavlik were just more lies to further the scheme to defraud, artificially inflate LTNC's stock price and volume, and fraudulently induce Plaintiffs to purchase and/or hold LTNC stock.

33. Furthermore, on multiple occasions in at least July and August 2021, Defendant McBride repeatedly falsely assured Plaintiff Sisson that the Company's deal with TB12 and Tom Brady was still in place and that it would soon be announced publicly. In particular, on August 19, 2021, Defendant McBride came to Las Vegas, Nevada to meet Plaintiff Sisson before Manny Pacquiao's last fight in the United States. During this meeting, Defendant McBride continued to falsely represent to Plaintiff Sisson that Tom Brady's endorsement of the Company would be officially announced shortly.

34. Indeed, even as late as January 2022, Defendant McBride continued to falsely represent to investors, including Plaintiffs, that the Company had a deal in place with Tom Brady. For example, on January 16, 2022, Defendant Toby McBride posted a picture on Instagram of himself at the Tampa Bay Buccaneers Wild Card Game versus the Philadelphia Eagles wearing a Tom Brady jersey and tagged @ag_tb12 (Alex Guerrero), @nxtlvlwtr, and @buccaneers. The Instagram post, in combination with the other activity described above, was intended to support the false impression that Defendants had given Plaintiffs and other investors that Takeover had a deal with one of the "GOATs."




35. Tom Brady's endorsement of the Company's NXT LVL products was particularly attractive to Plaintiff Sisson, who, as noted above, is also the Executive Director of the Manny

Pacquiao Foundation. Manny Pacquiao was very excited about Tom Brady's involvement with the Company, and he and Plaintiff Sisson believed Brady's endorsement would greatly enhance the Company's profitability. Later, after the fraud was discovered, in a letter from the Manny Pacquiao Foundation to Takeover's Board of Directors dated November 17, 2022, Plaintiff Sisson noted that he, Manny Pacquiao, and the Manny Pacquiao Foundation were "extremely misled by several claims of partnerships that [Defendants] said were already secured," including "Disney, Star Wars, Tom Brady, etc."

**B. Defendants Announce Endorsement Deals with "Elite Athletes" and Distribution Deals with Major Retailers That Are a Sham**

36. According to Labor Smart's Form 8-K filed with the SEC on August 25, 2021, LTNC entered into a joint venture with Manny Pacquiao and the Manny Pacquiao Foundation on April 27, 2021. Under the terms of the joint venture, Takeover and LTNC had the ability to use the name, likeness, and endorsement of Manny Pacquiao and the Manny Pacquiao Foundation in connection with the advertisement, promotion, and sale of the NXT LVL water beverage. In truth, however, this agreement was a sham because Defendants had no intention of honoring the terms of the contract. Indeed, despite Team Pacquiao going to great lengths to market and advertise Takeover's NXT LVL products leading up to and after Manny Pacquiao's last fight in the United States was broadcasted worldwide, Team Pacquiao to this date still has not received $900,000 of the $ 1 million it is owed per the parties' contractual agreement.

37. In addition, on or about May 12, 2021, LTNC announced that Takeover had entered into a joint venture agreement with Manny Pacquiao to manufacture NXT LVL products in the Republic of the Philippines for distribution throughout Asia. Defendant Pavlik commented, "Setting up manufacturing in the Philippines will allow us to quickly ramp up the production and sales of NXT LVL products throughout Asia." The potential for NXT LVL products to be

distributed globally induced many investors, including Plaintiffs, to purchase and/or hold LTNC stock. Unbeknownst to Plaintiffs, however, Defendants had no intention of expanding into Asia, but used the announced joint venture to continue to further their scheme to defraud, artificially inflate LTNC's stock price and volume, and fraudulently induce investors, like Plaintiffs, to purchase and/or hold LTNC stock.

38. Moreover, on June 7, 2021, LTNC announced that it had entered into an endorsement deal with Jacksonville Jaguars tight end Chris Manhertz, whereby Manhertz would endorse and use Takeover's NXT LVL Hydrogen Infused Spring Water during both his off-season and in-season training and competition. Defendant Pavlik commented, "We're excited to have Chris as part of [the] team as he's been a leader both on and off the field. His efforts within the community and commitment to give back fits in synch perfectly with our company philosophy. It will be interesting to see how NXT LVL Hydrogen Water improves his workout performance and recovery for the upcoming season." Upon information and belief, this press release was false and misleading because Manhertz had not signed any endorsement deal with Takeover and, in fact, was actually promoting another sports beverage.

39. Later in July 2021, when investors started demanding an explanation for the lack of GOATs, Defendants continued to fraudulently mislead investors into purchasing and/or holding LTNC stock. Instead of admitting that Takeover never had any real intention of signing endorsement deals with "GOATs," Defendant Pavlik blamed the lack of GOATs on people on Twitter not being able to "keep quiet." In particular, on July 10, 2021, Defendant Pavlik tweeted: "**A few goats got slaughtered because some people couldn't keep quiet**."

40. Statements and tweets like the ones described above were false and misleading because Defendants knew that Takeover had no "GOATs," that certain so-called "GOATs" were

endorsing other products, and the few endorsement deals Takeover had with "elite athletes" were just a sham so that Defendants could continue to artificially inflate LTNC's stock price and ultimately use the money invested by stockholders, including Plaintiffs, for personal gain.

41. Similarly, on August 9, 2021, Takeover announced that it had entered into a distribution deal with "retail powerhouse" Hy-Vee, whereby its NXT LVL products would be available in Hy-Vee stores across the Midwest. In particular, Defendant McBride commented: "We look forward to supplying the Hy-Vee family of employee owned stores and its consumers with our NXT LVL products, including Hydrogen Water. . . . Hy-Vee has a distinguished history of offering needed goods to its consumers, Takeover looks forward to NXT LVL being added to the Hy-Vee collection." However, these statements were false and misleading as Defendant McBride knew that Takeover did not have a distribution deal with Hy-Vee, but used the announced distribution deal to continue to further their scheme to defraud, artificially inflate LTNC's stock price and volume, and fraudulently induce investors, like Plaintiffs, to purchase and/or hold LTNC stock.

42. Indeed, in response to requests from consumers for confirmation of the distribution deal, Hy-Vee publicly tweeted: "**Despite what you may have seen, we do not have plans to carry this line at this time.**"




43. Hy-Vee also posted on its official Twitter page that it "**never approved a news release for distribution from [Takeover]**."




**C. Defendants Also Mislead Investors by Falsely Representing that LTNC Would Be "Pink Current" and Maintain its Active Trading Status**

44. Soon after LTNC's acquisition of Takeover and in furtherance of Defendants' fraudulent scheme, Defendants began falsely representing to potential investors, like Plaintiffs, that LTNC would be "Pink Current" by September 28, 2021, in compliance with SEC Rule 15c2-11, and maintain its active trading status.

45. By way of background, on September 16, 2020, the SEC adopted changes to Rule 15c2-11 to enhance disclosure and investor protection in the OTC market. Specifically, the amended Rule 15c2-11, which became effective on September 28, 2021, provides that, among other things, information about the issuer and its securities be "current" and publicly available before a broker-dealer can begin quoting that security. In other words, unless Defendants made



TUCKER000528

certain disclosures regarding the Company's financials in order to get LTNC "Pink Current" by September 28, 2021, LTNC would lose its trading status in the OTC markets. And, that is exactly what happened.

46. Although Defendants knew that they had no intention of becoming "Pink Current" by the September 28, 2021 deadline because doing so would ultimately reveal their fraud, Defendants used the foregoing false and misleading statements to artificially inflate LTNC's stock price and fraudulently induce Plaintiffs' to continue to purchase and/or hold LTNC stock so that Defendants could continue to use the money invested by stockholders, including Plaintiffs, to line their own pockets.

47. For example, in a Form 8-K filed by LTNC with the SEC on March 1, 2021, Defendants disclosed that Ryan Schadel, LTNC's former President and CEO had "agreed to stay in an advisory role as long as necessary for the Company to meet its interim goals and complete its registration and filings with OTC Markets Group to become 'Pink Current.'"

48. On April 3, 2021, Defendant Pavlik posted the following message on the Company's Twitter page:

> RE Current Status: We applied to access the disclosure service w/otcmarkets.com several weeks ago. If not given access by the end of April, our next course of action will be to file a Form 10 w/SEC. We prefer ARS w/OTCM, but **will not allow us to get boxed in against the calendar**.

49. On April 30, 2021, Defendant Pavlik tweeted that "Pink" is the Company's "**top focus**."

50. On May 2, 2021, Defendant Pavlik posted an update on Twitter to LTNC investors, including Plaintiffs, stating:

> OTCM did not allow access by end of April, but we may hear this week. So at 4:55PM on 4/30/21, a request was made to engage a PCAOB auditor for the

purposes of auditing 2 years financials. **Once audit is complete, we intend to file a Form 10 to become SEC reporting.** $LTNC

51. On May 11, 2021, Defendant Pavlik announced that the Company had hired Mitchell Silberberg & Knupp LLP, a law firm that specializes in dealing with the SEC and the OTC markets, for the purpose of getting LTNC "Pink Current."

52. On June 4, 2021, Defendant Pavlik tweeted:

> PATH TO PINK: We have been informed that these are next steps to move forward. At present, we believe these to be the next important steps to move forward as a public entity, & **we are working w our legal counsel to complete the following, this is what has & will happen**. The previous OTC Markets application filed by Labor Smart, Inc. (not us) was not approved. **We are working to refile the application and have OTC Markets accept the new Takeover Industries application**. Once OTC Markets allows us to file the application it will be filed. Legal is on it & @MSKLLP #NewYork will provide the necessary legal opinion letter required by #OTC Markets. When company is current on #OTC Markets (PINK), the company intends to take the necessary steps to also become registered w/ Securities & Exchange Commission (#SEC). As part of this process, the company will file an application with FINRA in order to change the company name and stock symbol. New symbol will better represent our market. We understand that our shareholders are excited for the new developments. **We are diligently working to complete this process as soon as possible. We have been informed that we can meet <u>any</u> filing deadlines**.

53. On June 5, 2021, Defendant Pavlik tweeted, "**Everything related to Pink is being disclosed & shared with full transparency** as this info becomes available & reviewed for legal approval prior to posting."

54. On June 19, 2021, Defendant Pavlik tweeted, "Pink & News: **This has been a priority** as of 5/1 once OTC has denied access . . ."

55. On August 25, 2021, in an update to LTNC shareholders, Defendants stated:

> We are also **making genuine efforts to become current on OTC Markets** and ultimately with the Securities and Exchange Commission. Due to some promotional communications made by our predecessor early in 2021, OTC Markets Group has limited our abilities to upload information for a period of time, however, we are in communication with them, and **it is our intention to satisfy all requirements and rectify any deficiencies**. We have been receiving many

shareholder calls and inquiries about our progress, and while we intend to be transparent, please understand that we cannot provide any material non-public information to individual shareholders that is not generally disseminated to the public. With respect to timing, we are unable to provide details at this time, but the work is underway, and we will disseminate information to the public and to our shareholders as permitted under the applicable securities laws and guidelines.

56. On September 28, 2021, after it became apparent that LTNC would not be "Pink Current" by the SEC's deadline, Defendant Pavlik caused the following false and misleading tweet to be posted on the Company's Twitter page:




57. Statements and tweets like the ones described above were false and misleading because Defendants knew that Takeover had no intention of becoming "Pink Current" by the September 28, 2021 deadline. Instead, Defendants used the foregoing false and misleading statements to artificially inflate LTNC's stock price and fraudulently induce Plaintiffs' to continue to purchase and/or hold LTNC stock so that Defendants could continue to use the money invested by stockholders, including Plaintiffs, for personal gain.

58. Indeed, LTNC still today has not submitted the required financials and regulatory disclosures to become "Pink Current." As a result, LTNC investors, including Plaintiffs, have been unable to trade in LTNC stock since September 28, 2021.

**D. Revelation that Defendants Holley and McBride Used Funds Generated by Their Fraudulent Scheme to Line Their Pockets**

59. On January 5, 2022, Takeover filed a lawsuit in the District Court for the Central District of California alleging, among other things, that Defendant Holley embezzled over $700,000 in Company funds for personal gain, leaving the Company with financial difficulties.[2] The lawsuit against Defendant Holley was voluntarily dismissed on March 7, 2022 and re-filed the very next day in the District Court for the District of Arizona.[3] According to the Arizona complaint, an audit by third-party accountant revealed that Defendant Holley had charged tens of thousands of dollars in personal expenses to Takeover, and had been doing so up until as late as December 2021. For example, while Defendant Holley was in the hospital battling COVID-19, his Company credit card allegedly was used to purchase food at a pizza shop in Crave Creek, Arizona, a restaurant in Scottsdale, Arizona, and two instances at Costco. In addition, according to the Arizona complaint, the audit revealed that Defendant Holley had authorized hundreds of thousands in distributions from Takeover without obtaining approval from the Company's board of directors, including $41,500 to One Elite Sports, LLC, a company controlled by Defendant Holley. Notably, Mr. Holley was removed from Takeover's Board of Directors in December 2021 as a result of these allegations.

60. In addition to Defendant Holley's $700,000 embezzlement, however, Defendant McBride has embezzled at least $243,000 from the Company. According to documents filed in the Arizona action in support of the Company's Emergency Motion for Injunctive Relief on November 10, 2022,[4] shockingly, Defendant McBride signed an acknowledgment on March 25,

---

[2] *See Takeover Industries, Inc. v. Holley et al.*, 2:22-cv-00192 (C.D. Cal.).
[3] *See Takeover Industries, Inc. v. Holley et al.*, 2:22-cv-00357-JJT (D. Ari.).
[4] *See id.*, ECF 79.

2022 that he owed the Company $243,534.94 for Company funds he used for personal expenses in 2021.

61. Although Defendant McBride agreed to repay this money, he instead spent at least an additional $30,000 in 2022 for personal expenses, including travel and shopping. On September 21, 2022, Takeover's Board of Directors held a Special Meeting to discuss Defendant McBride's misuse of Company funds for personal gain. According to documents filed in support of the Company's Emergency Motion for Injunctive Relief on November 10, 2022, Defendant McBride repeatedly apologized for lying and for using Company funds. The Board (including Defendant McBride, himself) agreed to a 60-day leave of absence for Defendant McBride to allow the Company to investigate the misconduct and to discuss the Company's findings. Defendant McBride also agreed to refrain from all Takeover and LTNC business during his administrative leave.

62. Without disclosing the true nature of Defendant McBride's unlawful actions, on September 23, 2022, the Company posted the following statement on Twitter:

TAKEOVER
INDUSTRIES

CORPORATE UPDATE

Takeover Industries, Inc. announces that as of September 21, 2022, Director and CEO Toby McBride is on unpaid administrative leave while the Company completes a comprehensive review of internal records and workflow procedures.

The Company is dedicated to implementing the most ethical and sound infrastructure to support its growth and the development of its new products.

63. Furthermore, according to documents filed in the Arizona action described above, since Defendant McBride's leave of absence began, Defendant McBride has spent more than $66,000 in Company funds for personal expenses.

**E. Defendants Take Control Over the Company to Conceal and Further Perpetuate Their Fraudulent Scheme**

64. On November 7, 2022, Defendants staged a complete takeover of the Company, ousting former Takeover President Jason Tucker and his management team so that they could continue to insulate themselves from claims asserted by or on behalf of the Company, all while continuing to steal and embezzle funds that should be appropriated for the successful growth of the Company.

65. Despite Defendant Holley having been removed from the Boards of both Takeover and LTNC in December 2021 and Defendant McBride's temporary suspension from the Company in September 2022, Defendants McBride and Holley participated in an LTNC Board meeting on November 7, 2022 and "resolved" to put themselves back in charge of Takeover. Shockingly, Defendant McBride, who admitted to stealing and continues to steal funds from the Company, is now the Treasurer.

66. After the meeting, Defendant McBride began sending messages to investors, including Plaintiffs, stating that he is back "in control" of the Company and claiming that Mr. Tucker has been "fired." For example, shortly after Defendants' hostile takeover of the Company, Defendant McBride sent Plaintiff Sisson a text message stating: "**Jason has been suspended and going to be fired**. We need to talk. **He has zero power**. I can email the docs to you to review about the change . . . . **It's important you guys have zero contract [sic] with him**." Referring to the Manny Pacquiao and Manny Pacquiao Foundation joint venture agreements, Defendant McBride also claimed that he "**will honor our deal**."

67. Defendants' statements like the ones described above were made solely so that Defendants can continue to insulate themselves from claims asserted by or on behalf of the Company and continue to steal and embezzle funds that should be appropriated for the successful growth of the Company. Indeed, Defendants have not done the minimal amount of work that would be required to make LTNC "Pink Current."

## ADDITIONAL SCIENTER ALLEGATIONS

68. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they each caused to be disseminated to the investing public, including Plaintiffs. Defendants condoned and encouraged each other's false statements.

69. Defendants were motivated to materially misrepresent the true nature of the Company's business, operations, and financial affairs—including, in particular, Takeover's non-existent relationships with global brands and distribution deals with major distributors, Takeover's endorsement deals with "GOATs" (or lack thereof), and LTNC's "Pink Current" status—to the public, including Plaintiffs, in order to keep LTNC's share price artificially high.

## LOSS CAUSATION / ECONOMIC LOSS

70. As alleged above, Defendants engaged in a systematic scheme to deceive the market and a course of conduct that artificially inflated the price of LTNC's stock, and operated as a fraud or deceit on purchasers of LTNC's stock, including Plaintiffs. When the Defendants' fraud and the previously concealed, material, adverse information was revealed to the market, the price of LTNC stock fell precipitously and Plaintiffs suffered economic loss.

71. The economic loss, i.e., damages, suffered by Plaintiffs was a direct result of the fraudulent scheme to artificially inflate LTNC's stock price and the subsequent significant decline in the value of LTNC's stock price when the prior misrepresentations and other fraudulent conduct were revealed. Indeed, as noted above, Defendants' scheme inflated LTNC to a market

capitalization of ***approximately one billion dollars***, but now LTNC's market capitalization is ***less than one million dollars*** and LTNC is virtually untradeable because it is not "Pink Current." Defendants' fraud scheme and conspiracy caused this economic loss, and have caused Plaintiffs' LTNC investments to be virtually worthless.

72. At all times relevant, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Plaintiffs. Those statements were materially false and misleading because they failed to disclose a true and accurate picture of the Company's business, operations, and financial condition, as alleged herein.

73. Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing LTNC's stock price to be artificially inflated.

74. Plaintiffs purchased LTNC stock at those artificially inflated prices and/or held on to their stock based on Defendants' false and misleading statements, causing them to suffer the damages complained of herein.

**NO SAFE HARBOR**

75. The statutory safe harbor under the Private Securities Litigation Reform Act of 1995, which applies to forward-looking statements under certain circumstances, does not apply to any of the allegedly false and misleading statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and

there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

76. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements were made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading.

## COUNT 1
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants

77. Paragraphs 1 through 76 above are re-alleged and incorporated by reference as if fully set forth herein.

78. Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, or the facilities of national securities exchanges, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

79. Defendants made false and misleading statements of material facts, omitted to state material facts which they had a duty to disclose under the Exchange Act and SEC rules promulgated thereunder, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

80. Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs.

81. Defendants engaged in a fraudulent intent to and did, as alleged herein, (i) deceive the investing public, including Plaintiffs; (ii) artificially inflate and artificially maintain the inflated

price of LTNC stock; (iii) cause Plaintiffs to purchase LTNC stock at artificially inflated prices and/or hold on to their LTNC stock; and (iv) use the invested proceeds for personal gain.

82. Defendants were motivated to make these statements and omissions in order to perpetuate their overarching fraudulent scheme to (i) deceive the investing public, including Plaintiffs; (ii) artificially inflate the market price and volume of LTNC stock; (iii) cause Plaintiffs to purchase LTNC stock at artificially inflated prices and/or hold on to their LTNC stock; and (iv) use the invested proceeds for personal gain.

83. Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Plaintiffs, by virtue of having made public statements that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

84. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for LTNC stock, Plaintiffs purchased LTNC stock at artificially inflated prices and/or held on to their LTNC stock. But for Defendants' fraud, Plaintiffs would not have bought LTNC stock at such artificially inflated prices and/or held on to their LTNC stock. By purchasing LTNC stock at these artificially inflated prices and/or holding on to their LTNC stock, Plaintiffs suffered economic losses, which losses were a direct and proximate result of Defendants' fraudulent conduct.

85. By virtue of the foregoing, Defendants are liable to Plaintiffs for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT 2**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants**

86. Paragraphs 1 through 85 above are re-alleged and incorporated by reference as if fully set forth herein.

87. This Count is brought under the provisions of Rule 10b-5(a) and (c). Accordingly, Plaintiffs need not allege in this Count, nor prove in this case, that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) or any other provisions of law.

88. Defendants carried out a plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs; (ii) artificially inflate the market price and volume of LTNC stock; (iii) cause Plaintiffs to purchase LTNC stock at artificially inflated prices and/or hold on to their LTNC stock; and (iv) use the invested proceeds for personal gain.

89. Defendants' conduct included, but was not limited to, making false statements about Takeover's relationships with global brands, deals with major distributors, and endorsements from "GOATs," as well as LTNC's "Pink Current" status, releasing such information in a way aimed at manipulating LTNC's stock price, omitting to disclose information about the risks posed by relying on such false statements, and omitting information necessary to render such statements not misleading.

90. Defendants were motivated to make these statements and omissions in order to perpetuate their overarching fraudulent scheme to (i) deceive the investing public, including Plaintiffs; (ii) artificially inflate the market price and volume of LTNC stock; (iii) cause Plaintiffs to purchase LTNC stock at artificially inflated prices and/or hold on to their LTNC stock; and (iv) use the invested proceeds for personal gain.

91. In furtherance of this unlawful plan, scheme, and course of conduct, Defendants employed devices, schemes, and artifices to defraud and manipulate, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a manipulation, fraud, and deceit upon Plaintiffs in connection with their purchases of LTNC stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

92. Plaintiffs reasonably relied upon the integrity of the market in which LTNC stock traded.

93. Plaintiffs were unaware of Defendants' fraudulent scheme and unlawful course of conduct or the impact of the fraudulent scheme. Had Plaintiffs known the true extent of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased and/or held on to LTNC stock or if they had purchased LTNC stock, would not have done so at the artificially inflated prices paid for such securities.

94. As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs suffered damages in connection with their purchases of and/or holding on to their LTNC stock.

95. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiffs for damages suffered in connection with their purchases of and/or holding on to their LTNC stock.

**COUNT 3**

**Violations of Section 517.301 of the Florida Securities and Investor Protection Act Against All Defendants**

96. Paragraphs 1 through 95 above are re-alleged and incorporated by reference as if fully set forth herein.

97. Defendants carried out a plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs; (ii) artificially inflate the market price of LTNC stock; (iii) cause Plaintiffs to purchase LTNC stock at artificially inflated prices and/or hold on to their LTNC stock; and (iv) use the invested proceeds for personal gain.

98. Defendants (a) employed devices, schemes and artifices to defraud; (b) obtained money or property by making an untrue statement of material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon Plaintiffs.

99. Defendants' conduct included, but was not limited to, making false statements about Takeover's relationships with global brands, deals with major distributors, and endorsements from "GOATs," as well as LTNC's "Pink Current" status, releasing such information in a way aimed at manipulating LTNC's stock price, omitting to disclose information about the risks posed by relying on such false statements, and omitting information necessary to render such statements not misleading.

100. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though they were readily available to them.

101. Plaintiffs were unaware of Defendants' fraudulent scheme and unlawful course of conduct or the impact of the fraudulent scheme, and relied on Defendants' false and misleading

Case 2:22-cv-00357-DJH Document 247-13 Filed 03/23/26 Page 32 of 331

statements. Had Plaintiffs known the true extent of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased and/or held on to their LTNC stock or if they had purchased LTNC stock, would not have done so at the artificially inflated prices paid for such securities.

102. As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs suffered damages in connection with their purchases of and/or holding on to their LTNC stock.

103. By reason of the foregoing, Defendants violated Section 517.301 of the Florida Securities and Investor Protection Act and are liable to Plaintiffs for damages suffered in connection with their purchases of and/or holding on to their LTNC stock.

**COUNT 4**
**Fraud Against All Defendants**

104. Paragraphs 1 through 103 above are re-alleged and incorporated by reference as if fully set forth herein.

105. Defendants employed a fraudulent scheme that included misrepresentations and omissions of material facts to Plaintiffs which were intended to and did induce Plaintiffs to purchase LTNC stock at artificially inflated prices and/or hold on to their LTNC stock. Defendants owed Plaintiffs a duty to ensure that full and fair disclosures were made in connection with the offer and sale of LTNC securities.

106. Defendants' material misrepresentations or omissions included, but was not limited to, making false statements about Takeover's relationships with global brands, deals with major distributors, and endorsements from "GOATs," as well as LTNC's "Pink Current" status, releasing such information in a way aimed at manipulating LTNC's stock price, omitting to disclose

information about the risks posed by relying on such false statements, and omitting information necessary to render such statements not misleading.

107. Defendants' material representations to Plaintiffs were untrue, and Defendants' omissions of material facts were necessary so that Defendants' misrepresentations to Plaintiffs were not misleading.

108. Defendants' untrue statements of material facts and omissions alleged herein regarding the true nature of the investment were made with the intention of inducing, and did thereby induce, Plaintiffs to purchase LTNC stock at artificially inflated prices and/or hold on to their LTNC stock. Defendants then used the investment funds for their own personal gain, as alleged herein.

109. Defendants knew that Plaintiffs relied upon their material misrepresentations and omissions in making the decision to invest in LTNC and/or hold on to their LTNC stock.

110. In reasonable reliance on Defendants' misrepresentations and omissions, Plaintiffs purchased LTNC stock at artificially inflated prices and/or held on to their LTNC stock.

111. Plaintiffs would not have agreed to purchase and/or hold on to their LTNC stock if Plaintiffs had been aware of the lack of truthfulness in Defendants' misleading statements and failure to disclose material facts.

112. Due to Plaintiffs' reliance on Defendants' representations and omissions, Plaintiffs have suffered damages.

**COUNT 5**
**Civil Conspiracy Against All Defendants**

113. Paragraphs 1 through 112 above are re-alleged and incorporated by reference as if fully set forth herein.

114. Defendants conspired to carry out a plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs; (ii) artificially inflate the market price and volume of LTNC stock; (iii) cause Plaintiffs to purchase LTNC stock at artificially inflated prices and/or hold on to their LTNC stock; and (iv) use the invested proceeds for personal gain.

115. Defendants entered into one or more agreements with the purpose of engaging in this scheme to defraud and making the misrepresentations and/or omissions alleged in this Complaint to induce Plaintiffs to invest in LTNC and/or hold on to their LTNC stock.

116. In furtherance of the conspiracy, Defendants did numerous unlawful acts, including, but not limited to, making false statements about Takeover's relationships with global brands, deals with major distributors, and endorsements from "GOATs," as well as LTNC's "Pink Current" status, releasing such information in a way aimed at manipulating LTNC's stock price, omitting to disclose information about the risks posed by relying on such false statements, and omitting information necessary to render such statements not misleading.

117. As a result of Defendants' conspiratorial conduct, Plaintiffs have been damaged, in an amount to be determined at trial and no less than the amounts each Plaintiff invested in LTNC, and are entitled to an award of punitive damages and attorneys' fees and costs of this action.

**COUNT 6**
**Violations of Florida's Deceptive and Unfair trade Practices Act**
**Fla. Sta. §§ 501.201-501.213**
**Against All Defendants**

118. Paragraphs 1 through 117 above are re-alleged and incorporated by reference as if fully set forth herein.

119. Chapter 501, Fla. Stat., Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") is to be liberally construed to protect consumers from those who engage in unfair

methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

120. Plaintiffs are consumers within the meaning of FDUTPA, and Defendants engaged in trade and commerce within the meaning of FDUTPA.

121. While FDUTPA does not define "deceptive" and "unfair," it incorporates by reference the Federal Trade Commission ("FTC")'s interpretations of these terms. The FTC has found that a "deceptive act or practice" encompasses "a representation, omission or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."

122. As described herein, Defendants engaged in deceptive and unfair business practices that harmed Plaintiffs.

123. Defendants' deceptive conduct included, but was not limited to, making false statements about Takeover's relationships with global brands, deals with major distributors, and endorsements from "GOATs," as well as LTNC's "Pink Current" status, releasing such information in a way aimed at manipulating LTNC's stock price, omitting to disclose information about the risks posed by relying on such false statements, and omitting information necessary to render such statements not misleading.

124. Defendants fraudulently induced Plaintiffs into purchasing LTNC stock at artificially inflated prices and/or holding on to their LTNC stock by, among other things, disseminating materially false and misleading statements, and, in so doing, engaged in unfair and deceptive trade practices.

125. As a result of Defendants' improper and unlawful misconduct, Plaintiffs have suffered damages.

126. Pursuant to FDUTPA, Plaintiffs are entitled to recover from Defendants damages, in an amount to be determined at trial and no less than what they invested in LTNC, and reasonable amount of their attorneys' fees and costs of this action.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court:

a. Enter Judgment for Plaintiffs and against Defendants as to each Count of this Complaint;

b. Awarding Plaintiffs actual damages and equitable monetary relief (including restitution) against all Defendants, jointly and severally, in an amount to be proven at trial, together with interest thereon;

c. Awarding Plaintiffs punitive damages, as allowable by law, against all Defendants, jointly and severally;

d. Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees; and

e. Granting such other and further relief as the Court deems just and proper.

Dated: January 6, 2023

Respectfully submitted,

**REED SMITH LLP**
200 South Biscayne Blvd, 26th Fl
Miami, Florida 33131
Phone: (786) 747-0286

By: <u>*/s/ Mark E. Bini*</u>
Mark E. Bini, Esq. (FBN 1026547)
Edward M. Mullins, Esq. (FBN 863920)
mbini@reedsmith.com
emullins@reedsmith.com

-and-

1301 K Street, N.W.
Washington, DC 20005
Phone: (202) 414-9200
Fax: (202) 414-9299
A. Scott Bolden, Esq. (*pro hac vice pending*)
abolden@reedsmith.com

-and-

599 Lexington Avenue
New York, New York 10022
Phone: (212) 521-5400
Fax: (212) 521-5450
Kaela Dahan, Esq. (*pro hac vice pending*)
kdahan@reedsmith.com

*Counsel for Plaintiffs*