LAW OFFICES
**MANOLIO & FIRESTONE, PLC**
8686 E. San Alberto Dr., Suite 200
Scottsdale, Arizona 85258
(480) 222-9100
vmanolio@mf-firm.com
Veronica L. Manolio, SBN 020230
*Attorneys for Tucker Defendants, Counterclaimants, and Third-Party Claimants*

**IN THE UNITED STATES DISTRICT COURT**

**IN AND FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Labor Smart, Inc.<br>Plaintiff,<br>v.<br>Jason and Melissa Tucker,<br>Defendants.<br><br>And related Counterclaims and Third-Party Claims. | Case No. 2:22-cv-00357-PHX-DJH<br><br>**DECLARATION OF JASON TUCKER** |

Under the penalty of perjury, the undersigned affirms and attests as follows:

1. I am over 18 years old, competent to make this Declaration, and if I were called to testify, I would do so consistently with the statements and opinions made herein.

2. I submit this declaration in support of Defendants' opposition to the Motion for Partial Summary Judgment (Doc. 239) filed by Labor Smart, Inc. and Third-Party Defendants Holley, McBride, Pavlik, and Zarro (the "LTNC Parties").

3. I have reviewed evidence, including deposition testimony and significant documentation, in order to make the attestations in this Declaration. I am not relying solely on opinions, but providing the Court what I believe is truly disputed evidence for the claims my wife and I have made in this litigation.

/ / /

**Facts Related to Realignment of the Parties and Abuse of Process**

4. This case obviously began when Takeover, under my charge as President, sued Michael Holley for misappropriating Takeover's assets and grossly overpaying himself. At that time, myself, Takeover, Labor Smart, McBride, and Pavlik were all "aligned" against Holley. At that time, I had no idea about McBride's complicity in Holley's theft/misappropriation,

5. Once I started learning, through discovery in this case, that Holley, McBride and Pavlik were all colluding to commit wrongdoing, things changed. Suddenly, Holley, McBride, and Pavlik all "realigned." Shortly after, they began working with Zarro, and these gentlemen were all "aligned" at the time they caused Labor Smart to file the Realignment in this lawsuit (even though Zarro was not technically a party to the suit yet).

6. At the time of Realignment, we had no idea that Zarro had "mediated" settlement of the Florida Lawsuit, which made him a voting shareholder and officer in Labor Smart and Takeover.

7. Nobody asked me for input into the settlement of the Florida Lawsuit, despite that I still held 17 preferred (voting) shares of Labor Smart at that time. I was not part of the vote when Holley, McBride, Pavlik, and Zarro all worked together and agreed that Labor Smart would pay eight hundred and twenty million shares of Labor Smart stock to get Holley, McBride, and Pavlik out of the personal claims against them.

8. Zarro later used his position in Labor Smart to convert a loan he had made to Takeover into a Note with Labor Smart (and for significantly more money than it was originally), just prior to Takeover filing Bankruptcy.

**Facts Related to Labor Smart's Claims**

9. When Labor Smart first became the "Plaintiff" in this lawsuit, I submitted significant evidence to Labor Smart that disproved the claims against me for Conversion

and Breach of Fiduciary Duties arising out of an alleged "theft" of Takeover funds.

10. In particular, I provided evidence:

a. The wire transfer of Takeover funds into my business account while Holley was hospitalized and I did not have access to pay bills out of Takeover's bank account ($95,000 received);

b. A wire transfer receipt showing I immediately deposited $25,000 into Takeover's bank account to ensure coverage of liabilities that would be automatically debited from Takeover;

c. A wire transfer receipt showing I paid a $10,000 payment to VGC, LLP, who was engaged to do a forensic analysis of Takeover's books and records, along with the engagement letter for VGC, LLP;

d. A wire transfer receipt showing I paid $25,000 due and owed to Nappy Boy Entertainment on a written contract with Takeover;

e. A wire transfer receipt showing I remitted an additional $15,000 back into the Takeover account to cover additional responsibilities that would be debited from the company; and

f. Testimony that McBride authorized me to keep the remaining $20,000 as it was owed to me as compensation I had earned but had not yet been paid.

11. For **<u>two and a half years</u>**, my counsel continued to ask Labor Smart counsel what the claim(s) were against me, given the proof that I never stole a penny from Takeover. Labor Smart admitted, at the time of depositions, that it never even looked at the evidence or authenticated anything in 2 ½ years.

12. Almost immediately following the depositions in this case, and both Holley and Zarro admitting (as the designated 30(b)(6) Representatives of Labor Smart) that they failed to analyze any evidence against me, the Labor Smart Parties finally dismissed their

claims. This came after multiple threats of Rule 11 and 28 USC §1927 sanctions.

**Facts Related to Interference with Stock Restriction Removal and Blackmail**

13. On April 1, 2024, and while this lawsuit was pending, Labor Smart received its "current" status and became eligible for trading on the open ("OTC") markets. At that time, the trade price was listed at .0094, which I will demonstrate at trial in reliance on the historical price index that is publicly available and published online (and was disclosed in this case as TUCKER002958-002986). I am only referencing it and not attaching more documentation for the sake of efficiency.

14. Immediately after the current status, I contacted Clear Trust, the transfer agent used by Labor Smart, to have the "restrictions" placed on both mine and my wife's shares of Labor Smart stock removed so that we could begin selling on the open market. Clear Trust sought approval from Labor Smart, which was controlled by Holley and Zarro at that time, to remove the restrictions. These Labor Smart Parties refused to allow removal of the restrictions, making up multiple excuses for over 3 months.

15. First, these Labor Smart Parties claimed they had no proof that we owned any of the shares I had purchased from Pavlik in 2021. They further claimed they had no proof of the 10,000,000 shares Labor Smart gave to my wife as a bonus for work her company performed to market Labor Smart. Although Labor Smart would have been required to maintain its own records of share transfers, we still provided proof.

16. Next, Labor Smart argued that I could not sell because I was an "Affiliate" of Labor Smart, such that the restriction should not be lifted. At this time, I had not been acting as an officer (President) of Takeover for well more than a year, nor had I been acting as a Labor Smart Director for over a year-and-a-half. This was just a game.

17. My wife and I were required to engage outside legal counsel, a Securities lawyer, to "fight" with Labor Smart and Holley and Zarro about the improper restrictions and Labor Smart's failure to remove. We spent thousands of dollars on outside counsel

opinion letters in a back-and-forth campaign with Labor Smart's Securities counsel.

18. By May 7, 2024, I further made written demand to Labor Smart, Holley, Pavlik, and Zarro regarding the July 2021 Agreement that triggered the duty for me to receive an **additional** 750,000,000 shares of common LTNC stock and preferred shares.

19. In June 2024, Labor Smart Board Member Sequeira, who is not a party to the lawsuit, began reaching out to me independently seeking to settle this lawsuit and promising me that Labor Smart would release the restrictions on my shares if I would agree to "walk away" from this lawsuit. Mr. Sequeira further wanted me to sell shares to him and Zarro. They wanted to make sure I would have no voting power in Labor Smart.

20. I called out Zarro and Sequeira for extortion or blackmail.

21. Shortly after that, and by July 1, 2024, Labor Smart finally removed the restriction on the shares held by myself and my wife.

22. Between the opening price (.0094) and the date of removal in July, the share price had plummeted to .0045. Melissa and I collectively owned 450,000,000 shares at that time – without regard to the 750,000,000 shares still owed to use, and the loss of time between the opening price and July 1, 2024 price caused at least $1.7Million in damages to us.

**Facts Related to Shares in Takeover (25% ownership of the Company)**

23. I was promised 25% ownership of the shares in Takeover at the time I agreed to join the company as an officer rather than just a consultant (June 2021). At that time, I had no idea that Holley and McBride had already "sold" all of Takeover's shares to Labor Smart.

24. Holley, McBride, Pavlik, and I all reduced our agreements to a written "July 2021 Agreement," which was executed by all of us, and which each of these men agree they signed/entered.

25. The written and executed agreement makes it clear that I was intended to be

a shareholder in Takeover and was, in fact, a 25% owner despite the lies and fraud.

26. Once I learned of the fraud, which was roughly in the spring of 2022, I made sure Takeover's shares were properly documented on the books of Takeover, which is what is represented in the LTNC Parties' Ex. 19 attached to their motion. It is not true that I first became a Takeover shareholder in May 2022 as argued; Ex. 19 was simply correcting documentation of the issuance of my 25% stake that I was given in June 2021.

27. No matter when I became a shareholder of Takeover, the reality is that I owned 25% of Takeover at the time I was ousted. I had Takeover profitable and with a good trajectory toward growth in late 2022, with a guaranteed investor aboard giving us financing to grow.

28. When Holley, McBride, and Pavlik staged the "takeover," I was still a shareholder **and** had nearly $200,000 of earned (but unpaid) salary owed to me on the books of Takeover. That is compensation owed simply for the $20,000 per month I had been taking – it ignores that I should have gotten "equal" to what Holley and McBride had paid themselves. I made sure this deferred compensation was listed as a debt of Takeover on its books, even though I forewent certain payments to ensure Takeover's growth.

**Facts Related to Battleship Stance and Oak Creek Wellness**

29. Battleship Stance, Inc. and Oak Creek Wellness, Inc. are two business entities that are owned 100% by my wife and me. Each of us elected to have shares issued to us, personally, put into the names of our business entities for formalities sake. However, if there is any issue or question whether we are permitted to, individually, seek damages for losses to Battleship Stance or Oak Creek Wellness, we can easily provide an Assignment from each company to the two of us, individually. This would not require others' involvement or voting. These are not public entities and there are no other shareholders, officers, or directors of either entity besides Melissa Tucker and myself.

/ / /

**Facts Related to Fraudulent Transfer and Additional Fraudulent Transfer**

30. There is undisputed evidence, including the underlying source code documentation, proving that NextGen literally "ported" the Takeover ecommerce website 100%. Both my wife (who specifically works in digital marketing and search engine optimization "SEO" of websites) and I (working as an intellectual property expert) can provide testimony relying on the source code, the Google "direct shopify link" historical data, the contact page information, and the ImmuniWeb Website Security test information (all disclosed to the LTNC Parties) as evidence of a direct porting. We will further be able to explain how the shopify ecommerce account taken from Takeover to NextGen contains all of the customer data, email lists, and sales data that was owned by Takeover.

31. In connection with this case, I have continued to monitor public filings, press releases, OTC disclosures, and related materials for Labor Smart. In doing so, I discovered that Labor Smart publicly announced a transaction (that was later consummated) for Labor Smart to acquire 100% of Go Fast Sports & Beverage Co. in or about 2024. Labor Smart publicly described that it would pay for this acquisition by issuing 400,000,000 shares of LTNC common stock.

32. Labor Smart later listed in its annual report that it purchased "Go Fast" by paying the 400,000,000 shares, a $1,083,000 convertible note, a $250,000 cash payment, and an assumption of certain liabilities.

33. The various public transaction summaries reflect that Labor Smart acquired and developed additional beverage brand and operating assets, and then in August 2025, Labor Smart transferred **all** of its beverage assets, including brand assets, trademarks, inventory, and related rights to Golden Triangle Ventures, Inc. ("Golden Ventures").

34. Public disclosures demonstrate that during the time of these transfers,

Labor Smart was in a position of financial distress and was also a party to **three** ongoing pieces of litigation, including this lawsuit.

35. The various disclosures of information show that officers and directors of Labor Smart, including Zarro were involved in control positions, equity ownership positions, and/or were the majority shareholders of Labor Smart prior to the transfer and then Golden Venture after the transfer(s).

36. Public information reflects that the very products previously marketed within the Labor Smart/Takeover/NextGen ecosystem later appeared as Golden Venture affiliated entity products. Public-facing materials reflect overlapping product categories, marketing and branding themes, and promotional positioning across these offerings.

37. These transactions were intentionally consummated after the close of discovery in this lawsuit, making it impossible to expose the continued fraud and fraudulent transfer at the time, but this Court can certainly take judicial notice of the public filings, and I would like to be permitted to testify at trial that the LTNC Parties simply believe litigation is a joke and that they can continue committing fraud.

Further affiant sayeth naught.

Jason Tucker

Date: March 23, 2026